# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No. CR 14-0747 JB

LYLE WOODY BEGAY,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant Lyle Woody Begay's Motion to Suppress Statement and Supportive Memorandum, filed July 22, 2014 (Doc. 28)("Suppression Motion"); and (ii) the United States' Motion to Exclude Expert Testimony from Suppression Hearing, filed August 16, 2017 (Doc. 128)("Exclusion Motion"). The Court held evidentiary hearings on August 17-18, 2017, and on November 20, 2017. The primary issues are: (i) whether Dr. Richard Leo, a Professor of Law and Psychology at the University of San Francisco School of Law, may offer expert testimony regarding police interrogation tactics; (ii) whether Dr. Leo may offer expert testimony regarding false confessions; (iii) whether Eric Lucero, a former New Mexico State Police officer and certified polygraph examiner, may offer expert testimony regarding polygraph examinations; (iv) whether Defendant Lyle Woody Begay's July 18, 2013, interview was a custodial interrogation; (v) whether Begay's statements during the July 18, 2013, interview were voluntary; (vi) whether Begay's July 19, 2013, interview was a custodial interrogation; (vii) whether Begay's statements during the July 19, 2013, interview were voluntary; (viii) whether Begay validly waived his

<u>Miranda</u>[1] rights during the July 30, 2013, interview; and (ix) whether Begay's statements during the July 30, 2013, interview were voluntary. The Court concludes that: (i) Dr. Leo may testify about police interrogation tactics generally, but not about the application of such techniques to this case; (ii) Dr. Leo may not testify regarding false confessions, because the United States Court of Appeals for the Tenth Circuit has indicated that such testimony is unreliable; (iii) the Court will exclude Lucero's testimony, because it is irrelevant; (iv) Begay's July 18, 2013, interview was not a custodial interrogation; (v) Begay's statements during the July 18, 2013, interview were voluntary; (vi) Begay's July 19, 2013, interview was not a custodial interrogation; (vii) Begay's statements during the July 19, 2013, interview were voluntary; (viii) Begay validly waived his <u>Miranda</u> rights during the July 30, 2013, interview; and (ix) Begay's statements during the July 30, 2013, interview were voluntary. Accordingly, the Court will deny the Suppression Motion and grant in part and deny in part the Exclusion Motion.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. <u>See</u> Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments.  In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)[2]("We need not resolve whether Crawford [v. Washington, 541 U.S. 36 (2004)]'s[3] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"); United States v. Ramirez,

---

[2]United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court concludes that United States v. Garcia, United States v. Medrano, 356 F. App'x 102 (10th Cir. 2009)(unpublished), and United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished) have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[3]Crawford v. Washington stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at a criminal trial unless the declarant is unable to testify and the defendant had a previous opportunity to cross examine the declarant.  See 541 U.S. at 53-54.

388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."). <u>Cf.</u> <u>United States v. Hernandez</u>, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that <u>Crawford v. Washington</u> does not apply to detention hearings").

**1. The FBI Interviews.**

1. On July 18, 2013, FBI Special Agent Matthew Schaeffer and Navajo Nation Criminal Investigator Darryl Boyd were investigating allegations that Begay had sexually abused a minor named Liberty Davis, Begay's niece. <u>See</u> Transcript of Recorded Interview of Lyle Woody Begay at 7:9-16 (Schaeffer, Begay); <u>id.</u> at 52:1-2 (Schaeffer); <u>id.</u> at 56:1-11 (Schaeffer, Begay)(taken July 18, 2013)("First FBI Tr.").

2. On July 18, 2013, Schaeffer and Boyd knocked on the door of Begay's home in Lukachukai, Arizona. <u>See</u> United States' Response in Opposition to Defendant's Motion to Suppress Statement at 1, filed August 11, 2014 (Doc. 35)("Suppression Response"); <u>See</u> Draft Transcript of Hearing at 164:25; 165:1 (taken August 17, 2017)(Schaeffer)("First Hearing Tr.").[4]

3. Schaeffer identified himself as an FBI agent with his credentials while standing at Begay's door. <u>See</u> First Hearing Tr. at 164:10-17 (Schaeffer, Wilson).

4. Schaeffer was dressed in plainclothes. <u>See</u> First Hearing Tr. at 164:10-17 (Schaeffer, Wilson).

5. Schaeffer's firearm was not visible. <u>See</u> First Hearing Tr. at 164:10-17

---

[4]The Court's citations to the transcripts of the three days of evidentiary hearings refer to the Court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

(Schaeffer, Wilson).

6. Schaeffer introduced Boyd as a tribal investigator. <u>See</u> Draft Transcript of Hearing at 22:2-8 (taken August 18, 2017)(Wilson, Boyd)("Second Hearing Tr.").

7. Boyd's badge and firearm were visible. <u>See</u> Second Hearing Tr. at 22:12-14 (Boyd).

8. Schaeffer asked Begay if he would be willing to speak to Schaeffer and Boyd, and Begay agreed to talk to Schaeffer and Boyd inside Schaeffer's Chevrolet Suburban. <u>See</u> Suppression Response at 1; First Hearing Tr. at 165:14-17 (Schaeffer, Wilson).

9. Begay entered the Suburban voluntarily. <u>See</u> Second Hearing Tr. at 24:3-9 (Boyd).

10. Schaeffer sat in the driver's seat of the Suburban, Boyd sat in the back seat, and Begay sat in the front passenger seat. <u>See</u> Suppression Response at 2; First Hearing Tr. at 165:18-25 (Schaeffer, Wilson); <u>id.</u> at 166:1-2 (Schaeffer, Wilson).

11. Schaeffer closed the Suburban's doors and windows, and told Begay that he closed them to use the Suburban's air conditioner. <u>See</u> First Hearing Tr. at 166:13-17 (Schaeffer).

12. The Suburban's doors were not locked. <u>See</u> Second Hearing Tr. at 24:11-15 (Boyd).

13. An M-4 carbine assault rifle was mounted on a rack inside the vehicle, but at no point during Begay's interview did Schaeffer touch the M-4. <u>See</u> First Hearing Tr. at 167:16-24 (Schaeffer, Wilson).

14. Begay did not see the M-4.[5] <u>See</u> First Hearing Tr. at 210:11-23 (Schaeffer).

---

[5]Although the Court can determine that the M-4 carbine was in the vehicle, there is

15.     "[N]either SA Schaeffer nor CI Boyd brandished their weapon at any time, nor did they threaten Defendant with physical force."  Suppression Response at 8.

16.     Begay was not arrested or handcuffed during the interview.  See First Hearing Tr. at 168:1-14 (Schaeffer, Wilson); Second Hearing Tr. at 24:3-9 (Boyd).

17.     Schaeffer informed Begay that he was not under arrest, that if Begay wanted to stop the interview or to not answer a question, he could do those things, and that Begay was free to leave.  See First Hearing Tr. at 168:1-14 (Schaeffer, Wilson).

18.     Neither Schaeffer nor Boyd read Begay his Miranda[6] rights during the July 18,

_____

evidence that Begay did not see it.  Schaeffer testified that:

> I wasn't trying to hide the weapon, so [Begay] may have seen it, but I find it hard to believe that [Begay] did see the weapon in the car . . . .  [T]he way the firearm is stored in the vehicle in order for Mr. Begay [to] actually see that firearm he would have to completely turn around and look toward the back seat to be able to see that firearm, and I was watching him the entire time and I don't ever recall him actually doing that.

First Hearing Tr. at 210:11-23 (Schaeffer).

[6]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444). The Supreme Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

2013 interview.  <u>See</u> Second Hearing Tr. at 49:10-12 (Samore, Boyd).

19.     Begay confirmed that the interview was voluntary.  <u>See</u> First FBI Tr. at 3:19 (Begay).

20.     Begay was articulate during the July 18, 2013, interview.  <u>See</u> First Hearing Tr. at 168:24-25 (Schaeffer); Second Hearing Tr. at 25:16-17 (Boyd).

21.     At no point in the interview did Begay say that he did not understand Schaeffer's questions.  <u>See</u> First Hearing Tr. at 169:3-5 (Wilson, Schaeffer).

22.     Begay never said that he wanted to leave the vehicle.  <u>See</u> First Hearing Tr. at 175:15-18 (Wilson, Schaeffer).

23.     Begay never asked for an attorney during the July 18, 2013, interview.  <u>See</u> First Hearing Tr. at 176:9-11 (Wilson, Schaeffer).

24.     During the interview, Begay admitted to or implied that he engaged in sexual acts with the alleged victim, Davis.  <u>See</u> First FBI Tr. at 58:17-25 (Begay, Schaeffer); <u>id</u>. at 77:21-25 (Schaeffer, Begay); <u>id</u>. at 78:1-2 (Begay).

25.     The July 18, 2013, interview lasted approximately three hours.  <u>See</u> First FBI Tr. at 3:4 (Schaeffer); <u>id</u>. at 135:19-20 (Schaeffer).

26.     The next day, July 19, 2013, Begay, unexpectedly and without an appointment, traveled to the FBI office in Gallup, New Mexico to speak with Schaeffer.  <u>See</u> Suppression Response at 3; Transcript of Recorded Interview of Lyle Woody Begay at 3:1-8 (taken July 19, 2013)(Schaeffer)("Second FBI Tr.").

27.     Schaeffer and Begay spoke by themselves.  <u>See</u> Second FBI Tr. at 3:4-8 (Schaeffer).

28.     Schaeffer informed Begay  that "he didn't have to answer questions that he didn't

want to," that he was not under arrest, and that Begay could end the interview and leave at any point. First Hearing Tr. at 178:23-25 (Schaeffer, Wilson); id. at 179:1-3 (Schaeffer, Wilson).

29. Schaeffer did not read Begay his Miranda rights during the July 19, 2013 interview. See generally Second FBI Tr. (Schaeffer, Begay).

30. Begay stated that he came to the FBI office voluntarily. See Second FBI Tr. at 3:8-10 (Schaeffer, Begay).

31. Begay never asked to stop speaking to Schaeffer, to leave the FBI office, or to speak with an attorney. See First Hearing Tr. at 179:15-21 (Wilson, Schaeffer).

32. Begay said he felt coerced into answering Schaeffer's questions the previous day, see Second FBI Tr. at 13:12-14 (Begay), but he also stated that he participated in the previous day's interview voluntarily, see Second FBI Tr. at 14:2 (Begay).

33. Begay had just awakened when Schaeffer and Boyd had arrived the previous day, and "wasn't mentally prepared for those questions." Second FBI Tr. at 52:24-25 (Begay); id. at 53:2-4 (Begay).

34. Schaeffer asked Begay if Begay was willing to take a polygraph examination, and Begay agreed to take a polygraph. See First Hearing Tr. at 181:17-21 (Wilson, Schaeffer).

35. Begay felt that, because of the FBI's authority, the FBI expected him to take a polygraph examination. See Second Hearing Tr. at 105:11-16 (Begay); id. at 105:8-10 (Begay).

36. The July 19, 2013, interview lasted approximately 1.5 hours. See Second FBI Tr. at 3:3-4 (Schaeffer); id. at 71:23 (Schaeffer).

37. On July 30, 2013, Begay returned to the Gallup FBI office to take a polygraph examination. See Suppression Response at 4; Second Hearing Tr. at 100:25 (Begay).

38. Begay spoke with FBI Special Agent Jennifer Sullivan, who read to Begay from

an FBI Consent to Interview with Polygraph form.  See First Hearing Tr. at 14:20-25 (Sullivan);

id. at 15:1-5 (Sullivan); Consent to Interview with Polygraph at 1 (dated July 30, 2013)

(Government's Hearing Ex. 8)("Polygraph Consent Form").

> 39.    The Polygraph Consent Form states:

> Before we begin an examination by means of the polygraph in connection
> with the fondling of Liberty Davis you must understand your rights.

> ### YOUR RIGHTS

> You have the right to refuse to take the polygraph test.
> If you agree to take the polygraph test, you have the right to stop the test at
> anytime.
> If you agree to take the polygraph test, you have the right to refuse to answer
> any individual question.

> ### WAIVER AND CONSENT

> I have read this statement of my rights and I understand what my rights are.  I
> voluntarily agree to be examined by means of the polygraph during this
> interview.  I understand and know what I am doing.  No threats or promises
> have been used against me to obtain my consent to the use of the polygraph.  I
> understand that the polygraph examination may be monitored or recorded.  I
> understand that any attempt on my part to utilize polygraph countermeasures
> will be construed as purposeful non-cooperation. With the above
> understanding, I agree to submit to a polygraph examination.

Polygraph Consent Form at 1.

> 40.    Sullivan read to Begay the portions of the Polygraph Consent Form "all the way

down to the waiver," and Begay read the part of the form labeled "waiver and consent."  First

Hearing Tr. at 136:15-18 (Samore, Sullivan).  See Polygraph Consent Form at 1.

> 41.    Sullivan then read to Begay the portions of the FBI's Advice of Rights form

listing Begay's Miranda rights, see Advice of Rights at 1 (dated July 30, 2013)(Government's

Hearing Ex. 7)("Miranda Form"), down to the part labeled "consent," and Begay read the

"consent" section of the form.[7]  See First Hearing Tr. at 136:21-22 (Sullivan); Miranda Form at 1.

       42.     The Miranda Form reads:

**YOUR RIGHTS**

Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

**CONSENT**

I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

Miranda Form at 1.

       43.     Begay signed the Polygraph Consent Form.  See Polygraph Consent Form at 1.

       44.     Begay also signed the Miranda Form.  See Miranda Form at 1.

       45.     Begay read and understood the Miranda Form and the Polygraph Consent Form.

---

[7]The Court recognizes that Begay's testimony contradicts Sullivan's.  Begay testified that Sullivan did not read the Polygraph Consent Form to him, but rather "explained what it was and kind of left it for me to read myself."  Second Hearing Tr. at 77:12-14 (Begay).  Begay further testified that, when Sullivan showed him the Miranda Form, "at no point in time did she have me recite anything, nor did she read anything off of the form or anything."  Second Hearing Tr. at 130:12-14 (Begay).  The Court accepts Sullivan's version of events, because Sullivan, who is now a retired FBI agent, see First Hearing Tr. at 5:10 (Sullivan), has nothing to gain from potentially perjuring herself, whereas Begay has charges pending against him, and has incentive to lie.  The Court observed Sullivan's and Begay's demeanor on the stand, and found Sullivan credible when her testimony differed from Begay's, and did not find Begay credible when he differed from Sullivan.  That Begay contradicted his testimony of having read and understood the Polygraph Consent Form, see Second Hearing Tr. at 99:17-21 (Nayback, Begay)(stating that he read and understood the Miranda Form and the Polygraph Consent Form); Second Hearing Tr. at 108:15-17 (Begay)(stating "I skimmed through [the Polygraph Consent Form] not having [read] and comprehended word for word as I did and do [right] now")(alterations added), also underscores his credibility in relation to Sullivan's.

46.     Begay signed the forms, because he was "well within the FBI headquarters" at the time that he signed them, and felt that he "need[ed] to go along with what these guys are . . . expecting."  Second Hearing Tr. at 115:3-6 (Begay).

47.     Begay had never signed a form waiving his <u>Miranda</u> rights before July 30, 2013. <u>See</u> Second Hearing Tr. at 80:18-21 (Samore, Begay).

48.     Begay never indicated in any way that he did not want to keep speaking with Sullivan.  <u>See</u> First Hearing Tr. at 151:1 (Sullivan).

49.     Begay never asked for a lawyer when speaking with Sullivan.  <u>See</u> First Hearing Tr. at 30:5-11 (Sullivan).

50.     During this interview, Sullivan did not have a gun or a visible badge.  <u>See</u> First Hearing Tr. at 12:1-3 (Sullivan).

51.     Part of Sullivan's interrogation technique is to "use charm and verbal skill and body language . . . to win over the trust of the person [she is] interviewing."  First Hearing Tr. at 104:3-6 (Samore, Sullivan).

52.     The FBI did not force Begay to take a polygraph examination, but Begay felt that

---

[8]The Court recognizes that Begay later contradicted his testimony of having read and understood at least one of these two forms.  When first asked if he had read the <u>Miranda</u> Form and the Polygraph Consent Form, he responded "I read them."  Second Hearing Tr. at 99:17-19 (Nayback, Begay).  When asked if he understood them, he responded "Yes."  Second Hearing Tr. at 99:21 (Nayback, Begay).  Begay later contradicted himself, however, stating, "I skimmed through [the Polygraph Consent Form] not having [read] and comprehended word for word as I did and do [right] now."  Second Hearing Tr. at 108:15-17 (Begay)(alterations added).  Given that Begay at one point testified that he read and understood both forms, and that Sullivan testified, regarding the <u>Miranda</u> Form, that "when we went over the form and he was advised of his rights, I certainly understood that he knew what each of the rights meant," First Hearing Tr. at 136:5-7 (Sullivan), the Court finds that Begay read and understood the forms.  The Court accepts Sullivan's version of events, because Sullivan, who is now a retired FBI agent, <u>see</u> First Hearing Tr. at 5:10 (Sullivan), has nothing to gain from potentially perjuring herself, whereas Begay has charges pending against him, and has incentive to lie.

he was well within the FBI office and that "in order to make [his] way back out . . . [he] need[ed] to do what's expected of [him]." Second Hearing Tr. at 106:2-14 (Begay, Nayback).

53. Begay understood how a polygraph worked. <u>See</u> Second Hearing Tr. at 81:4-12 (Samore, Begay).

54. Sullivan explained to Begay how a polygraph examination worked, but then she pushed the polygraph equipment aside, and told Begay that he did not want to take the polygraph examination, because "it picks up on the slightest bit of deception." Second Hearing Tr. at 82:10-15 (Begay).

55. Ultimately, "a polygraph test was not administered to Mr. Begay." Draft Transcript of Hearing at 34:15-16 (taken November 20, 2017)(Lucero)("Third Hearing Tr.").

56. Sullivan then stated that Begay's alleged crimes were "not a big deal," because they "happened so long ago," and that "maybe we can get this settled," with the implication that Begay should tell her what happened. Second Hearing Tr. at 84:19-25 (Begay); <u>id</u>. at 85:1-3 (Begay).

57. Sullivan "was very talkative and she had almost more to say than [Begay] did, in fact anytime [Begay] had a chance to speak she would . . . stop [Begay] and . . . imply and suggest . . . whatever direction she wanted to take it." Second Hearing Tr. at 136:9-13 (Begay).

58. Sullivan did not yell at Begay, but she made "little outbursts here and there . . . where she was displease[d] at what [Begay] was saying." Second Hearing Tr. at 140:6-11 (Nayback, Begay).

59. Sullivan never made any promises of leniency or family counseling to Begay.

See First Hearing Tr. at 33:8-13 (Nayback, Sullivan).[9]

60.    Begay "felt as though that if [he] didn't answer according to her that [he] wasn't going to be able to leave."  Second Hearing Tr. at 95:14-16 (Begay).

61.    Begay was articulate during the July 30, 2013, interview.  See First Hearing Tr. at 148:10-16 (Sullivan, Nayback).

62.    Sullivan's interview with Begay lasted about three hours.  See Second Hearing Tr. at 136:9-13 (Begay).

63.    After Sullivan's interview ended, another interview began in which Schaeffer, Sullivan, Boyd, and Begay participated, and this interview -- unlike Sullivan's interview -- was recorded.  See Suppression Response at 4; Transcript of Recorded Interview of Lyle Woody Begay at 3:1-2 (taken July 30, 2013)(Schaeffer)("Third FBI Tr.").

64.    The recorded July 30, 2013, interview lasted approximately 1.5 hours.  See Third FBI Tr. at 3:2 (Schaeffer); id. at 65:1 (Schaeffer).

65.    During the recorded interview on July 30, 2013, Begay never asked to stop answering questions, to stop talking, to speak with an attorney, or to leave.  See First Hearing Tr. at 189:4-15 (Wilson, Schaeffer); Second Hearing Tr. at 32:17-24 (Wilson, Boyd).

---

[9]Begay's testimony contradicts Sullivan's. According to Begay, Sullivan said that, if Begay confessed that he was an adult when he allegedly molested Davis, and that he sexually desired to molest her, then Sullivan could get Begay's family some form of help such as family counseling.  See Second Hearing Tr. at 93:12-25 (Begay); id. at 94:1-22 (Begay); id. at 95:10-14 (Begay).  In contrast, when Sullivan was asked if she made "any promises of leniency such as counseling or family therapy," First Hearing Tr. at 33:8-10 (Nayback), Sullivan responded: "Never. I don't do that. I've never done that. Nor was there any discussion about family counseling." First Hearing Tr. at 33:11-13 (Sullivan).  The Court accepts Sullivan's version of events because, as explained above, Sullivan is now a retired FBI agent, see First Hearing Tr. at 5:10 (Sullivan), and has nothing to gain from potentially perjuring herself, whereas Begay has charges pending against him, and has incentive to lie.  If Sullivan had said that she sometimes makes promises of leniency, but did not here, then Begay's testimony might have some weight, but given that Sullivan testified that she never makes such promises, and Begay offers no evidence that she has done so in other cases, the Court credits Sullivan's testimony.

66.     Begay was never handcuffed or arrested during this interview.  <u>See</u> First Hearing Tr. at 189:4-15 (Wilson, Schaeffer).

67.     During the recorded portion of the July 30, 2013, interview, Begay admitted to engaging in sexual acts with Davis.  <u>See</u> Third FBI Tr. at 11:1-8 (Begay); <u>id</u>. at 11:14-19 (Begay); <u>id</u>. at 26:20-22 (Sullivan, Begay).

68.     Begay received a GED in 2006.  <u>See</u> Suppression Motion at 1.

69.     During the FBI interviews, Begay was approximately twenty-six years old.  <u>See</u> Suppression Response at 11.

**2.      <u>Dr. Leo's Testimony</u>.**

70.     Dr. Leo is a Professor of Law and Psychology at the University of San Francisco School of Law.   <u>See</u> Richard A. Leo Hamill Family Chair Professor of Law and Social Psychology and Dean's Circle Scholar at 1 (Defendant's Hearing Ex. O)("Leo Biography").

71.     "Dr. Leo is one of the leading experts in the world on police interrogation practices, the impact of *Miranda*, psychological coercion, false confessions, and the wrongful conviction of the innocent."  Leo Biography at 1.

72.     "Dr. Leo has authored more than 100 articles in leading scientific and legal journals as well as several books."  Leo Biography at 1.

73.     Dr. Leo was previously a professor at both the University of California, Irvine and the University of Colorado, Boulder.  <u>See</u> Leo Biography at 1.

74.     Approximately thirty-five years of empirical research and dozens of peer-reviewed books exist on the topic of police interrogations.  <u>See</u> Second Hearing Tr. at 176:19-25 (Leo).

75.     "[N]obody in the social sciences disputes that [the study of police interrogations]

is a valid and recognized area of empirical social science." Second Hearing Tr. at 190:16-18 (Leo).

76.     "There are five or six empirical methods that social scientists use" to study interrogation tactics. Second Hearing Tr. at 191:13-14 (Leo). These methods include field research, observational research, laboratory experiments, analysis of documents or archival research, interviews, and survey studies. See Second Hearing Tr. at 191:14-24 (Leo).

77.     In using these methods, Dr. Leo explained that "we gather data, we form hypotheses, gather data, go out and get that data, write it up, [and] submit it for peer review." Second Hearing Tr. at 192:5-7 (Leo).

78.     "[T]here has been peer review, there has been training, there has been substantial research and publication going back many years" on the study of police interrogation tactics. See Second Hearing Tr. at 192:14-16 (Leo).

79.     The study of police interrogations is generally accepted in the social scientific community. See Second Hearing Tr. at 177:15 (Leo).

80.     Dr. Leo has published dozens of peer-reviewed articles, several books, and has "been researching and writing in this area longer than almost anyone else." Second Hearing Tr. at 178:1-5 (Leo).

81.     Regarding the application of police interrogation techniques to this case, Dr. Leo's methodology involves listening to interrogation recordings, studying the transcripts,

> identifying which techniques were used, and what I think about those techniques
> in light of the issues that the attorney directs me to. If there is a fully recorded
> interrogation, then it's all there. I'm just really applying my expert knowledge in
> evaluating the research techniques and the risks that may have been created, or
> anything else that somebody with expert knowledge would see and be concerned
> about one way or the other.

Second Hearing Tr. at 210:7-15 (Leo). If the interrogation was not recorded, Dr. Leo's

methodology involves interviewing those present at the interrogation. See Second Hearing Tr. at 210:16-25 (Leo).

82.　　Dr. Leo has testified as an expert witness approximately 300 times over the past twenty years. See Second Hearing Tr. at 179:15 (Leo).

83.　　The police interrogation process is not designed for innocent people; rather "it's designed for guilty people to move them from denial to admission." Second Hearing Tr. at 187:17-20 (Leo).

84.　　Police officers "are taught and trained to make a judgment that somebody is guilty [of the] crime before they interrogate . . . and that the goal of the interrogation is to get a confession." Second Hearing Tr. at 192:5-10 (Leo).

85.　　Police officers are often taught various techniques to get a confession, including, first, "to convince the suspect he or she is caught; the evidence establishes their guilt . . . [and] there is no way [out]," Second Hearing Tr. at 195:4-6 (Leo), and, second, to induce "a suspect to think that it's to their advantage, to their benefit, whether for moral or psychological or legal or other reasons to confess," Second Hearing Tr. at 195:9-12 (Leo).

86.　　Another interrogation technique is to minimize a confession's consequences or to magnify the consequences of refusing to confess. See Second Hearing Tr. at 194:4-9 (Leo).

87.　　Sullivan's unrecorded July 30, 2013, interview with Begay "was a guilty presumptive interrogation." Second Hearing Tr. at 215:1-2 (Leo).

88.　　Begay's July 30, 2013, interview was not a polygraph pre-test,[10] but, rather, was

_____

[10]According to Lucero, in a polygraph pre-test, the examiner establishes that the examinee is suitable for a polygraph, explains to the examinee how a polygraph works, and ensures that the examinee knows about the allegations against him. See Third Hearing Tr. at 25:3-7 (Lucero).

an interrogation.  See Second Hearing Tr. at 216:17-19 (Leo).

89.     "[I]nterrogators are trained when somebody says they don't remember a crime, don't tell them they remember. That increases the risk [of] false confessions."  Second Hearing Tr. at 232:15-17 (Leo).

90.     Regarding the frequency of false confessions,

We cannot say how frequently [false confessions] occur, because there is no database maintained by the government or a private organization that makes all police interrogations available to us, from which we could do a random sample and then come up with an error rate or, you know, a false confession rate.

Second Hearing Tr. at 223:17-23 (Leo)(alteration added).

91.     Although social scientists have documented hundreds of false confessions, "[w]hen we document a proven false confession, it's very hard to prove the negative.  You'd have to show it was physically impossible for somebody to commit a crime . . . or you have to show that no crime occurred."  Second Hearing Tr. at 224:1-6 (Leo).

92.     "[T]here are lots of confessions where there is an allegation that it's false, and we can't prove it one way or another.  So when I say we prove -- we have hundreds of proven false confessions, these have to be the tip of the iceberg, because oftentimes you just don't know."  Second Hearing Tr. at 224:16-21 (Leo).

93.     "There is a type of false confession where the person admits to something despite having no memory."  Second Hearing Tr. at 232:18-22 (Leo).

94.     A sign of this kind of false confession is conditional or subjunctive language where the suspect says "I could have done this, I probably did this.  I would have done that, I might have done the other."  Second Hearing Tr. at 232:24-25 (Leo); id. at 233:1 (Leo).

**3.      Eric Lucero's Testimony.**

95.     Eric Lucero is a former New Mexico State Police officer and a certified

polygraph examiner.  See Resume at 1 (Defendant's Hearing Ex. U).

96.     Lucero attended the Backster School of Lie Detection,[11] where he received polygraph training.  See Third Hearing Tr. at 6:8-11 (Lucero).

97.     Lucero has testified in New Mexico state courts fifty-seven times, see Third Hearing Tr. at 11:4-5 (Lucero), and in federal courts three times, see Third Hearing Tr. at 10:23-24 (Lucero).

98.     In a polygraph pre-test, the examiner establishes that the examinee is suitable for a polygraph, which involves determining the examinee's education level, health, and the presence or absence of psychological disorders, see Third Hearing Tr. at 19:13-18 (Lucero), explains to the examinee how a polygraph works, and ensures that the examinee knows about the allegations against him, see Third Hearing Tr. at 25:3-7 (Lucero).

99.     A polygraph pre-test interview usually takes twenty or thirty minutes, and in Lucero's opinion, a three-hour pre-test interview is not proper.  See Third Hearing Tr. at 25:3-10 (Lucero).

100.    Sullivan "shifted away from the pretest interview and actually went into a subtle interrogation" during Begay's July 30, 2013, interview.  Third Hearing Tr. at 32:14-16 (Lucero).

101.    The FBI does not record its polygraph examinations, including the pre-tests.  See Third Hearing Tr. at 25:12-19 (Samore, Lucero).

102.    "[A] polygraph is not set up to do an interrogation."  Third Hearing Tr. at 31:17-18 (Lucero).

---

[11]The Backster School of Lie Detection is a polygraph training school located in San Diego, California.    See "Contact Information," Backster School of Lie Detection, http://backster.net/info.asp (last viewed January 8, 2018).

## PROCEDURAL BACKGROUND

On March 11, 2014, a federal grand jury indicted Begay for one count of violating 18 U.S.C. §§ 1153, 2241(c), Aggravated Sexual Abuse, and three counts of violating 18 U.S.C. §§ 1153, 2244(a), and 2246(3), Abusive Sexual Contact. See Indictment at 1-2, filed March 11, 2014 (Doc. 2)("Indictment"). Begay allegedly "did knowingly engage in and attempt to engage in a sexual act with . . . a child who had not attained the age of 12 years." Indictment at 1. The alleged sexual act included both "penetration" and "intentional touching." Indictment at 1-2. Begay is an Indian and the alleged event occurred in Indian Country. See Indictment at 1. While the case was awaiting trial, Begay filed the Suppression Motion and the Plaintiff United States of America filed the Exclusion Motion.

### 1.    The Suppression Motion.

Begay argues that the Court should suppress his statements to the FBI, because he did not validly waive his Miranda rights and that, even if he had properly waived them, he did not voluntarily make the statements. See Suppression Motion at 6. He argues that "the reading of his full Miranda [rights] and voluntarily and knowing waiver was required to admit any word of his statement for any reason." Suppression Motion at 7. Begay continues that "the recorded representations by the federal agents regarding what rights he had are illusory and inadequate to meet the Miranda Rights standard." Suppression Motion at 7. He concludes that "all the statements given by Mr. Begay must be suppressed in entirety," because they were obtained in violation of Miranda and were not made knowingly and voluntarily. Suppression Motion at 7.

### 2.    The Suppression Response.

The United States responded to the Second Motion. See Suppression Response at 1. The United States argues that Begay's statements to the FBI are admissible. See Suppression

Response at 8. First, the United States avers that the "Defendant's three interviews were consensual encounters because Defendant was not in custody and free to leave." Suppression Response at 8. The United States explains that "neither SA Schaeffer nor CI Boyd brandished their weapon at any time, nor did they threaten Defendant with physical force." Suppression Response at 8. SA Schaeffer asked the Defendant if he would be willing to speak to them, and he agreed." Suppression Response at 8. Further, according to the United States, Begay voluntarily agreed to get into Schaeffer and Boyd's vehicle, where the first interview occurred. See Suppression Response at 8. Further, according to the United States, the vehicle was unlocked, and the windows were closed only because it was a hot day in July and the agents kept the vehicle's air conditioner operating. See Suppression Response at 9. The United States emphasizes that Schaeffer told Begay that whenever Begay did not want to answer Schaeffer's questions, Begay was free to leave. See Suppression Response at 9.

Regarding the second interview, the United States contends that Begay traveled "on his own volition" to the FBI office in Gallup and asked to speak with Schaeffer. See Suppression Response at 10. According to the United States, Schaeffer told Begay that Begay was free to leave at any time and did not have to answer questions. See Suppression Response at 10.

Regarding the third interview, the United States avers that Begay was informed of his rights on two forms, and that Begay voluntarily signed both forms waiving his rights. See Suppression Response at 10. The United States adds that at no point was Begay handcuffed or arrested. See Suppression Response at 10. From these facts, the United States concludes that all three interviews were consensual encounters between Begay and the law enforcement agents, see Suppression Response at 10, and that Begay made his statements voluntarily, see Suppression Response at 13. The United States thus asks the Court to deny the Suppression

Motion and to allow the jury to hear all three recorded statements that Begay made to the FBI. See Suppression Response at 15.

**3.      The Reply.**

Begay replies to the Suppression Response.  See Reply to Response in Opposition to Defendant's Motion to Suppress Statements at 1, filed July 30, 2017 (Doc. 123)("Reply"). Begay states that he was "placed in an imposing Government SUV, the doors shut, and he . . . sat with one officer behind him, one at his side, and, next to the officer in the front seat, a shotgun, placed to obviously intimidate."[12]  Reply at 3.  Begay contends that "placing any suspect in the front seat next to a shotgun with an unseen agent behind, another asking the questions and absorbing primary attention . . . skirts the very edge of constitutional propriety."  Reply at 6. Begay continues that telling a suspect that a conversation is voluntary does not make it voluntary.  See Reply at 6.  Begay thus concludes that the Court should grant the Suppression Motion.  See Reply at 7.

**4.      The Exclusion Motion.**

The United States moves the Court to exclude two expert witnesses from testifying, Dr. Leo and Lucero.  Dr. Leo is a Professor of Law and Psychology at the University of San Francisco School of Law who plans to testify about false confessions.  See Defendant's Hearing Exhibit O at 1.  Lucero is a former New Mexico State Police officer and a certified polygraph examiner who plans to testify regarding polygraph procedures.  See Defendant's Hearing Exhibit U at 1.  The United States argues that the Court should not permit Dr. Leo or Lucero to testify, because neither have provided "reports, any literature to support their testimony, or any analysis

---

[12]At the hearing, Schaeffer clarified that this "shotgun" was actually the M-4 carbine described above.  See First Hearing Tr. at 167:15-17 (Schaeffer).

of what they reviewed in order to become familiar with this case." Exclusion Motion at 1. The United States contends that, without such information, Dr. Leo and Lucero "failed to meet Rule 702's[13] requirements." Exclusion Motion at 3.

Next, the United States avers that the Court should exclude Dr. Leo's testimony because it is not reliable, and that "false confessions experts such as Leo are unable to accurately predict the frequency and causes of false confessions." Exclusion Motion at 3. The United States also anticipates that Dr. Leo will testify about "law enforcement practices, training, and assumptions generally without tying them directly to the practices, training, or assumptions of the agents who interviewed the Defendant." Exclusion Motion at 6-7. The United States contends that such testimony would be improper, because "'the expert's opinion must be able to be properly applied to the facts in issue.'" Exclusion Motion at 7 (quoting Hoffman v. Ford Motor Co., 493 F. App'x 962, 975 (10th Cir. 2012)). The United States therefore concludes that the Court should exclude Dr. Leo's and Lucero's testimony. See Exclusion Motion at 8.

### 5.    The Exclusion Response.

Begay responds to the Exclusion Motion. See Mr. Begay's Response to United States' Motion to Exclude Expert Testimony From Suppression Hearing at 1, filed August 31, 2017 (Doc. 130)("Exclusion Response"). Begay argues that Dr. Leo's testimony regarding false confessions is reliable, and that "psychologists, criminologists, and forensic scientists have all contributed to this cross-discipline body of research." Exclusion Response at 4. Begay adds that "a variety of accepted research methods are utilized in the study of false confessions." Exclusion Response at 5.

Begay then argues that caselaw supports the admissibility of Dr. Leo's testimony. See

---

[13]Fed. R. Evid. 702.

Exclusion Response at 5. Specifically, Begay avers that "'Dr. Leo has authored dozens of peer-reviewed publications in the field of police interrogation and false confessions, and has been qualified to testify as an opinion witness over 200 times.'" Exclusion Response at 6 (quoting Caine v. Burge, No. 11 C 8996, 2013 WL 1966381, at *1 (N.D. Ill. May 10, 2013)(Durkin, J.)). Begay adds that "there is a vast body of decisional law admitting expert testimony about false and coerced confessions, including hundreds of cases in which Dr. Leo himself has testified." Exclusion Response at 6.

Finally, Begay argues that "the Daubert[14] Gatekeeping function is less limiting on admissible expert evidence when the judge is the factfinder." Exclusion Response at 7. Begay avers that "any concern that the fact-finder will be misled is simply not as pressing when the judge is the factfinder." Exclusion Response at 7 (citing In re Tex. Grand Prairie Hotel Realty, LLC, 710 F.3d 324, 329 (5th Cir. 2013)(Higginbotham, J.)). Begay concludes that the Court should permit Dr. Leo to testify. See Exclusion Response at 8.

**6.     The Hearings.**

The Court held hearings on August 17-18, 2017 and on November 20, 2017. See First Hearing Tr. at 1:3 (Court); Second Hearing Tr. at 1:2 (Court); Third Hearing Tr. at 1:6 (Court). The United States first called Sullivan to the stand. See First Hearing Tr. at 4:21-22 (Nayback). Sullivan testified that, when she interviewed Begay in the Gallup FBI office on July 30, 2013, she did not have a gun or a visible badge. See First Hearing Tr. at 12:1-3 (Sullivan). Sullivan continued that, at the beginning of her interview with Begay, she read Begay his rights from the Polygraph Consent Form. See First Hearing Tr. at 14:20-25 (Sullivan); id. at 15:1-5 (Sullivan); Polygraph Consent Form at 1. According to Sullivan, "Begay was able to read the waiver and

_____
[14]Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

consent form without any trouble," and he signed the form. First Hearing Tr. at 16:2-5 (Sullivan). Sullivan continued that she next read to Begay his rights from the <u>Miranda</u> Form, and that Begay signed the form. <u>See</u> First Hearing Tr. at 17:10-14 (Sullivan); <u>Miranda</u> Form at 1. Sullivan explained that Begay did not seem confused on the morning that she encountered him, and that he never asked for a lawyer. <u>See</u> First Hearing Tr. at 30:5-11 (Sullivan). According to Sullivan, she never made any promises of leniency or family counseling to Begay. <u>See</u> First Hearing Tr. at 33:8-13 (Nayback, Sullivan).

On cross-examination, Sullivan admitted that part of her interrogation technique is to "use charm and verbal skill and body language . . . to win over the trust of the person you're interviewing." First Hearing Tr. at 104:3-6 (Samore, Sullivan). When asked about Begay signing the <u>Miranda</u> Form, Sullivan testified that, "when we went over the form and he was advised of his rights, I certainly understood that he knew what each of the rights meant." First Hearing Tr. at 136:5-7 (Sullivan). Sullivan added that she read the <u>Miranda</u> Form to Begay "all the way down to the consent, then he reads the consent." First Hearing Tr. at 136:21-22 (Sullivan).

Regarding the Polygraph Consent Form, Sullivan testified that she read the form to Begay "all the way down to the waiver," and that Begay read the part of the form labeled "waiver and consent." First Hearing Tr. at 136:15-18 (Samore, Sullivan). <u>See</u> Polygraph Consent Form at 1. On re-direct, Sullivan testified that, when she met Begay, he did not seem unsophisticated and that she thought he was articulate. <u>See</u> First Hearing Tr. at 148:10-16 (Sullivan, Nayback). Sullivan continued that Begay never indicated in any way that he did not want to keep speaking with her. <u>See</u> First Hearing Tr. at 151:1 (Sullivan).

The United States next called Schaeffer to the stand. <u>See</u> First Hearing Tr. at 157:23-24

(Wilson).  Schaeffer described his July 18, 2013, encounter with Begay at Begay's house.  See First Hearing Tr. at 164:1-2 (Schaeffer).  Schaeffer testified that he identified himself as an FBI agent with his credentials while standing at Begay's door, that he was dressed in plainclothes, and that his firearm was not visible.  See First Hearing Tr. at 164:10-17 (Schaeffer, Wilson).  According to Schaeffer, he asked Begay if Begay was willing to speak with him, and Begay said yes.  See First Hearing Tr. at 165:14-17 (Schaeffer, Wilson).  Schaeffer continued that they spoke in Schaeffer's Chevrolet Suburban, and that he sat in the driver's seat, that Begay sat in the front passenger seat, and that Boyd sat in the rear passenger seat.  See First Hearing Tr. at 165:18-25 (Schaeffer, Wilson); 166:1-2 (Schaeffer, Wilson).  Schaeffer stated that the vehicle's doors were not locked, but that he closed the doors and windows, and told Begay that he did so to use the vehicle's air conditioning.  See First Hearing Tr. at 166:13-17 (Schaeffer).  Schaeffer clarified that the doors were not locked at any point.  See First Hearing Tr. at 167:9-11 (Schaeffer, Wilson).

Schaeffer testified that an M-4 carbine was mounted on a rack in the vehicle, but that at no point during Begay's interview did Schaeffer access the M-4.  See First Hearing Tr. at 167:16-24 (Schaeffer, Wilson).  Schaeffer continued that Begay was not handcuffed, and that he informed Begay that Begay was not under arrest, that if Begay wanted to stop the interview or not answer a question, Begay could do so, and that Begay was free to leave.  See First Hearing Tr. at 168:1-14 (Schaeffer, Wilson).  When asked about Begay's communication abilities, Schaeffer said that he thought Begay was very articulate, see First Hearing Tr. at 168:24-25 (Schaeffer), and that at no point in the interview did Begay say that he did not understand Schaeffer's questions, see First Hearing Tr. at 169:3-5 (Wilson, Schaeffer).  According to Schaeffer, Begay never said that he wanted to leave the vehicle at any time, see First Hearing Tr.

at 175:15-18 (Wilson, Schaeffer), nor did he ask for an attorney, see First Hearing Tr. at 176:9-11 (Wilson, Schaeffer).

Schaeffer next discussed his second encounter with Begay, which occurred the next day, July 19, 2013.  See First Hearing Tr. at 176:18-19 (Wilson).  According to Schaeffer, Begay, unexpectedly and without an appointment, arrived at the FBI office in Gallup and asked to speak with Schaeffer.  See First Hearing Tr. at 176:25 (Schaeffer); id. at 177:1-18 (Schaeffer).  Schaeffer testified that he spoke with Begay, and informed him that "he didn't have to answer questions that he didn't want to," that he was not under arrest, and that Begay could end the interview and leave at any point.  First Hearing Tr. at 178:23-25 (Schaeffer, Wilson); id. at 179:1-3 (Schaeffer, Wilson).  Schaeffer added that, during the July 19, 2013, interview, Begay never asked to stop speaking to him, to leave the FBI office, or to speak with an attorney.  See First Hearing Tr. at 179:15-21 (Wilson, Schaeffer).  Schaeffer stated that he asked Begay if Begay was willing to take a polygraph examination, and Begay agreed to take one.  See First Hearing Tr. at 181:17-21 (Wilson, Schaeffer).

Finally, Schaeffer testified regarding Begay's third interview, which occurred on July 30, 2013.  See First Hearing Tr. at 183:24-25 (Wilson).  Schaeffer was not present during the entire interview, but he testified that, during the part of the interview in which he participated, Begay never asked to stop answering questions or to stop talking, was never handcuffed or arrested, and never asked to speak with an attorney.  See First Hearing Tr. at 189:4-15 (Wilson, Schaeffer).

On cross-examination, Begay asked Schaeffer about the M-4 carbine that was in the FBI vehicle during the July 18, 2013 interview.  See First Hearing Tr. at 210:6 (Samore).  Schaeffer testified that

> I wasn't trying to hide the weapon, so [Begay] may have seen it, but I find it hard to believe that [Begay] did see the weapon in the car . . . .  [T]he way the firearm

is stored in the vehicle in order for Mr. Begay [to] actually see that firearm he would have to completely turn around and look toward the back seat to be able to see that firearm, and I was watching him the entire time and I don't ever recall him actually doing that.

First Hearing Tr. at 210:11-23 (Schaeffer).

The Court continued the hearing the following day. See Second Hearing Tr. at 1:1-2 (Court). The United States called Boyd to the stand. See Second Hearing Tr. at 16:11-13 (Wilson). Boyd first testified about his July 18, 2013, encounter with Begay, where he accompanied Schaeffer to Begay's house. Boyd said that Schaeffer introduced himself at Begay's door as an FBI agent and introduced Boyd as a tribal investigator. See Second Hearing Tr. at 22:2-8 (Wilson, Boyd). Boyd testified that his badge and his firearm were visible. See Second Hearing Tr. at 22:12-14 (Boyd). He explained that Schaeffer and he interviewed Begay in Schaeffer's FBI vehicle. See Second Hearing Tr. at 23:5 (Boyd). According to Boyd, Begay got into the vehicle voluntarily, was not under arrest, and was not handcuffed. See Second Hearing Tr. at 24:3-9 (Boyd). Further, according to Boyd, the vehicle's doors were closed so that they could use the vehicle's air conditioner, but they were not locked. See Second Hearing Tr. at 24:11-15 (Boyd). Boyd added that Begay was told that he could leave the vehicle at any time during the interview, see Second Hearing Tr. at 25:1-3 (Wilson, Boyd), and that Begay was "very articulate very well spoken for a young man," Second Hearing Tr. at 25:16-17 (Boyd).

Boyd also testified regarding the July 30, 2013 interview. See Second Hearing Tr. 30:19-20 (Wilson). Boyd was not present for the entire interview, but, according to Boyd, during the part in which he participated, Begay never asked for an attorney, to leave, or to stop answering questions. See Second Hearing Tr. at 32:17-24 (Wilson, Boyd). Boyd added that he thought Begay was "very articulate for somebody that's out from the reservation, Navajo reservation that is." Second Hearing Tr. at 33:8-11 (Boyd).

On cross-examination, Boyd admitted that he did not read Begay his <u>Miranda</u> rights during the July 18, 2013 interview.  <u>See</u> Second Hearing Tr. at 49:10-12 (Samore, Boyd).  Boyd said that he believed Begay voluntarily entered the FBI vehicle because Begay said that he would do so.  <u>See</u> Second Hearing Tr. at 49:18-20 (Boyd).

Begay's counsel then called Begay to the stand and announced that he would limit Begay's testimony specifically to Begay's "unrecorded interaction with Ms. Sullivan on July 30."  Second Hearing Tr. at 72:20-22 (Samore).  Begay testified that, at the beginning of his encounter with Sullivan on July 30, 2013, she did not read the Polygraph Consent Form to him, but rather "explained what it was and kind of left it for me to read myself."  Second Hearing Tr. at 77:12-14 (Begay).  Begay said that he only had "just an instant you know, to kind of just look over it quick before you know I went to sign" the Polygraph Consent Form.  Second Hearing Tr. at 78:7-8 (Begay).  When asked if he read the <u>Miranda</u> form, Begay testified that "I looked at it, yeah, and I did read some of it, and you know, the heading, and you know a few of the points and stuff like that . . . before I signed."  Second Hearing Tr. at 79:21-24 (Begay).  Begay added that about ten seconds passed between the time Sullivan showed him the <u>Miranda</u> Form and the time that he signed it.  <u>See</u> Second Hearing Tr. at 79:24-25 (Begay).  Further, Begay stated that he had never signed a form waiving his <u>Miranda</u> rights before that day.  <u>See</u> Second Hearing Tr. at 80:18-21 (Samore, Begay).  When asked about taking a polygraph examination, Begay said that he understood how a polygraph worked, and agreed that he was willing to take one.  <u>See</u> Second Hearing Tr. at 81:4-12 (Samore, Begay).

Begay then said that, after Sullivan explained to him how a polygraph examination worked, she pushed the polygraph equipment aside, and told him that he did not want to take the polygraph examination, because "it picks up on the slightest bit of deception."  Second Hearing

Tr. at 82:10-15 (Begay). According to Begay, Sullivan then stated that Begay's alleged crimes were "not a big deal," because they "happened so long ago" and that "maybe we can get this settled," with the implication that Begay should tell her what happened. Second Hearing Tr. at 84:19-25, 85:1-3 (Begay). According to Begay, Sullivan said that, if Begay confessed that he was an adult when he allegedly molested Davis, and that he sexually desired to molest her, then Sullivan could get Begay's family some form of help, such as family counseling. See Second Hearing Tr. at 93:12-25 (Begay); id. at 94:1-22 (Begay); id. at 95:10-14 (Begay). Begay continued: "I felt as though that if I didn't answer according to her that I wasn't going to be able to leave." Second Hearing Tr. at 95:14-16 (Begay).

On cross-examination, Begay conceded that, during the July 30, 2013, interview with Sullivan, he "read" the Miranda Form and the Polygraph Consent Form, and understood them. Second Hearing Tr. at 99:17-21 (Nayback, Begay). When asked about taking the polygraph examination, Begay testified that "I felt as though you know they wanted me there that you know . . . . [this] is something that I was expected you know, to do . . . for them." Second Hearing Tr. at 105:8-10 (Begay). Begay suggested that, because of the FBI's authority, he felt as though he needed to take a polygraph examination. See Second Hearing Tr. at 105:11-16 (Begay). Begay conceded that the FBI did not force him to take a polygraph examination, but testified that he was well within the FBI office and felt that "in order to make my way back out . . . I need to do what's expected of me." Second Hearing Tr. at 106:2-14 (Begay, Nayback).

The United States then asked Begay about the Polygraph Consent Form. See Second Hearing Tr. at 108:10-11 (Nayback). Begay testified that, during the July 30, 2013, interview, he "skimmed through it not having [read] and comprehended word for word." Second Hearing Tr. at 108:15-16 (Begay). Begay conceded that no one forced him to sign the form. See Second

Hearing Tr. at 109:3 (Begay). When asked "so did you understand you have the right to remain silent," Second Hearing Tr. at 111:14-15 (Nayback), Begay responded "yeah," Second Hearing Tr. at 111:16 (Begay).

Begay then testified that he did not understand the <u>Miranda</u> Form's language saying that "if you do . . . answer any questions without a lawyer present, you have the right to stop answering at any time." Second Hearing Tr. at 113:22-25 (Begay); <u>id</u>. at 114:1-4 (Begay). Begay also implied that he signed the forms because he was "well within the FBI headquarters" and "I need to go along with what these guys are . . . expecting." Second Hearing Tr. at 115:3-6 (Begay). Begay further testified that, when Sullivan showed him the <u>Miranda</u> Form, "at no point in time did she have me recite anything, nor did she read anything off of the form or anything." Second Hearing Tr. at 130:12-14 (Begay).

The United States then asked Begay if he felt that he had to go to the FBI office on July 30th to take the polygraph examination. <u>See</u> Second Hearing Tr. at 133:14-15 (Nayback). Begay testified that "I felt as though I couldn't tell [Schaeffer] no." Second Hearing Tr. at 134:17-18 (Begay). The United States then inquired about the details of Begay's interview with Sullivan. <u>See</u> Second Hearing Tr. at 135:25 (Nayback); <u>id</u>. at 136:1 (Nayback). Begay testified that Sullivan's interview lasted about three hours and that Sullivan "was very talkative and she had almost more to say than I did, in fact anytime I had a chance to speak she would . . . stop me and you know imply and suggest . . . whatever direction she wanted to take it." Second Hearing Tr. at 136:9-13 (Begay). Begay further testified that Sullivan did not yell at him, but that she made "little outbursts here and there . . . where she was displease[d] at what I was saying." Second Hearing Tr. at 140:6-11 (Nayback, Begay).

When asked if Sullivan explained to him and if he understood that anything he said could

be used against him in Court, Begay replied "no."  Second Hearing Tr. at 140:17-21 (Nayback, Begay).  Begay further testified that, contrary to Sullivan's testimony, Sullivan did not read aloud to him the portion of the <u>Miranda</u> Form clarifying that warning.  <u>See</u> Second Hearing Tr. at 140:22-24 (Nayback, Begay).  Begay continued that, contrary to his previous testimony, he did not read that portion of the <u>Miranda</u> Form, but rather, Sullivan "ran this by me."  Second Hearing Tr. at 141:1-2 (Begay).  Begay further contradicted Sullivan's testimony, saying that she had not read aloud parts of the forms nor did she have him read aloud any part of the forms.  <u>See</u> Second Hearing Tr. at 142:16-17 (Begay).

Begay then called his first expert witness, Dr. Leo.  <u>See</u> Second Hearing Tr. at 174:22 (Samore).  Dr. Leo testified that he is a professor at the University of San Francisco School of Law.  <u>See</u> Second Hearing Tr. at 176:1-9 (Leo).  According to Dr. Leo, approximately thirty-five years of empirical research and dozens of peer-reviewed books exist on the topic of police interrogations.  <u>See</u> Second Hearing Tr. at 176:19-25 (Leo).  Dr. Leo testified that the study of police interrogations is generally accepted in the social scientific community.  <u>See</u> Second Hearing Tr. at 177:15 (Leo).  Dr. Leo continued that he has published dozens of peer-reviewed articles, and several books, and that he has "been researching and writing in this area longer than almost anyone else."  Second Hearing Tr. at 178:1-5 (Leo).  Dr. Leo further stated that he has testified as an expert witness approximately 300 times over the past twenty years.  <u>See</u> Second Hearing Tr. at 179:15 (Leo).

Begay then offered Dr. Leo as an expert witness "in the general areas of social psychology and criminology" and in the areas of "police interrogation, psychological coercion and involuntary confession."  Second Hearing Tr. at 183:18-22 (Samore).  The United States objected to Dr. Leo's admittance as an expert, arguing that "he has provided no opinion," that

"there are problems with the methodology," and that, "in this case, specifically, we don't have anything to rely on."  Second Hearing Tr. at 184:1-6 (Wilson).  The Court said that it would take Dr. Leo's testimony and later decide if Dr. Leo satisfies <u>Daubert</u>, but added that "it doesn't sound like there is a disagreement that he's qualified to offer opinions in social psychology, criminology and . . . police interrogation so I'll allow those opinions to be offered in this case. Then we'll decide whether they meet <u>Daubert</u> standards."  Second Hearing Tr. at 184:12-21 (Court).

Dr. Leo then explained that the police interrogation process is not designed for innocent people; rather "it's designed for guilty people to move them from denial to admission."  Second Hearing Tr. at 187:17-20 (Leo).  Dr. Leo distinguished between the terms "interview" and "interrogate" in the police context, explaining that "there is no reason an innocent person should ever be interrogated according to police training," and that the police "interview" innocent people rather than "interrogating" them.  Second Hearing Tr. at 187:20-23 (Leo).

Dr. Leo elaborated that a problem with police interrogations is that the police "are taught and trained to make a judgment that somebody is guilty [of the] crime before they interrogate . . . and that the goal of the interrogation is to get a confession."  Second Hearing Tr. at 192:5-10 (Leo).  According to Dr. Leo, "when they say we're just trying to get the truth what they really mean is they're trying to get what they already believe to be the truth."  Second Hearing Tr. at 192:10-13 (Leo).  Dr. Leo explained that the police are taught techniques to get a confession. <u>See</u> Second Hearing Tr. at 192:24-25 (Leo).  Specifically, according to Dr. Leo, police are taught to do two things: first, "to convince the suspect he or she is caught, the evidence establishes their guilt . . . [and] there is no way [out]," and, second, to induce "a suspect to think that it's to their advantage to their benefit whether moral or psychological or legal or other reasons to confess."

Second Hearing Tr. at 192:25 (Leo); id. at 193:1-12 (Leo). Dr. Leo added that another technique is to minimize a confession's consequences, or to magnify the consequences of refusing to confess. See Second Hearing Tr. at 194:4-9 (Leo).

Dr. Leo then discussed the interrogations that occurred in this case. See Second Hearing Tr. 213:20-21 (Leo). He testified that "there were a number of interrogation techniques, some of which I've described, used on [July 18th, 2013]." Second Hearing Tr. at 213:20-22 (Leo). Dr. Leo stated that, "particularly on the 18[th], there had been many techniques used that were standard guilt presumptive." Second Hearing Tr. at 214:9-11 (Leo).

Dr. Leo then spoke about Sullivan's unrecorded July 30, 2013 interview with Begay. See Second Hearing Tr. at 214:14-19 (Leo, Samore). Dr. Leo thought that "this was a guilty presumptive interrogation," Second Hearing Tr. at 215:1-2 (Leo), because Sullivan was told that Begay's statements on July 18th, 2013 were confessions, and Sullivan assumed that Begay's statements were true, see Second Hearing Tr. at 215:19-21 (Leo). Dr. Leo was also concerned about the way in which Sullivan described the July 30th interview. See Second Hearing Tr. at 216:17-19 (Leo). Dr. Leo stated that the interview was not a polygraph pre-test,[15] but rather, was an interrogation. See Second Hearing Tr. at 216:17-19 (Leo). Dr. Leo added that "I'm concerned there was no recording, I think [Sullivan] should have recorded within FBI policy, this was not a pretest it was a guilt presumptive interrogation." Second Hearing Tr. at 217:5-8 (Leo).

Dr. Leo then testified about false confessions. See Second Hearing Tr. at 232:14-17 (Leo). He stated that "interrogators are trained when somebody says they don't remember a crime, don't tell them they remember. That increases the risk [of] false confessions." Second

---

[15]According to Lucero, in a polygraph pre-test, the examiner establishes that the examinee is suitable for a polygraph, explains to the examinee how a polygraph works, and ensures that the examinee knows about the allegations against him. See Third Hearing Tr. at 25:3-7 (Lucero).

Hearing Tr. at 232:15-17 (Leo).  Dr. Leo continued that "we see this over and over again in the interrogation on the 18[th].  [Begay] keeps saying I don't remember . . . . There is a type of false confession where the person admits to something despite having no memory."  Second Hearing Tr. at 232:18-22 (Leo).

Dr. Leo elaborated that a sign of this false confession is conditional or subjunctive language where the suspect says "I could have done this, I probably did this.  I would have done that, I might have done the other."  Second Hearing Tr. at 232:24-25 (Leo); 233:1 (Leo).  Dr. Leo stated that the July 18, 2013, interrogation "is rife with this.  Mr. Begay is essentially adopting their suggestion[s]."  Second Hearing Tr. at 233:4-5 (Leo).  On cross-examination, however, when asked if he could say that a false confession occurred in this case, Dr. Leo stated: "No, I think that would be outside the scope of my testimony."  Second Hearing Tr. at 241:8-9 (Leo).

The Court continued the hearing on November 20, 2017.  See Third Hearing Tr. at 1:3-6 (Nayback, Court).  Begay called Lucero to the stand.  See Third Hearing Tr. at 4:14-15 (Court).  Lucero testified that he is a licensed polygraph examiner in New Mexico, see Third Hearing Tr. at 5:2-4 (Lucero), and that he previously worked for the New Mexico State Police for twenty-one years, see Third Hearing Tr. at 5:9-10 (Lucero).  Lucero explained that, when he was a police officer, he was selected to go to polygraph school and attended the Baxter School of Lie Detection, where he received polygraph training.  See Third Hearing Tr. at 6:8-11 (Lucero). He added that he has testified in New Mexico state courts fifty-seven times, see Third Hearing Tr. at 11:4-5 (Lucero), and in federal courts three times, see Third Hearing Tr. at 10:23-24 (Lucero).

Begay then offered Lucero as an expert in polygraphy.  See Third Hearing Tr. at 11:10-11 (Samore).  The United States objected and began to voir dire Lucero.  See Third Hearing Tr.

at 11:13-14 (Nayback).  On voir dire, Lucero stated that he planned to testify about polygraph standards that the American Polygraph Association makes, in contrast to federal polygraph policies.  See Third Hearing Tr. at 14:21-23 (Nayback, Lucero).

On continuation of direct, Lucero spoke about polygraph pre-test procedures.  See Third Hearing Tr. at 25:3-4 (Lucero).  He explained that a polygraph pre-test interview usually takes twenty or thirty minutes, and that, in his opinion, a three-hour pre-test interview is not proper. See Third Hearing Tr. at 25:3-10 (Lucero).  He further stated that the only thing which the FBI does differently from the American Polygraph Association's standards is that the FBI does not record its polygraphs, including the pre-tests.  See Third Hearing Tr. at 25:12-19 (Samore, Lucero).  Lucero continued that "a polygraph is not set up to do an interrogation," Third Hearing Tr. at 31:17-18 (Lucero), and that, during the July 30, 2013 interview, Sullivan "shifted away from the pre-test interview and actually went into a subtle interrogation," Third Hearing Tr. at 32:14-16 (Lucero).

The United States began cross-examining Lucero.  See Third Hearing Tr. at 34:3-6 (Court, Nayback).  On cross-examination, Lucero stated that "a polygraph test was not administered to Mr. Begay."  Third Hearing Tr. at 34:15-16 (Lucero).  At the conclusion of Lucero's testimony, the Court stated that it would allow Lucero to offer opinion testimony about polygraphy.  See Third Hearing Tr. at 51:25 (Court).  At the hearing's conclusion, the Court stated that it was inclined to admit Dr. Leo's testimony, at least partially, see Third Hearing Tr. at 70:21-25 (Court); 71:1-5 (Court), and that its inclination was that Begay's statements were voluntary, see Third Hearing Tr. at 71:22-24 (Court).

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow

Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011) (Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

1.      **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that

particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). See United States v. Edwards, No. CR 16-3068, 2017 WL 4857441, at *13 (D.N.M. 2017)(Browning, J.).

**2.      The Standard in Daubert v. Merrell Dow Pharm., Inc.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir.

2003)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district

court's first-step reliability determination, including: (i) whether the method has been tested;

(ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the

existence of standards and whether the witness applied them in the present case; and (v) whether

the witness' method is generally accepted as reliable in the relevant medical and scientific

community.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95.  The court is also to

consider whether the witness' conclusion represents an "unfounded extrapolation" from the data;

whether the witness has adequately accounted for alternative explanations for the effect at issue;

whether the opinion was reached for the purposes of litigation or as the result of independent

studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co.,

LP, 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The

Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878

(10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable."  Bitler v. A.O. Smith Corp., 391
> F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . . ).  This
> obligation involves a two-part inquiry.  Id.  "[A] district court must [first]
> determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'"  Id.  (quoting Daubert, 509
> U.S. at 592 . . . ).  In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid . . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . . ).  Second, the district
> court must further inquire into whether proposed testimony is sufficiently
> "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted).  "The second inquiry

is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure

that the proposed expert testimony logically advances a material aspect of the case . . . .  The

evidence must have a valid scientific connection to the disputed facts in the case."  Norris v.

Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc., will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the

methodology he or she uses to support his or her opinions is reliable, and that his or her opinion

fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare

Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp.,

289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in
> assessing reliability under Daubert, and because, in light of that discretion, there
> is not an extensive body of appellate case law defining the criteria for assessing
> scientific reliability, we are limited to determining whether the district court's
> application of the Daubert manifests a clear error of judgment or exceeds the
> bounds of permissible choice in the circumstances . . . . Thus, when coupled with
> this deferential standard of review, Daubert's effort to safeguard the reliability of
> science in the courtroom may produce a counter-intuitive effect: different courts
> relying on the essentially the same science may reach different results.

Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d at 1206. The United States Court of

Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R. Co., 29 F.3d 499 (9th Cir.

1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method. Certainly, scientists may form initial tentative
> hypotheses. However, scientists whose conviction about the ultimate conclusion
> of their research is so firm that they are willing to aver under oath that it is correct
> prior to performing the necessary validating tests could properly be viewed by the
> district court as lacking the objectivity that is the hallmark of the scientific
> method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's
> discretion to determine whether expert testimony will be helpful to the trier of
> fact. In making that determination, the court should consider, among other factors,
> the testimony's relevance, the jurors' common knowledge and experience, and
> whether the expert's testimony may usurp the jury's primary role as the evaluator
> of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir.

2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").  See United States v. Edwards, 2017 WL 4857441, at *14-15.

**3.**      **Necessity of Evaluating an Issue Under** **Daubert v. Merrell Dow Pharm., Inc.**

The restrictions in Daubert v. Merrell Dow Pharm., Inc. apply to both "novel" expert

testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[16] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[17] and in fact some courts have indicated their acceptance of it."). See United States v. Edwards, 2017 WL 4857441, at *16; United States v. Harry, 20 F. Supp. 3d 1196, 1226 (D.N.M. 2014)(Browning, J.); United States v. Chapman, 59 F. Supp. 3d 1194, 1212-13 (D.N.M. 2014)(Browning, J.).

---

[16]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

[17]PCR stands for polymerase chain reaction, which the expert witness used to replicate bacteria DNA, "a process that would allow her to identify whether such bacteria were present in various environmental samples." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.

# RELEVANT LAW REGARDING THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

The Fifth Amendment's self-incrimination clause states: "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Statements that a defendant makes during a law-enforcement officer's custodial interrogation are generally not admissible as evidence against that defendant if the declarant has not received the warnings that Miranda v. Arizona, 384 U.S. at 436, requires. See Dickerson v. United States, 530 U.S. 428, 444 (2000); United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008). Miranda v. Arizona's requirements, however, are limited. "Police officers need not administer Miranda warnings to everyone they question." United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008). Rather, "Miranda applies only to 'custodial interrogation[s].'" United States v. Jones, 523 F.3d at 1239 (quoting Miranda v. Arizona, 384 U.S. at 444).

In other words, "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)). Any questioning by law-enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). See United States v. Medrano, 356 F. App'x 102, 107 (10th Cir. 2009)(unpublished); United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993). The "in custody" requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984)(quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). See United States v. Jones, 523 F.3d at 1239. Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'"

United States v. Rogers, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).  In determining the custodial nature of an interrogation, the Court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'"  United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted).

The Tenth Circuit, in recognizing that an examination of the circumstances' totality is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place.  See United States v. Jones, 523 F.3d at 1240.  Those factors include: (i) whether the suspect is informed that he or she may end the interview at will, or is not required to answer questions; (ii) whether the interview's nature is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.  See United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)).  Several factors indicate police domination of the encounter: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See United States v. Jones, 523 F.3d at 1240.  The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole rather than exclusively relying on some enumerated factors while ignoring others.  See United States v. Jones, 523 F.3d at 1240.

<u>**ANALYSIS**</u>

The Court concludes that Dr. Leo may testify about police interrogation tactics generally, but not about the application of such techniques to this case. Additionally, Dr. Leo may not testify regarding false confessions, because the Tenth Circuit has indicated that such testimony is unreliable. The Court will also exclude Lucero's testimony, because it is irrelevant. The Court further concludes that Begay's July 18, 2013, interview was not a custodial interrogation, and his statements during that interview were voluntary. Begay's July 19, 2013, interview was also not a custodial interrogation, and, further, Begay's statements during that interview were voluntary. Finally, Begay validly waived his <u>Miranda</u> rights during the July 30, 2013, interview, and Begay's statements during that interview were voluntary. Accordingly, the Court will deny the Suppression Motion and grant in part and deny in part the Exclusion Motion.

## I. DR. LEO MAY TESTIFY REGARDING POLICE INTERROGATION TACTICS GENERALLY, BUT NOT REGARDING THE APPLICATION OF SUCH TACTICS TO THIS CASE.

The Court concludes that Dr. Leo may testify about police interrogation tactics generally, but not regarding the application of such tactics to this case. Dr. Leo is a Professor of Law and Psychology at the University of San Francisco School of Law. <u>See</u> Leo Biography at 1; Finding of Fact ("FOF") ¶ 70, at 14. "Dr. Leo is one of the leading experts in the world on police interrogation practices, the impact of *Miranda*, psychological coercion, false confessions, and the wrongful conviction of the innocent." Leo Biography at 1. <u>See</u> FOF ¶ 71, at 15. "Dr. Leo has authored more than 100 articles in leading scientific and legal journals as well as several books." Leo Biography at 1. <u>See</u> FOF ¶ 72, at 15. Dr. Leo was previously a professor at both the University of California, Irvine and at the University of Colorado, Boulder. <u>See</u> Leo Biography at 1; FOF ¶ 73, at 15. In short, Dr. Leo is one of the leading experts in his field. <u>See</u> Leo

Biography at 1-2; FOF ¶ 71, at 15.

Rule 702 first requires the trial court to "determine whether the expert is proposing to testify to . . . scientific, technical, or other specialized knowledge." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). "Fed. R. Evid. 702 . . . instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence. Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991). Police interrogation tactics are "specialized knowledge," because a juror would not be able to understand fully the evidence against Begay, specifically the FBI interviews, without knowledge of such tactics.

The Court must next assess whether Dr. Leo's testimony meets the Daubert reliability standards. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *2. The Supreme Court has articulated a non-exclusive list of factors that weigh into a district court's reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95. The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc. will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

Here, Dr. Leo testified that "[t]here are five or six empirical methods that social scientists use" to study interrogation tactics. Second Hearing Tr. at 191:13-14 (Leo). <u>See</u> FOF ¶ 76, at 15. These methods include field research, observational research, laboratory experiments, analysis of documents or archival research, interviews, and survey studies. <u>See</u> Second Hearing Tr. at 191:14-24 (Leo); FOF ¶ 76, at 15. Dr. Leo explained that "we form hypotheses, gather data, go out and get that data, write it up, [and] submit it for peer review." Second Hearing Tr. at 192:5-7 (Leo). <u>See</u> FOF ¶ 77, at 15. He continued that "there has been peer review, there has been training, there has been substantial research and publication going back many years." Second Hearing Tr. at 192:14-16 (Leo). <u>See</u> FOF ¶ 78, at 15. Further, approximately thirty-five years of empirical research and dozens of peer-reviewed books exist on the topic of police interrogations. <u>See</u> Second Hearing Tr. at 176:19-25 (Leo); FOF ¶ 74, at 15. From this testimony, the Court can conclude that Dr. Leo's methods have been tested, are published, and subject to peer review. <u>See also</u> Leo Biography at 4-6 (listing Dr. Leo's publications). The United States does not offer any evidence, expert or otherwise, suggesting that Dr. Leo's methods are not tested or are not peer reviewed.

The Court also concludes that Dr. Leo's methods are generally accepted as reliable in the social scientific community, because Dr. Leo testified that "nobody in the social sciences disputes that this is a valid and recognized area of empirical social science," Second Hearing Tr. at 190:16-18 (Leo); <u>see</u> FOF ¶ 75, at 15, and that approximately thirty-five years of empirical research and dozens of peer-reviewed books exist on the topic of police interrogations, <u>see</u> Second Hearing Tr. at 176:19-25 (Leo); FOF ¶ 74, at 15. Again, the United States does not offer any evidence, expert or otherwise, suggesting that Dr. Leo's methods are not generally accepted, or that his field is not a valid and recognized area of social science.

Regarding the error-rate and existence-of-standards <u>Daubert</u> factors, "<u>Daubert</u> makes clear that the factors it mentions do not constitute a definitive checklist or test. And <u>Daubert</u> adds that the gatekeeping inquiry must be tied to the facts of a particular case." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 150 (internal quotation marks omitted). The error-rate and existence-of-standards <u>Daubert</u> factors are not appropriate to use regarding Dr. Leo's testimony about police interrogation tactics generally, because such testimony does not involve conducting any experiment that would have standards and an error rate. The Court therefore concludes that Dr. Leo's testimony regarding general police interrogation tactics meets the <u>Daubert</u> standard even though there is not an applicable error rate or standards.

The Court also concludes, however, that Dr. Leo may not testify regarding the application of interrogation tactics to Begay's case. Unlike testimony regarding police interrogation tactics generally, proffered testimony regarding the application of such techniques to this case suggests that the Court consider the error rate, because the error rate "might prove helpful in determining the reliability of a particular scientific theory or technique." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 141 (quotations omitted). Further, the Court may "consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 141 (italics in original). Regarding the application of police interrogation techniques to this case, Dr. Leo testified that his methodology involves listening to interrogation recordings, studying the transcripts,

> identifying which techniques were used, and what I think about those techniques in light of the issues that the attorney directs me to. If there is a fully recorded interrogation, then it's all there. I'm just really applying my expert knowledge in evaluating the research techniques and the risks that may have been created, or anything else that somebody with expert knowledge would see and be concerned about one way or the other.

Second Hearing Tr. at 210:7-15 (Leo). <u>See</u> FOF ¶ 81, at 16. If the interrogation was not

recorded, Dr. Leo's methodology involves interviewing those present at the interrogation. See Second Hearing Tr. at 210:16-25 (Leo); FOF ¶ 81, at 16. Essentially, Dr. Leo reviews an interrogation and then applies his knowledge to identify which interrogation tactics were used and what effect they may have had. See Second Hearing Tr. at 210:7-15 (Leo); id. at 210:16-25 (Leo); FOF ¶ 81, at 16. The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at 1266 (citing Bourjaily v. United States, 483 U.S. at 175). Dr. Leo's testimony does not discuss the error rate of misidentifying a police interrogation technique used in a given case or, more importantly, his error rate of determining the effect of such a technique. Because Begay, the proponent of Dr. Leo's testimony, has not met this burden, the Court will not allow Dr. Leo to testify regarding the application of interrogation tactics to Begay's case.

Additionally, such testimony is not helpful under rule 702. Rule 702 states that an expert witness may offer opinion testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed R. Evid. 702(a). See United States v. Muldrow, 19 F.3d at 1337. While the Court concludes that Dr. Leo's general testimony regarding police interrogation tactics is helpful, a trier of fact is capable of discerning the extent to which the police interrogation tactics that Dr. Leo describes were used in this case. "Jurors are pretty smart, and the Court's experience is that they routinely ignore experts . . . . " United States v. Ganadonegro, 805 F. Supp. 2d at 1212.

The Court must next assess whether Dr. Leo's testimony regarding interrogation tactics "will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d at 1337. "Whether the expert testimony will assist the trier of fact goes

primarily to relevance." <u>United States v. Markum</u>, 4 F.3d 891, 896 (10th Cir. 1993). The Court concludes that Dr. Leo's police interrogation testimony is relevant, because it concerns voluntariness. "Under the relevance prong of the <u>Daubert</u> analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . . The evidence must have a valid scientific connection to the disputed facts in the case." <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 884 n.2 (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 43 F.3d at 1315 (on remand from the Supreme Court); <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. at 591). The Court concludes that Dr. Leo's testimony regarding police interrogation tactics is relevant, because it concerns the voluntariness of Begay's alleged confessions. "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." <u>United States v. Ganadonegro</u>, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing <u>United States v. Benally</u>, 541 F.3d at 996). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations, <u>see</u> <u>United States v. Adams</u>, 271 F.3d at 1245, whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." <u>United States v. Ganadonegro</u>, 805 F. Supp. 2d at 1214. If the Court concludes that the statement is voluntary, the defendant may challenge the statement's reliability at trial, <u>see</u> <u>Crane v. Kentucky</u>, 476 U.S. at 688-89 ("[D]ue process . . . requires 'that a jury [not] hear a confession unless and until the trial judge [or some other independent decisionmaker] has determined that it was freely and voluntarily given.'"). "The jury does not decide the constitutional voluntariness; [it] decide[s] only factual voluntariness to assess the statement's reliability and credibility." <u>United States v. Ganadonegro</u>, 805 F. Supp. 2d at 1214 (alterations added). <u>See</u> Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, **CRIMINAL**

**PATTERN JURY INSTRUCTIONS** 1.25, at 38 (**2011 Edition** Updated January 2017)(VOLUNTARINESS OF STATEMENT BY DEFENDANT)("[C]onsider factors bearing on the voluntariness of the statement.  For example, consider the age, gender, training, education, occupation, and physical and mental condition of the defendant, and any evidence concerning his treatment while under interrogation.").

Here, Dr. Leo's testimony regarding police interrogation tactics concerns the voluntariness, rather than the credibility, of Begay's alleged confessions, and thus, the Court will allow Dr. Leo's testimony.  Dr. Leo testified that the police interrogation process is not designed for innocent people; rather "it's designed for guilty people to move them from denial to admission."  Second Hearing Tr. at 187:17-20 (Leo).  See FOF ¶ 83, at 16.  Dr. Leo further explained that police officers are often taught various techniques to get a confession, including, first, "to convince the suspect he or she is caught; the evidence establishes their guilt . . . [and] there is no way [out]," Second Hearing Tr. at 195:4-6 (Leo); see FOF ¶ 85, at 17, and, second, to induce "a suspect to think that it's to their advantage, to their benefit, whether for moral or psychological or legal or other reasons to confess,"  Second Hearing Tr. at 195:9-12 (Leo); see FOF ¶ 85, at 17.  Thus, the "proposed expert testimony logically advances a material aspect of the case . . . ," namely, the voluntariness of Begay's alleged confessions.  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d at 1315 (on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591).  The Court therefore concludes that Dr. Leo may testify generally about police interrogation tactics, and the Court will consider this testimony in deciding the Suppression Motion.

## II. DR. LEO MAY NOT TESTIFY REGARDING FALSE CONFESSIONS, BECAUSE THE TENTH CIRCUIT HAS INDICATED THAT SUCH TESTIMONY IS UNRELIABLE.

The Court concludes that Dr. Leo may not offer opinion testimony regarding false confessions, because the Tenth Circuit has indicated that such testimony is unreliable. The Tenth Circuit has noted that the "Supreme Court has held that Rule 702 imposes a special obligation upon a trial judge to ensure that all expert testimony, even non-scientific and experience-based expert testimony, is both relevant and reliable." United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)(citations omitted).

In United States v. Benally, 541 F.3d 990 (10th Cir. 2008), two girls indicated that the defendant had sexually abused them. See 541 F.3d at 992. Following these allegations, FBI officers interviewed the defendant. See 541 F.3d at 992. The defendant "initially denied touching either girl inappropriately, but confessed to the allegations later in the interview. At the conclusion of the meeting, he provided the agents with a written confession." 541 F.3d at 992. Before trial, the defendant notified the United States that he planned to call "Dr. Deborah Davis, a professor of psychology at the University of Nevada at Reno, as an expert witness on false confessions." 541 F.3d at 993. The defendant "offered Dr. Davis's testimony on two subjects: (1) whether false confessions occur; and (2) why people confess falsely. Dr. Davis had never examined [the defendant], and would not offer an opinion as to whether he confessed falsely." 541 F.3d at 993. At a Daubert hearing, the district court ruled that Dr. Davis' testimony was inadmissible, because "it did not meet the standards for relevant or reliability required by Daubert." 541 F.3d at 993. The Tenth Circuit, in an opinion that the Honorable Mary Briscoe, United States Circuit Judge, wrote and that the Honorable Carlos Lucero and Timothy Tymkovich, United States Circuit Judges, joined, concluded that the district court did not abuse

its discretion by excluding Dr. Davis' testimony. See 541 F.3d at 994. The Tenth Circuit

identified "three concerns associated with this type of testimony." 541 F.3d at 994-95.

> First, expert testimony which does nothing but vouch for the credibility of another
> witness encroaches upon the jury's vital and exclusive function to make
> credibility determinations, and therefore does not assist the trier of fact as
> required by Rule 702. Also, a proposed expert's opinion that a witness is lying or
> telling the truth might be inadmissible pursuant to Rule 702 because the opinion
> exceeds the scope of the expert's specialized knowledge and therefore merely
> informs the jury that it should reach a particular outcome. Yet another rationale
> for exclusion is that the testimony of impressively qualified experts on the
> credibility of other witnesses is prejudicial, unduly influences the jury, and should
> be excluded under Rule 403.

United States v. Benally, 541 F.3d at 995 (quoting United States v. Adams, 271 F.3d 1236, 1245

(10th Cir. 2001)). The defendant protested that "Dr. Davis did not intend to provide an opinion

as to whether the defendant before the court falsely confessed." United States v. Benally, 541

F.3d at 995. The Tenth Circuit, stated, however:

> While Mr. Benally emphasizes that Dr. Davis would not have opined as to
> whether she believed Mr. Benally confessed falsely, with or without the opinion,
> the import of her expert testimony would be the same: disregard the confession
> and credit the defendant's testimony that his confession was a lie. Testimony
> concerning credibility "is often excluded because it usurps a critical function of
> the jury and because it is not helpful to the jury, which is capable of making its
> own determination regarding credibility." United States v. Call, 129 F.3d 1402,
> 1406 (10th Cir. 1997).

United States v. Benally, 541 F.3d at 995. The Tenth Circuit thus affirmed the district court's

decision to exclude Dr. Davis' false confession testimony. See United States v. Benally, 541

F.3d at 996.

The Court followed United States v. Benally, and a similar case, United States v.

Adams,[18] 271 F.3d at 1244, and excluded expert testimony regarding false confessions, both

_____

[18]In United States v. Adams, the Tenth Circuit "affirmed a district court's exclusion of a
psychologist's expert testimony regarding the credibility of incriminating statements made by a

generally and as it went to the particular defendant's credibility, because the "'evidence lack[s] relevance and would not assist the trier of fact as required by Rule 702.'" United States v. Ganadonegro, 805 F. Supp. 2d at 1213, 1218 (quoting United States v. Adams, 271 F.3d at 1246).[19]

---

defendant to police officers." United States v. Benally, 541 F.3d at 994 (citing United States v. Adams, 271 F.3d at 1244). United States v. Adams was the first case in which the Tenth Circuit compiled the "three concerns associated with this type of testimony." United States v. Benally, 541 F.3d at 994-95.

[19]The Court has critiqued United States v. Benally's and United States v. Adams' holdings. See United States v. Ganadonegro, 805 F. Supp. 2d at 1212. The Court stated that

> the defendant should be able to proffer a psychological expert to explain to the jury that some defendants give, for whatever reason, false confessions to a crime, and that the defendant has psychological traits that make it possible that he would give a false confession. The Court would not . . . allow the expert to say a particular defendant gave a false confession.

> . . . .

> The Court believes, particularly with careful limiting instructions, that a jury could distinguish between information about the psychology profession's beliefs about false confessions, and the limits on the expert's opinion as to what a particular defendant did. Jurors are pretty smart, and the Court's experience is that they routinely ignore experts and make their own credibility decisions.

United States v. Ganadonegro, 805 F. Supp. 2d at 1212. The Court continues to think that the law should be more nuanced than the Tenth Circuit wants. It is indisputable that there are false confessions. See Payne v. State of Ark., 356 U.S. 560, 568 (1958)("The judgment must be reversed because of the admission in evidence of the coerced confession"). Jurors may not, however, know this reality. It seems useful to let an expert tell the jury that there are false confessions. After all, the Tenth Circuit says a jury should scrutinize confessions with care. Specifically, the "Voluntariness of Statement by Defendant" Tenth Circuit Pattern Jury Instruction says that evidence relating to a defendant's statement "should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made." Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, **CRIMINAL PATTERN JURY INSTRUCTIONS** 1.25, at 38 (**2011 Edition** Updated January 2017)(VOLUNTARINESS OF STATEMENT BY DEFENDANT). It seems odd to give this jury instruction, and then not let an expert tell the jury that there are false confessions

Here, the Court will exclude Dr. Leo's testimony regarding false confessions. Dr. Leo testified at length regarding false confessions indicators. See FOFs ¶¶ 93-94, at 18. This testimony is very similar to that which the Tenth Circuit affirmed the district court's exclusion in United States v. Benally, where the defendant "offered Dr. Davis's testimony on two subjects: (1) whether false confessions occur; and (2) why people confess falsely." United States v. Benally, 541 F.3d at 993. Testimony regarding false confessions indicators necessarily states that false confessions sometimes occur. Further, Dr. Leo's testimony that "interrogators are trained when somebody says they don't remember a crime, don't tell them they remember. That increases the risk [of] false confessions," Second Hearing Tr. at 232:15-17 (Leo). See FOF ¶ 89, at 17, is testimony regarding why people confess falsely, because it shows how an interrogation tactic can induce someone into confessing falsely. Because Dr. Leo's false confessions testimony is substantially similar to the testimony that the Tenth Circuit excluded in United States v. Benally, the Court will exclude it.[20]

---

and why people who give false confessions do so. The Court would, on a clean slate, give the jurors the tools to take the defendant's statements "with caution."

[20]The Court could distinguish the Tenth Circuit's decisions in United States v. Benally and United States v. Adams, because the Tenth Circuit affirmed the district courts' exclusions of false confessions expert testimony, but did not say that the admission of such expert testimony would be an abuse of discretion. See United States v. Benally, 541 F.3d at 994 ("The district court did not abuse its discretion by excluding Dr. Davis's testimony."); United States v. Adams, 271 F.3d at 1246 ("The judge was well within his discretion in determining that the evidence lacked relevance and would not 'assist the trier of fact as required by Rule 702.'"). The Tenth Circuit might affirm, under an abuse-of-discretion standard, the admission of a false confessions expert, but that argument would probably be slicing the bologna too thinly and would be disrespectful to the Tenth Circuit. The Tenth Circuit -- at least five of its judges -- has indicated that it does not like false confessions expert testimony. The Court wishes that the law it could apply was more nuanced and a little friendlier to defendants, who, under pressure, make confessions. Nevertheless, the Court must, and will, follow Tenth Circuit authority which holds that it is not only appropriate to exclude false confessions experts, but also strongly suggests that district courts should not permit such experts to testify.

The Court will also exclude Dr. Leo's false confessions testimony as applied to Begay for the separate reason that it does not meet the Daubert standard, specifically the error rate of identifying a false confession. The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at 1266 (citing Bourjaily v. United States, 483 U.S. at 175). Dr. Leo testified:

> We cannot say how frequently [false confessions] occur, because there is no database maintained by the government or a private organization that makes all police interrogations available to us, from which we could do a random sample and then come up with an error rate or, you know, a false confession rate.

Second Hearing Tr. at 223:17-23 (Leo). See FOF ¶ 90, at 17 (alteration added). Dr. Leo continued that, although social scientists have documented hundreds of false confessions, "[w]hen we document a proven false confession, it's very hard to prove the negative. You'd have to show it was physically impossible for somebody to commit a crime . . . . or you have to show that no crime occurred." Second Hearing Tr. at 224:1-6 (Leo). See FOF ¶ 91, at 18. He further stated that "there are lots of confessions where there is an allegation that it's false, and we can't prove it one way or another. So when I say we prove -- we have hundreds of proven false confessions, these have to be the tip of the iceberg, because oftentimes you just don't know." Second Hearing Tr. at 224:16-21 (Leo). See FOF ¶ 92, at 18. Based on this testimony, the Court cannot soundly conclude that Begay has met his burden of showing that Dr. Leo's method of identifying false confessions is reliable, see Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at 1266 (citing Bourjaily v. United States, 483 U.S. at 175), because the error rate of identifying a false confession is unknown. The Court will thus not let Dr. Leo say whether Begay's statements are false.

The Court also notes that the Honorable William Johnson, now Chief United States

District Judge for the District of New Mexico, previously excluded Dr. Leo's testimony on similar grounds. See United States v. Pauline Yazzie, No. 11-CR-1876 WJ, Memorandum Opinion and Order Granting United States' Motion to Exclude Expert Testimony of Richard Leo, PH.D., filed September 17, 2012 (Doc. 145)("Yazzie"). In Yazzie, Dr. Leo "testified that researchers do not have the kind of data allowing them to predict the likelihood that a given interrogation technique will lead to a false confession in real world cases." Yazzie at 4. Dr. Leo also "testified that he could only identify a confession as false when the defendant was exonerated by other means. That is, experts in this field analyze confessions that have already been determined to be false, and identify interrogation techniques common to those confessions." Yazzie at 5. Judge Johnson thus concluded that such techniques provide "no reliable means of determining the likelihood that a given confession is false." Yazzie at 5. In short, Judge Johnson had similar reliability concerns that the Court has today regarding the error rate of Dr. Leo's methodology. See People v. Kowalski, 821 N.W.2d 14, 37 (Mich. 2012)(Kelly, J.)(affirming "the exclusion of Dr. Leo's testimony . . . based on false-confession research because the circuit court's determination that it was not reliable . . . was not an abuse of discretion"); United States v. Deuman, 892 F. Supp. 2d 881, 888 (W.D. Mich. 2012)(Quist, J.)("The danger of allowing such testimony, then, is that the jury may conclude that Defendant's incriminating statements were false not because there is a sound evidentiary basis for doing so, but because Dr. Leo, an impressively-credentialed expert, says 'it is so.'"). For these reasons, the Court will exclude Dr. Leo's false confessions testimony and will not consider it in ruling on the Suppression Motion.

## III. THE COURT WILL EXCLUDE LUCERO'S TESTIMONY, BECAUSE IT IS NOT RELEVANT.

The Court concludes that Lucero's testimony is not relevant and therefore will exclude it. The Tenth Circuit has noted that the "Supreme Court has held that Rule 702 imposes a special

obligation upon a trial judge to ensure that all expert testimony, even non-scientific and experience-based expert testimony, is both relevant and reliable." United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)(citations omitted). "Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d at 1315 (on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591).

Lucero's testimony is not relevant. Lucero is a former New Mexico State Police officer and a certified polygraph examiner, who testified about polygraph procedures. See Defendant's Hearing Ex. U at 1; FOF ¶ 95, at 18. Polygraphs, however, are not relevant to this case. By Lucero's own admission, "a polygraph test was not administered to Mr. Begay." Third Hearing Tr. at 34:15-16 (Lucero); FOF ¶ 55, at 12. Further, although Sullivan may have started a polygraph pre-test during her July 30, 2013, interview with Begay, by Lucero's own admission, Sullivan "shifted away from the pretest interview and actually went into a subtle interrogation." Third Hearing Tr. at 32:14-16 (Lucero); FOF ¶ 100, at 19. Additionally, although the Court will not consider Dr. Leo's testimony regarding the extent to which the FBI used on Begay the interrogation tactics that Dr. Leo describes, Dr. Leo testified that Begay's July 30, 2013 interview with Sullivan was not a polygraph pre-test, but rather, was an interrogation. See Second Hearing Tr. at 216:17-19 (Leo); FOF ¶ 88, at 17. Both of Begay's experts, therefore, testified that a real polygraph pre-test never occurred. See Second Hearing Tr. at 216:17-19 (Leo); FOF ¶ 88, at 17; Third Hearing Tr. at 32:14-16 (Lucero); FOF ¶ 100, at 19. The Court therefore concludes that, because Begay never took a polygraph examination, and because

Sullivan did not administer a polygraph pre-test to Begay, Lucero's testimony regarding polygraphs is irrelevant to this case. The Court will thus exclude Lucero's testimony.

## IV. BEGAY'S JULY 18, 2013, SUBURBAN INTERVIEW WAS NOT A CUSTODIAL INTERROGATION.

The Court concludes that Begay's July 18, 2013, interview was not a custodial interrogation. Any law-enforcement officer questioning "reasonably likely to elicit an incriminating response" constitutes an interrogation. Rhode Island v. Innis, 446 U.S. at 301. In determining an interrogation's custodial nature, the Court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'" United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted).

The Tenth Circuit, in recognizing that an examination of the totality of the circumstances is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place. See United States v. Jones, 523 F.3d at 1240. Those factors include: (i) whether the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the nature of the interview is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect. See United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)). Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.

See United States v. Jones, 523 F.3d at 1240.  The Tenth Circuit was deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole, rather than exclusively relying on some enumerated factors while ignoring others.  See United States v. Jones, 523 F.3d at 1240.

As a threshold matter, the July 18, 2013, interview was an interrogation.  Any questioning by law-enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation.  Rhode Island v. Innis, 446 U.S. at 301.  During the interview, Schaeffer asked Begay many questions about Begay's alleged sexual conduct with Davis, and Begay admitted to or implied that he engaged in sexual acts with Davis.  See First FBI Tr. at 58:17-25 (Begay, Schaeffer); id. at 77:21-25 (Schaeffer, Begay); id. at 78:1-2 (Begay); FOF ¶ 24, at 7.  The Court must thus determine whether the interrogation was custodial.

The Court concludes that the July 18, 2013, interrogation was not custodial.  The first custodial interrogation factor is whether the suspect is informed that he or she may end the interview at will, or is not required to answer questions.  See United States v. Jones, 523 F.3d at 1240.  Schaeffer informed Begay that he was not under arrest, that if Begay wanted to stop the interview or to not answer a question, he could do those things, and that Begay was free to leave.  See First Hearing Tr. at 168:1-14 (Schaeffer, Wilson); FOF ¶ 17, at 6.  The first factor thus cuts against a custodial interrogation finding.

The second factor is "the nature of the questioning where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave."  United States v. Jones, 523 F.3d at 1240 (quotations omitted).  The Court has reviewed the First FBI Transcript, documenting the July 18, 2013 interrogation, and finds, not accusatory questioning, but rather, a different interrogation method that Dr. Leo describes.  See

Second Hearing Tr. at 194:4-9 (Leo); FOF ¶ 86, at 17. Dr. Leo explains that one interrogation technique is to minimize a confession's consequences. See Second Hearing Tr. at 194:4-9 (Leo); FOF ¶ 86, at 17. The Court concludes that Schaeffer and Boyd did not engage in prolonged accusatory questioning, but, rather, tried to minimize the gravity of a confession and to sympathize with Begay in an attempt to get him to admit that he engaged in sexual acts with Davis. See First FBI Tr. at 38:6-7 ("You know, I want to try to help you out.")(Schaeffer); id. at 38:19-20 ("You made a mistake, I understand that. Stuff happens.")(Shaeffer); id. at 39:20-21 ("You're a different person now. You don't do that kind of stuff anymore, right[?]")(Schaeffer); id. at 42:7-8 ("You're going through puberty. You're horny, stuff like that.")(Schaeffer); id. at 42:24-25 ("Like I said, people make mistakes. You know, that's not to say that that's who you are.")(Schaeffer); id. at 51:17-19 ("I understand how difficult this is for you . . . but like I said, accidents happen, mistakes happen.")(Schaeffer); id. at 81:7-8 ("I mean, you weren't trying to hurt her or anything like that, right?")(Schaeffer). Indeed, the July 18, 2013, interview is filled, not with prolonged accusatory questioning, but rather, with questioning designed to minimize or to sympathize with a confession. The second factor thus cuts against a custodial interrogation finding.

Finally, the third factor is "whether police dominate the encounter." United States v. Jones, 523 F.3d at 1240. Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory. See United States v. Jones, 523 F.3d at 1240.

Here, the majority of these factors indicate police domination. Schaeffer and Boyd took Begay, by himself, into their Suburban for questioning, see First Hearing Tr. at 165:18-25 (Schaeffer, Wilson); id. at 166:1-2 (Schaeffer, Wilson); FOF ¶ 10, at 5, so they separated him from others and isolated him in a nonpublic questioning room, i.e. their Suburban. There were multiple officers, Schaeffer and Boyd, inside the vehicle with Begay. See First Hearing Tr. at 165:18-25 (Schaeffer, Wilson); id. at 166:1-2 (Schaeffer, Wilson); FOF ¶ 10, at 5. Although Schaeffer's firearm was not visible, see First Hearing Tr. at 164:10-17 (Schaeffer, Wilson); FOF ¶ 5, at 5, Boyd's firearm was, see Second Hearing Tr. at 22:12-14 (Boyd); FOF ¶ 7, at 5, so at least one agent displayed a weapon.[21] The first four factors thus indicate a finding of police domination.

The fifth and sixth factors, however, cut against police domination. Nothing in the record suggests that Schaeffer and Boyd physically contacted Begay, and the Court concludes that Schaeffer and Boyd's language did not suggest that Begay had to comply with their requests. On the contrary, Schaeffer told Begay, at the beginning of the interview, that Begay was not under arrest, that, if Begay wanted to stop the interview or to not answer a question, he could do those things, and that Begay was free to leave. See First Hearing Tr. at 168:1-14 (Schaeffer, Wilson); FOF ¶ 17, at 6. Further, Begay confirmed that the interview was voluntary. See First FBI Tr. at 3:19 (Begay); FOF ¶ 19, at 7.

Having analyzed all of the factors, the Court concludes that the FBI dominated the July 18, 2013 interview, because a majority of the police domination factors indicate such a finding,

---

[21]Although the Court finds that Begay did not see the FBI's M-4 carbine inside the Suburban, see First Hearing Tr. at 210:11-23 (Schaeffer); FOF ¶ 14, at 6, the Court notes that, even if Begay saw the M-4, it would not change the Court's analysis, because that additional information would not outweigh the other evidence indicating that the interrogation was not custodial.

and because the Court does not find the two contrasting factors particularly weighty. The Court ultimately concludes, however, that the July 18, 2013, interview was not a custodial interrogation, because police domination is only one factor, and two of the three custodial interrogation factors cut against a custodial finding. In reaching this conclusion, the Court especially considers the Tenth Circuit's holding that, in determining the custodial nature of an interrogation, the Court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'" United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted). Although Begay stated that he felt coerced into answering Schaeffer's questions, see Second FBI Tr. at 13:12-14 (Begay); FOF ¶ 32, at 8, the relevant standard is objective, and not subjective. The Court does not see how a reasonable person who entered the Suburban voluntarily, see Second Hearing Tr. at 24:3-9 (Boyd); FOF ¶ 9, at 5, was informed that he was not under arrest, that he was free to leave, that if he wanted to stop the interview or to not answer a question, he could do those things, see First Hearing Tr. at 168:1-14 (Schaeffer, Wilson); FOF ¶ 17, at 6, was not arrested or handcuffed, see First Hearing Tr. at 168:1-14 (Schaeffer, Wilson); Second Hearing Tr. at 24:3-9 (Boyd); FOF ¶ 16, at 6, and who sat in the FBI Suburban with the doors unlocked, see Second Hearing Tr. at 24:11-15 (Boyd); FOF ¶ 12, at 5, "would have understood the situation as the functional equivalent of formal arrest.'" United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted). The Court therefore concludes that the July 18, 2013, interview was not a custodial interrogation. Because the interrogation was not custodial, Schaeffer and Boyd did not have to read Begay his Miranda rights. See United States v. Jones, 523 F.3d at 1239 ("Miranda applies only to 'custodial interrogation[s].'")(quoting Miranda v. Arizona, 384 U.S. at 444).

## V.     BEGAY'S STATEMENTS DURING THE JULY 18, 2013, INTERVIEW WERE VOLUNTARY.

The Court concludes that Begay's statements during the July 18, 2013, interview were voluntary. "The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary." United States v. Lopez, 437 F.3d 1059, 1063 (10th Cir. 2006)(Ebel, J.). The key question is whether

> the confession [is] the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

United States v. Lopez, 437 F.3d at 1063 (quoting United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993))(alterations in United States v. Lopez). The Court "determines the voluntariness of a confession based upon the totality of the circumstances, considering both the characteristics of the accused and the details of the interrogation." United States v. Lopez, 437 F.3d at 1063 (quotations omitted). "No single factor is determinative." United States v. Lopez, 437 F.3d at 1063 (quotations omitted). "The United States Supreme Court has identified a nonexhaustive list of factors for assessing the voluntariness of a statement." Sharp v. Rohling, 793 F.3d 1216, 1233 (10th Cir. 2015)(citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). Those factors include "'(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.'" United States v. Lopez, 437 F.3d at 1063-64 (quoting United States v. Toles, 297 F.3d 959, 965-66 (10th Cir. 2002)).

Begay's age, intelligence, and education indicate a finding of voluntariness. Begay received a GED in 2006. See Suppression Motion at 1; FOF ¶ 68, at 14. At the time of the FBI

interviews, Begay was approximately twenty-six years old.  See Suppression Response at 11; FOF ¶ 69, at 14.  The Tenth Circuit has held that the first factor indicated a voluntariness finding when the defendant was twenty-one years old and had received a GED.  See United States v. Toles, 297 F.3d at 966.  See also United States v. Lopez, 37 F.3d at 1065 (holding that the first factor indicated voluntariness when the defendant had completed the eleventh grade and was thirty-three years old).  Like the defendant in United States v. Toles, Begay has a GED.  See Suppression Motion at 1; FOF ¶ 68, at 14.  Further, Begay was approximately twenty-six years old at the time of the FBI interviews, making him several years older than the defendant in United States v. Toles.  See Suppression Response at 11; FOF ¶ 69, at 14.  Additionally, multiple FBI agents described Begay as articulate during the July 18, 2013 interview.  See First Hearing Tr. at 168:24-25 (Schaeffer); Second Hearing Tr. at 25:16-17 (Boyd); FOF ¶ 20, at 7.  The Court therefore concludes that the first factor indicates voluntariness.

The second factor, "the length of detention," also indicates that Begay's statements were voluntary.  United States v. Lopez, 437 F.3d at 1063-64.  The July 18, 2013, interview lasted approximately three hours.  See First FBI Tr. at 3:4 (Schaeffer); id. at 135:19-20 (Schaeffer); FOF ¶ 25, at 7.  The Tenth Circuit has ruled that a three-hour interview "was not unduly long." United States v. Rodebaugh, 798 F.3d 1281, 1292 (10th Cir. 2015).  The Tenth Circuit has also ruled that a custody length of five hours "weighs in favor of voluntariness."  Sharp v. Rohling, 793 F.3d at 1233.  Given Begay's three-hour interview, the Court concludes that the detention-length factor indicates voluntariness.

Regarding the questioning's length and nature, the Tenth Circuit often does not explicitly address this factor, but appears to tie it to government promises of leniency.  See United States v. Lopez, 437 F.3d at 1064; Sharp v. Rohling, 793 F.3d at 1233-34.  Nothing in the record indicates

that Schaeffer and Boyd made any leniency promise to Begay during the July 18, 2013, interview. Further, the use of prolonged accusatory questioning from the custodial interrogation analysis may be relevant to determining which way this factor cuts. See United States v. Jones, 523 F.3d at 1240. As explained above, Schaeffer and Boyd did not engage in prolonged accusatory questioning, but, rather, tried to minimize the gravity of a confession and to sympathize with Begay in an attempt to get him to admit that he engaged in sexual acts with Davis. See First FBI Tr. at 38:6-7 ("You know, I want to try to help you out.")(Schaeffer); id. at 38:19-20 ("You made a mistake, I understand that. Stuff happens.")(Shaeffer). For these reasons, the Court concludes that the third factor indicates voluntariness.

The fourth factor, "whether the defendant was advised of his constitutional rights," United States v. Lopez, 437 F.3d at 1063-64, cuts against voluntariness, because the agents did not read Begay his Miranda rights. See Second Hearing Tr. at 49:10-12 (Samore, Boyd); FOF ¶ 18, at 6. Nevertheless, this factor is only one, and "[n]o single factor is determinative." United States v. Lopez, 437 F.3d at 1063 (quotations omitted). The fifth factor, "whether the defendant was subject to physical punishment," United States v. Lopez, 437 F.3d at 1063-64, indicates voluntariness, because nothing in the record suggests that Schaeffer and Boyd physically punished Begay in any way.

Four of the five voluntariness factors therefore indicate that Begay's statements were voluntary. For the reasons explained above, the Court concludes that Begay's statements during the July 18, 2013, interview were voluntary, and the interview was not a custodial interrogation. The Court will therefore not suppress the recording and transcript of the July 18, 2013, interview.

## VI. THE JULY 19, 2013, INTERVIEW WAS NOT A CUSTODIAL INTERROGATION.

The Court concludes that the July 19, 2013, interview was not a custodial interrogation.

The first custodial interrogation factor, whether the suspect is informed that he or she may end the interview at will or is not required to answer questions, see United States v. Jones, 523 F.3d at 1240, cuts against a custodial finding. Schaeffer informed Begay that "he didn't have to answer questions that he didn't want to," that he was not under arrest, and that Begay could end the interview and leave at any point. First Hearing Tr. at 178:23-25 (Schaeffer, Wilson); id. at 179:1-3 (Schaeffer, Wilson); FOF ¶ 28, at 8.

The second factor, whether the interview's nature is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning, see United States v. Jones, 523 F.3d at 1240, also cuts against a custody finding. The Court has reviewed the Second FBI Transcript, documenting the July 19, 2013, interview, see Second FBI Tr. at 3:3 (Schaeffer), and concludes that Schaeffer did not engage in prolonged, accusatory questioning. Rather, Schaeffer engaged in little questioning at all and allowed Begay to speak at length about topics, including his family history and his relationship with Davis. See, e.g., Second FBI Tr. at 10:8-25 (Begay, Schaeffer); id. at 11:1-25 (Begay, Schaeffer); id. at 37:9-25 (Begay, Schaeffer). The second factor therefore cuts against a custodial finding.

The third factor, whether the police dominate the encounter with the suspect, see United States v. Jones, 523 F.3d at 1240, also indicates that the interview was not custodial. Several factors indicate police domination of the encounter: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory. See United States v. Jones, 523 F.3d at 1240.

First, the FBI did not separate Begay from anyone who could lend moral support, nor did the FBI isolate Begay; Begay did those things on his own volition when he, unexpectedly and without an appointment, traveled by himself to the FBI office in Gallup to speak with Schaeffer. See Suppression Response at 3; Second FBI Tr. at 3:1-8 (Schaeffer); FOF ¶ 26, at 8. Further, Schaeffer and Begay spoke by themselves, so multiple officers were not present. See Second FBI Tr. at 3:4-8 (Schaeffer); FOF ¶ 27, at 8. Additionally, nothing in the record suggests that Schaeffer displayed a weapon during the July 19, 2013, interview, or that Schaeffer physically contacted Begay. Finally, nothing suggests that Schaeffer used language or vocal tones implying that Begay was required to comply with his requests. The only real request that Schaeffer made was when Schaeffer asked Begay if Begay was willing to take a polygraph examination, and Begay agreed to take a polygraph. See First Hearing Tr. at 181:17-21 (Wilson, Schaeffer); FOF ¶ 34, at 8. Although Begay felt that, because of the FBI's authority, the FBI expected him to take a polygraph examination, see Second Hearing Tr. at 105:11-16 (Begay); id. at 105:8-10 (Begay); FOF ¶ 35, at 9, the standard is objective, and not subjective, see United States v. Chee, 514 F.3d at 1112, and nothing in the record suggests that Schaeffer stated or implied that Begay was required to take the polygraph examination. For these reasons, the Court concludes that Schaeffer did not dominate the July 19, 2013 interview. All three factors therefore indicate that the interview was not custodial.

Further, the Court cannot conclude that a reasonable person in Begay's situation would have understood the July 19, 2013, interview as "the functional equivalent of a formal arrest." United States v. Chee, 514 F.3d at 1112. Begay, without being asked to come to Gallup, drove to the FBI office to speak with Schaeffer, who was not expecting him, see FOF ¶ 26, at 8, and was told that he could leave at any time, FOF ¶ 28, at 8. The Court concludes that a reasonable

person in such a situation could not have understood it as "the functional equivalent of a formal arrest." United States v. Chee, 514 F.3d at 1112. For these reasons, the Court concludes that the July 19, 2013, interview was not a custodial interrogation. Because the interrogation was not custodial, Schaeffer did not have to read Begay his Miranda rights. See United States v. Jones, 523 F.3d at 1239 ("Miranda applies only to 'custodial interrogation[s].'")(quoting Miranda v. Arizona, 384 U.S. at 444).

## VII. BEGAY'S STATEMENTS DURING THE JULY 19, 2013, INTERVIEW WERE VOLUNTARY.

The Court concludes that Begay's statements during the July 19, 2013, interview were voluntary.[22] The Court "determines the voluntariness of a confession based upon the totality of the circumstances, considering both the characteristics of the accused and the details of the interrogation." United States v. Lopez, 437 F.3d at 1063 (quotations omitted). "No single factor is determinative." United States v. Lopez, 437 F.3d at 1063 (quotations omitted). "The United States Supreme Court has identified a nonexhaustive list of factors for assessing the voluntariness of a statement." Sharp v. Rohling, 793 F.3d at 1233. Those factors include "'(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.'" United States v. Lopez, 437 F.3d at 1063-64 (quoting United States v. Toles, 297 F.3d 959, 965-66 (10th Cir. 2002)).

Begay's age, intelligence, and education indicate a finding of voluntariness. Begay received a GED in 2006. See Suppression Motion at 1; FOF ¶ 68, at 14. At the time of the FBI

---

[22]Begay does not appear to say anything particularly damaging during the July 19, 2013, interview. Nevertheless, Begay alleges that "[a]ll his statements . . . were not voluntary," so the Court will make voluntariness determinations regarding the July 19, 2013, interview. Suppression Motion at 7.

interviews, Begay was approximately twenty-six years old.  <u>See</u> Suppression Response at 11;

FOF ¶ 69, at 14.  The Tenth Circuit has held that the first factor indicated voluntariness when the

defendant was twenty-one years old and had received a GED.  <u>See</u> <u>United States v. Toles</u>, 297

F.3d at 966.  <u>See</u> <u>also</u> <u>United States v. Lopez</u>, 37 F.3d at 1065 (holding that the first factor

indicated voluntariness when the defendant had completed the eleventh grade and was thirty-

three years old).  Like the defendant in <u>United States v. Toles</u>, Begay has a GED.  <u>See</u>

Suppression Motion at 1; FOF ¶ 68, at 14.  Further Begay was approximately twenty-six years

old at the time of the FBI interviews, making him several years older than the defendant in

<u>United States v. Toles</u>.  <u>See</u> Suppression Response at 11; FOF ¶ 69, at 14.  The Court therefore

concludes that the first factor indicates voluntariness.

The second factor, the detention length, also indicates voluntariness.  The July 19, 2013,

interview lasted approximately 1.5 hours.  <u>See</u> Second FBI Tr. at 3:3-4 (Schaeffer); <u>id.</u> at 71:23

(Schaeffer); FOF ¶ 36, at 9.  The Tenth Circuit has ruled that a three-hour interview "was not

unduly long."  <u>United States v. Rodebaugh</u>, 798 F.3d 1281, 1292 (10th Cir. 2015).  The Tenth

Circuit has also ruled that a custody length of five hours "weighs in favor of voluntariness."

<u>Sharp v. Rohling</u>, 793 F.3d at 1233.  Given Begay's 1.5 hour interview, the Court concludes that

the detention length factor indicates voluntariness.

Regarding, the third factor, the length and nature of the questioning, the Tenth Circuit

often does not explicitly address this factor, but appears to tie it to government promises of

leniency.  <u>See United States v. Lopez</u>, 437 F.3d at 1064; <u>Sharp v. Rohling</u>, 793 F.3d at 1233-34.

Nothing in the record indicates that Schaeffer made any leniency promise to Begay during the

July 19, 2013, interview.  Further, the use of prolonged accusatory questioning from the

custodial interrogation analysis may be relevant to determining which way this factor cuts.  <u>See</u>

United States v. Jones, 523 F.3d at 1240. As explained above, Schaeffer did not engage in prolonged, accusatory questioning, but rather, engaged in little questioning at all and allowed Begay to speak at length about topics, including his family history and his relationship with Davis. See, e.g., Second FBI Tr. at 10:8-25 (Begay, Schaeffer); id. at 11:1-25 (Begay, Schaeffer); id. at 37:9-25 (Begay, Schaeffer). The third factor therefore suggests voluntariness.

The fourth factor, "whether the defendant was advised of his constitutional rights," United States v. Lopez, 437 F.3d at 1063-64, cuts against a voluntariness finding, because Schaeffer did not read Begay his Miranda rights. See FOF ¶ 29, at 8. Nevertheless, this is only one factor, and "[n]o single factor is determinative." United States v. Lopez, 437 F.3d at 1063 (quotations omitted). The fifth factor, "whether the defendant was subject to physical punishment," United States v. Lopez, 437 F.3d at 1063-64, indicates voluntariness, because nothing in the record suggests that Schaeffer physically punished Begay in any way during the July 19, 2013, interview.

Four of the five voluntariness factors therefore indicate that Begay's statements were voluntary. For the reasons explained above, the Court concludes that Begay's statements during the July 19, 2013, interview were voluntary, and the interview was not a custodial interrogation. The Court will therefore not suppress the recording and transcript of the July 19, 2013, interview.

## VIII. BEGAY VALIDLY WAIVED HIS <u>MIRANDA</u> RIGHTS DURING THE JULY 30, 2013, INTERVIEW.

The Court concludes that Begay validly waived his Miranda rights during the July 30, 2013, interview. "A defendant may waive [his Miranda] rights, but any such waiver must be made 'voluntarily, knowingly and intelligently.'" Smith v. Duckworth, 824 F.3d 1233, 1247 (10th Cir. 2016)(quoting Miranda v. Arizona, 384 U.S. at 444). "To determine if a defendant has validly waived his *Miranda* rights, the trial court must engage in two distinct inquiries." Smith

v. Duckworth, 824 F.3d at 1247.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Smith v. Duckworth, 824 F.3d at 1247 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)(internal quotations omitted). This totality-of-the-circumstances approach mandates "'inquiry into all the circumstances surrounding the interrogation.'" Smith v. Duckworth, 824 F.3d at 1247 (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). Considerations include "'evaluation of the [suspect's] age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'" Smith v. Duckworth, 824 F.3d at 1247 (quoting Fare v. Michael C., 442 U.S. at 725)(alterations in Smith v. Duckworth).

Here, Begay signed the FBI's Miranda Form, purporting to waive his Miranda rights. See Miranda Form at 1; FOF ¶ 44, at 11. The Court first concludes that Begay signed the form voluntarily, and as "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Smith v. Duckworth, 824 F.3d at 1247. Citing this language, the Supreme Court held that "the voluntariness of waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Colorado v. Connelly, 479 U.S. 157, 170 (1986)(Rehnquist, C.J.)(citing Moran v. Burbine, 475 U.S. at 421). Although Begay signed the forms, because he was "well within the FBI headquarters" and felt that he "need[ed] to go along with what these guys are . . . expecting," Second Hearing Tr. at 115:3-6 (Begay); FOF ¶ 46, at 11, the Court cannot soundly conclude that the FBI overreached

in such a situation.  The fact that Begay was inside the FBI office, <u>see</u> FOF ¶ 46, at 11, in the presence of one FBI agent, Sullivan, who was unarmed at the time, <u>see</u> First Hearing Tr. at 12:1-3 (Sullivan); FOF ¶ 50, at 12, cannot be construed as police overreach based on "the totality of the circumstances surrounding the interrogation."   <u>Smith v. Duckworth</u>, 824 F.3d at 1247 (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)(internal quotations omitted).

The Court next concludes that Begay did not sign the <u>Miranda</u> Form because of deception.  The Court finds that Sullivan never made any promises of leniency or family counseling to Begay.  <u>See</u> First Hearing Tr. at 33:8-13 (Nayback, Sullivan); FOF ¶ 59 n.9, at 13. Additionally, while Sullivan admits that part of her interrogation technique is to "use charm and verbal skill and body language . . . to win over the trust of the person [she is] interviewing," First Hearing Tr. at 104:3-6 (Samore, Sullivan); FOF ¶ 51, at 12, Sullivan did not begin interrogating Begay until after Begay signed the <u>Miranda</u> Form.  <u>See</u> FOF ¶ 41, at 10 (reading the <u>Miranda</u> Form to Begay); Second Hearing Tr. at 82:10-15 (Begay); FOF ¶ 54, at 12 (beginning the interrogation).  Sullivan's interrogation techniques therefore did not deceive Begay into signing the <u>Miranda</u> Form.  On these facts, the Court concludes that Begay signed the <u>Miranda</u> Form voluntarily.

The Court further concludes that Begay signed the <u>Miranda</u> Form "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Smith v. Duckworth</u>, 824 F.3d at 1247.  The <u>Miranda</u> Form states the full <u>Miranda</u> warning:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Miranda Form at 1; FOF ¶ 42, at 10-11.  It also states: "I have read this statement of my rights and I understand what my rights are."  Miranda Form at 1; FOF ¶ 42, at 11.  The Court finds that Begay read and understood the Miranda Form.  See Second Hearing Tr. at 99:17-21 (Nayback, Begay); FOF ¶ 45 n.8, at 11.  Because Begay read and understood this form, including the phrase "anything you say can be used against you in court," Miranda Form at 1; FOF ¶ 42, at 10, the Court concludes that Begay signed the Miranda Form "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," Smith v. Duckworth, 824 F.3d at 1247.

Additionally, Begay has a GED, see Suppression Motion at 1; FOF ¶ 87, at 17, was approximately twenty-six years old at the time of the FBI interviews, see Suppression Response at 11; FOF ¶ 69, at 14, and was articulate during the July 30, 2013, interview, see First Hearing Tr. at 148:10-16 (Sullivan, Nayback); FOF ¶ 61, at 13.  On these facts, the "totality of the circumstances surrounding the interrogation reveal . . . the requisite level of comprehension."  Smith v. Duckworth, 824 F.3d at 1247.  The Court therefore concludes that Begay validly waived his Miranda rights during the July 30, 2013, interview.

## IX.   BEGAY'S STATEMENTS DURING THE JULY 30, 2013, INTERVIEW WERE VOLUNTARY.

The Court concludes that Begay's statements during the July 30, 2013, interview were voluntary.  "The United States Supreme Court has identified a nonexhaustive list of factors for assessing the voluntariness of a statement."  Sharp v. Rohling, 793 F.3d 1216, 1233 (10th Cir.

2015)(citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).  Those factors include "'(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.'"  <u>United States v. Lopez</u>, 437 F.3d at 1063-64 (quoting <u>United States v. Toles</u>, 297 F.3d 959, 965-66 (10th Cir. 2002)).

Begay's age, intelligence, and education indicate a finding of voluntariness.  Begay received a GED in 2006.  <u>See</u> Suppression Motion at 1; FOF ¶ 68, at 14.  At the time of the FBI interviews, Begay was approximately twenty-six years old.  <u>See</u> Suppression Response at 11; FOF ¶ 69, at 14.  The Tenth Circuit has held that the first factor indicated voluntariness when the defendant was twenty-one years old and had received a GED.  <u>See</u> <u>United States v. Toles</u>, 297 F.3d at 966.  <u>See</u> <u>also</u> <u>United States v. Lopez</u>, 37 F.3d at 1065 (holding that the first factor indicated voluntariness when the defendant had completed the eleventh grade and was thirty-three years old).  Like the defendant in <u>United States v. Toles</u>, Begay has a GED.  <u>See</u> Suppression Motion at 1; FOF ¶ 68, at 14.  Further, Begay was approximately twenty-six years old at the time of the FBI interviews, making him several years older than the defendant in <u>United States v. Toles</u>.  <u>See</u> Suppression Response at 11; FOF ¶ 69, at 14.  Finally, Begay was articulate during the July 30, 2013, interview.  <u>See</u> First Hearing Tr. at 148:10-16 (Sullivan, Nayback); FOF ¶ 61, at 13.  The Court therefore concludes that the first factor indicates voluntariness.

The second factor, the detention length, also indicates voluntariness.  The unrecorded portion of the July 30, 2013, interview with Begay lasted about three hours.  <u>See</u> Second Hearing Tr. at 136:9-13 (Begay); FOF ¶ 62, at 13.  The recorded portion lasted approximately 1.5 hours.  <u>See</u> Third FBI Tr. at 3:2(Schaeffer); <u>id.</u> at 65:1 (Schaeffer); FOF ¶ 64, at 14.  The total interview

length was therefore approximately 4.5 hours.  See Second Hearing Tr. at 136:9-13 (Begay); FOF ¶ 62, at 13; Third FBI Tr. at 3:2(Schaeffer); id. at 65:1 (Schaeffer); FOF ¶ 64, at 14.  The Tenth Circuit has ruled that a custody length of five hours "weighs in favor of voluntariness." Sharp v. Rohling, 793 F.3d at 1233.  Given Begay's 4.5 hour interview, the Court concludes that the detention-length factor indicates voluntariness.

The third factor, the questioning's length and nature, cuts against voluntariness, "based upon the totality of the circumstances, considering . . . the details of the interrogation."  United States v. Lopez, 437 F.3d at 1063 (quotations omitted).  During the interview, Sullivan "was very talkative and she had almost more to say than [Begay] did, in fact anytime [Begay] had a chance to speak she would . . . stop [Begay] and . . . imply and suggest . . . whatever direction she wanted to take it."  Second Hearing Tr. at 136:9-13 (Begay); FOF ¶ 57, at 13.  Further, although Sullivan did not yell at Begay, she made "little outbursts here and there . . .  where she was displease[d] at what [Begay] was saying."  Second Hearing Tr. at 140:6-11 (Nayback, Begay); FOF ¶ 58, at 13.  Finally, Begay "felt as though that if [he] didn't answer according to her that [he] wasn't going to be able to leave."  Second Hearing Tr. at 95:14-16 (Begay); FOF ¶ 60, at 13. Essentially, Sullivan's questioning was aggressive, prolonged, and accusatory.  Such questioning contrasts with Schaeffer's on July 18, 2013, in which he tried to minimize the gravity of a confession and to sympathize with Begay.  See First FBI Tr. at 38:6-7 ("You know, I want to try to help you out.")(Schaeffer); id. at 38:19-20 ("[Y]ou made a mistake, I understand that.  Stuff happens.")(Schaeffer).  Sullivan's questioning also differs from Schaeffer's July 19, 2013, interview, in which he allowed Begay to speak at length about topics including his family history and his relationship with Davis.  See, e.g., Second FBI Tr. at 10:8-25 (Begay, Schaeffer); id. at 11:1-25 (Begay, Schaeffer); id. at 37:9-25 (Begay, Schaeffer).  The Court therefore concludes

that this factor cuts against voluntariness "based upon the totality of the circumstances, considering . . . the details of the interrogation." United States v. Lopez, 437 F.3d at 1063 (quotations omitted). Nevertheless, "[n]o single factor is determinative." United States v. Lopez, 437 F.3d at 1063 (quotations omitted).

The fourth factor, "whether the defendant was advised of his constitutional rights," United States v. Lopez, 437 F.3d at 1063-64, indicates voluntariness, because Begay signed the Miranda Form, see Miranda Form at 1; FOF ¶ 44, at 11, and read and understood it, see Second Hearing Tr. at 99:17-21 (Nayback, Begay); FOF ¶ 45, at 11. The fifth factor, "whether the defendant was subject to physical punishment," United States v. Lopez, 437 F.3d at 1063-64, indicates voluntariness, because nothing in the record suggests that the agents physically punished Begay in any way during the July 30, 2013, interview. Four of the five voluntariness factors therefore indicate that Begay's statements were voluntary. For the reasons explained above, the Court concludes that Begay's statements during the July 30, 2013, interview were voluntary, and Begay validly waived his Miranda rights. The Court will therefore not suppress the evidence relating to the July 30, 2013, interview.

In sum, the Court's impression of Begay is that he is intelligent and made voluntary statements to agents on multiple occasions. He tried to talk his way out of the allegations, and that attempt fared badly. He should not have -- at least without an attorney -- been so agreeable to interviews by skilled law enforcement agents. In the end, Begay's actions were not involuntary, but just bad decisions.

**IT IS ORDERED** that: (i) the requests in the Motion to Suppress Statement and Supportive Memorandum, filed July 22, 2014 (Doc. 28), are denied; and (ii) the requests in the United States' Motion to Exclude Expert Testimony from Suppression Hearing, filed August 16,

2017 (Doc. 128), are granted in part and denied in part.  Evidence relating to Defendant Lyle Woody Begay's July 18, 2013, July 19, 2013, and July 30, 2013, FBI interviews will not be suppressed.  Richard Leo may testify at trial regarding police interrogation techniques generally, but not about the application of such techniques to this case, about false confessions, or about why people may falsely confess.  Eric Lucero's testimony is excluded.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Kyle T. Nayback
Novaline Wilson
Michael D. Murphy
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

John F. Samore
Albuquerque, New Mexico

  *Attorney for the Defendant*