**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                               No. CR 14-0747 JB

LYLE WOODY BEGAY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on: (i) the United States' First Motion *in Limine*,

filed January 11, 2019 (Doc. 172)("First MIL");[1] (ii) the United States' Motion for a *Lafler-Frye*

Hearing, filed January 11, 2019 (Doc. 173)("Lafler-Frye Motion"); (iii) the United States' Sealed

Motion *in Limine* to Exclude Evidence of the Victims' Sexual Behavior and Predispositions, filed

January 11, 2019 (Doc. 174)("Second MIL"); (iv) the United States' Motion *in Limine* to Prohibit

Discussion of Sentencing or Punishment at Trial, filed August 26, 2019 (Doc. 189)("Third MIL");

(v) the United States' Motion *in Limine* for Pre-trial Determination of Indian Country Status, filed

August 26, 2019 (Doc. 190)("Fourth MIL"); (vi) the United States' Sealed Motion to Admit

Evidence Pursuant to Rules 413, 414, and 404(b), filed August 26, 2019 (Doc. 192)("Fifth MIL");

(vii) the United States' Motion to Exclude Expert Testimony at Trial, filed February 14, 2020

(Doc. 218)("Sixth MIL"); and (viii) the Defendant's Sealed Motion *in Limine* to Exclude Evidence

Regarding Jail Calls, filed March 31, 2020 (Doc. 229)("Defense MIL").  The primary issues are:

(i) whether the Court should preclude Defendant Lyle Woody Begay from argument, commentary,

---

[1]The United States filed an identical motion in the United States First Motion *in Limine*, filed August 26, 2019 (Doc. 188).  The Court therefore addresses the motion that the United States filed first.

or inquiry at trial regarding his alleged victims' sexual behavior and history; (ii) whether the Court should hold a hearing pursuant to Missouri v. Frye, 566 U.S. 134 (2012), and Lafler v. Cooper, 566 U.S. 156 (2012)("Lafler-Frye hearing"), to determine whether Begay's counsel has effectively communicated the United States' plea offer to Begay; (iii) whether the acts that the United States alleges Begay committed occurred in Indian Country such that the Court has subject-matter jurisdiction over this case; (iv) whether the Court should permit Plaintiff United States of America to admit evidence of Begay's uncharged prior sexual misconduct regarding the alleged victims in this case; (v) whether Dr. Davis' proposed expert testimony is based on sufficiently reliable scientific principles and methods to be admissible pursuant to rule 702 of the Federal Rules of Evidence; (vi) whether evidence of calls that Begay made from jail between October, 2019, and February, 2020, is relevant and not unfairly prejudicial; (vii) whether the Court should prohibit Begay from discussing any alleged misconduct by the United States at trial; (viii) whether the Court should prohibit Begay from impeaching the United States' witnesses with prior administrative discipline; (ix) whether the Court should prohibit Begay from discussing at trial any issues relating to his health; and (x) whether the Court should prohibit Begay from arguing or introducing evidence about topics that only he knows.  The Court concludes that: (i) Begay may not comment, inquire, or argue at trial regarding his alleged victims' sexual behavior and history, because rule 412 of the Federal Rules of Evidence prohibits evidence of an alleged victim's sexual behavior and history in a criminal trial involving sexual misconduct; (ii) the Court will hold a Lafler-Frye hearing to determine whether Begay was adequately informed of the United States' plea offers; (iii) the acts that the United States alleges occurred in the Navajo Nation Indian Reservation, and so the Court has subject-matter jurisdiction; (iv) the United States may introduce

- 2 -

evidence of Begay's uncharged conduct, because it is relevant and not unfairly prejudicial; (v) Dr. Davis may testify regarding police interrogation tactics, but may not testify regarding false-confession theory, because the Court concludes that false-confession theory is not sufficiently reliable to be admissible pursuant to rule 702 of the Federal Rules of Evidence; (vi) the Court will not generally exclude evidence of calls that Begay made from jail between October, 2019, and February, 2020, unless Begay identifies specific calls that he asserts must be excluded and demonstrates why they must be excluded; (vii) the Court will not at this time prohibit Begay from discussing government misconduct, because the United States does not identify any specific evidence that it wishes to exclude; (viii) at this time, the Court will not prohibit Begay from impeaching the United States' witnesses with prior administrative discipline, because the United States does not specify the evidence it wishes to exclude; (ix) at this time, the Court will not prohibit Begay from discussing his health, because the United States does not sufficiently explain its request; and (x) at this time, the Court will not prohibit Begay from discussing topics about which only he knows, because the United States does not sufficiently explain its request.

## FACTUAL BACKGROUND

In a criminal prosecution under 18 U.S.C. §§ 1152 or 1153, the Court determines its jurisdiction based on facts established by a preponderance of the evidence. See United States v. Bustillos, 31 F.3d 931, 933 (10th Cir. 1994)(citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)). The United States charges Begay with a violation of 18 U.S.C. § 1153. See Indictment at 1, filed March 21, 2014 (Doc. 2)("Indictment"). The following facts, which the

Court finds by a preponderance of the evidence,[2] are relevant to the Court's jurisdictional determination:

1.     Navajo (town site) community in Navajo, County of McKinley, State of New Mexico, is in Land Management District 18 of the United States Bureau of Indian Affairs. <u>See</u> Letter at 1.

2.     The United States of America holds title to Land Management District 18 in trust for the Navajo Tribe of Indians. <u>See</u> Letter at 1.

3.     The geographic coordinates of N 35º 54.233', W 109º 02.368, are in Land Management District 18. <u>See</u> Letter at 1.

## PROCEDURAL BACKGROUND

On March 11, 2014, a Grand Jury indicted Begay on four counts of sexual misconduct against minors in Navajo Nation. <u>See</u> Indictment at 1-3, filed March 11, 2014 (Doc. 2)("Indictment").   Counts 1, 2, and 3 allege that, in February, 2004, Begay allegedly "did knowingly engage in and attempt to engage in a sexual act with JANE DOE 1, a child who had not attained the age of 12 years."  Indictment at 1-3.  The alleged sexual act included both "penetration" and "intentional touching." Indictment at 1-2.  Count 2 alleges that, between 2004 and 2011, Begay "knowingly engaged in and caused sexual contact with and by Jane Doe 2, a

---

[2]The Court notes that the United States creates a thin record establishing that Begay's alleged acts took place in Indian Country.  The United States attaches a letter to the Fourth MIL from a Program Manager at the Navajo Land Department. <u>See</u> Letter from W. Mike Halona to Carol A. York (dated Sept. 12, 2013), filed August 26, 2019 (Doc. 190-1)(Letter).  The Letter is not sworn. <u>See</u> Letter at 1.  Begay does not respond, however, to the Fourth MIL or otherwise contest that the alleged acts took place in Indian Country.  Accordingly, should Begay so desire, the Court will afford Begay the opportunity to contest the Court's findings and the United States' evidence on which those findings rest.

- 4 -

child who had not attained the age of 12 years." Indictment at 2. The Indictment further alleges that Begay is an Indian and that the alleged event occurred in Indian Country. See Indictment at 1. Begay has been in custody awaiting trial since March 12, 2014, when he was arrested. See Arrest Warrant at 1, filed March 18, 2014 (Doc. 10). By the Court's count, Begay has filed over forty continuance motions. See 2014-CR-00747-JB court docket.

This case has already seen extensive litigation on a number of issues, and the Court has issued three memorandum opinions addressing a range of pretrial issues. See United States v. Begay, 310 F. Supp. 3d 1318 (D.N.M. 2018)(Browning, J.)("Feb. 23 MOO")(denying motion to suppress and granting the United States' motion to exclude Begay's proposed expert witness); United States v. Begay, No. CR 14-0747, 2018 WL 401265 (D.N.M. Jan. 12, 2018)(Browning, J.)(resolving discovery dispute as to the alleged victim's school records); United States v. Begay, No. CR 14-0747, 2017 WL 4737250 (D.N.M. Oct. 19, 2017)(Browning, J.)(denying Begay's request to compel disclosure of certain witness statements). In January and August of 2019, the United States filed a series of motions in limine to address evidentiary disputes that could potentially arise at trial.

### 1.     **The First MIL.**

In the First MIL, the United States requests that the Court rule on eight potential discovery disputes. See First MIL at 1. First, the United States requests that the Court "preclude Defendant and his counsel from, while the jury is present, introducing any evidence, making any statement, or asking any questions regarding allegations of government misconduct or constitutional violations." First MIL at 1. The United States does not elaborate any alleged misconduct, but asserts that evidence or argument regarding alleged prosecutorial or investigative misconduct

would be unfairly prejudicial and could confuse the jury.  <u>See</u> First MIL at 1.  Second, the United States requests, for similar reasons, that the Court preclude allusion to any of the Court's pretrial rulings in this case.  <u>See</u> First MIL at 2.  The United States does not assert why the Court should make such a ruling, but cites to rules 401, 402, and 403.  <u>See</u> First MIL at 2.  Third, the United States asks that the Court prohibit Begay from alluding or referring to any plea discussion or negotiations.  <u>See</u> First MIL at 2 (citing Fed. R. Evid. 401-403, 410).  Fourth, the United States requests that the Court preclude Begay from any making any comment or introducing any evidence "regarding Defendant volunteering, offering, or in any manner agreeing to stipulate to certain facts unless some agreement between all parties with approval of the Court has been arranged concerning a stipulation."  First MIL at 2 (citing Fed. R. Evid. 401-403; <u>United States v. Schene</u>, 543 F.3d 627, 643 (10th Cir. 2008)).  Fifth, the United States asks that the Court prohibit Begay from introducing any evidence that could "only otherwise come to the jury's attention through the sworn testimony of Defendant, unless Defendant's counsel informs the Court that Defendant will, in fact, testify."  First MIL at 3.  Sixth, the United States requests that the Court preclude Begay from impeaching any United States witness with prior disciplinary proceedings "unless and until the Court has an opportunity to review such evidence to determine its admissibility."  First MIL at 3 (citing Fed. R. Evid. 608(b)).  The United States requests that the Court order Begay to approach the bench before alluding to any prior disciplinary  proceedings against the United States' witnesses.  <u>See</u> First MIL at 3.  Seventh, the United States asks that the Court prohibit Begay from offering any exhibit that he already has not disclosed to the United States.  <u>See</u> First MIL at 3 (citing Fed. R. Crim. P. 16(d)(2)(C)).  Eighth, the United States asks that the Court prohibit Begay from "introducing any evidence, making any statement, or asking any questions regarding

- 6 -

Defendant's mental or physical health, including, without limitation, past or current diseases, traumas, illnesses, attacks, and medical or psychological conditions." First MIL at 3 (citing Fed. R. Evid. 401-403). The United States "presume that defendant opposes this motion." First MIL at 4.

### 2.    The Lafler-Frye Motion.

The United States next requests that the Court hold a hearing to ensure that Begay's counsel has communicated the United States' plea offers to Begay. See Lafler-Frye Motion at 1 (citing Missouri v. Frye, 566 U.S. 134; Lafler v. Cooper, 566 U.S. 156). The United States contends that such a hearing is necessary "[s]o that a clear record will exist in the event Defendant is convicted at trial and subsequently brings a claim under 28 U.S.C. § 2255 alleging that his attorney failed to effectively convey the United States' plea offer to him." Lafler-Frye Motion at 1. The United States "presumes that defendant opposes this motion." Lafler-Frye Motion at 2.

### 3.    The Second MIL.

In the Second MIL, the United States requests that the Court prevent Begay from alluding to his alleged victim's sexual history. See Second MIL at 1. The United States notes that rule 412 bars evidence of a victim's sexual history and sexual predisposition. See Second MIL at 1 (citing Fed. R. Evid. 412). The United States notes that rule 412 is intended to avoid victims' embarrassment, prevent the jury from relying on bias or stereotype, and encourage victims to report sexual misconduct. See Second MIL at 1-2 (citing Fed. R. Evid. 412 advisory committee notes; United States v. Elbert, 561 F.3d 771, 776 (8th Cir. 2009)). The United States contends that "[p]ast sexual behavior connotes all activities that involve actual physical conduct, i.e., sexual intercourse or sexual contact." Second MIL at 2 (citing, e.g., United States v. Galloway, 937 F.2d

- 7 -

542 (10th Cir. 1991)).  The United States also argues that the Court should construe "behavior" to "include activities of the mind, such as fantasies or dreams."  Second MIL at 2 (citing 23 C. Wright and K. Graham, Jr., Federal Practice and Procedure, § 5384, at 548 (1980)).  The United States also avers that rule 412's reference to "'sexual predisposition'" is "'designed to exclude evidence that . . . the proponent believes may have a sexual connotation for the factfinder," such as "the alleged victim's mode of dress, speech, or life-style[.]'"  Second MIL at 2 (quoting Fed. R. Evid. 412 advisory committee notes to the 1994 amendments)(alterations in Second MIL)).  The United States further asserts that "reputation or opinion evidence is never admissible under rule 412," because rule 412's exceptions require specific instances of a victim's sexual behavior.  Second MIL at 3 (citing United States v. Torres, 937 F.2d 1469, 1472 (9th Cir. 1991)).  The United States accordingly asserts that Begay may not introduce evidence of or allude to his alleged victim's sexual reputations.  See Second MIL at 3.

The United States notes that rule 412 provides three exceptions to the general prohibition against allusions to victims' sexual past and sexual behavior.  See Second MIL at 3 (citing Fed. R. Evid. 412).  The United States contends that none of those exceptions permits evidence of Begay's alleged victim's "sexual behavior or predisposition" or apply to this case.  Second MIL at 4.  The United States contends that rule 412(b)(1)(A) -- which allows evidence of specific prior conduct to show that another individual caused or is responsible for evidence against the defendant -- is inapplicable, because there is no semen, physical injury, or other physical evidence in this case.  See Second MIL at 4.  The United States contends that rule 412(b)(1)(B) -- which allows a defendant to introduce evidence of previous sexual encounters with the alleged victim to demonstrate that the encounter in question was consensual -- is inapplicable, because Begay's

- 8 -

alleged victims are young relatives with whom Begay did not have a prior sexual relationship. <u>See</u> Second MIL at 4. Finally, the United States contends that rule 412(b)(1)(C) -- which allows evidence whose exclusion would violate a defendant's constitutional rights -- is inapplicable, because excluding evidence of Begay's alleged victim's sexual behavior and history will not violate Begay's constitutional rights. <u>See</u> Second MIL at 5. The United States contends that limiting a defendant's ability to cross-examine an alleged victim on unrelated prior incidents does not rise to the level of a constitutional violation. <u>See</u> Second MIL at 5 (citing <u>United States v. Payne</u>, 944 F.2d 1458, 1469 (9th Cir. 1991)). The United States further argues that defendants do not have an absolute constitutional right to present evidence in their defense, and that such rights often must "bow to other interests." Second MIL at 5 (citing <u>Michigan v. Lucas</u>, 500 U.S. 145, 149 (1991)).

The United States next argues that evidence of prior abuse that Jane Doe 1 or Jane Doe 2 suffered is irrelevant. <u>See</u> Second MIL at 6. "The sole purpose of introducing such evidence," the United States avers, "would be to impugn the victims' testimony in an effort to impeach their credibility or to impermissibly encourage jury nullification." Second MIL at 6 (citing <u>United States v. Davila</u>, 704 F.2d 749 (5th Cir. 1983)). The United States further argues that such cross-examination will embarrass Jane Doe 1 and Jane Doe 2, and discourage other victims from reporting sex crimes in the future. <u>See</u> Second MIL at 6 (citing Fed. R. Evid. 412 advisory committee notes). The United States similarly argues that evidence of Jane Doe 1's and Jane Doe 2's sexual conduct since the alleged assaults is irrelevant. <u>See</u> Second MIL at 6. The United States closes by stating that it "presumes that defendant opposes this motion." Second MIL at 7.

4.      **The Third MIL**.

In the Third MIL, the United States requests that the Court prohibit Begay from alluding to the potential sentence that a conviction would entail.  See Third MIL at 1.  The United States asserts that, pursuant to 18 U.S.C. §§ 1153 and 2241(c), Begay faces between thirty years and life imprisonment if he is convicted of Count 1.  See Third MIL at 2.  The United States contends that the only reason to introduce evidence of that penalty is to encourage jury nullification, and the United States argues that defendants do not have a right to jury nullification.  See Third MIL at 2 (citing Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999)).  The United States further argues that the Court should prohibit Begay from warning the jury against "taking away defendant's freedom," "sending him to jail," "taking him away from his family," "labeling him a sex offender," or "any statement regarding possible consequences serve no purpose at trial."  Third MIL at 4.

5.      **Fourth MIL**.

In the Fourth MIL, the United States asks that the Court determine whether the alleged crimes occurred in Indian Country.  See Fourth MIL at 9.  The United States contends that the alleged crimes occurred in "Navajo (town site) community, Navajo, McKinley County, New Mexico, identified by WGS84 GPS Geographic Coordinates of N 35º 54.233', W 109º 02.368', Bureau of Indian Affairs Land Management District No. 18, Fort Defiance Agency, McKinley County, State of New Mexico, and was determined to be on Navajo Nation Trust Land."  Fourth MIL at 1.  The United States avers that it determined that Begay committed his alleged crimes "within Navajo Nation Trust Land within the exterior boundaries of the Navajo Nation Indian Reservation."  Fourth MIL at 1.  The United States further avers that "[e]very act that could possibly be at issue in this case occurred within the exterior boundaries of the Navajo Nation, and

that area is far removed from any boundary that would impact federal jurisdiction over this case."
Fourth MIL at 2 (citing 18 U.S.C. § 1151(a)).

The United States asserts that, where the alleged crimes occurred is a jurisdictional fact,
and so requests that the Court determine whether the alleged crimes occurred in Indian County.
See Fourth MIL at 2 (citing United States v. Roberts, 185 F.3d 1125, 1139 (10th Cir. 1999)). The
United States argues that such a determination "avoids forcing the United States to mix proof of a
purely legal matter such as land status together with the evidence it presents at trial." Fourth MIL
at 4. The United States further asserts that submitting the territorial status question to the jury
would confuse and distract from the case's core facts. See Fourth MIL at 4. The United States
argues that the Court should determine territorial status to avoid "integrating a jurisdictional
question into the trial after jeopardy has attached," because, should the Court submit the issue to
the jury, and should the jury conclude that the acts did not happen in Indian Country, the United
States could be "deprived of the opportunity to appeal the decision" or else violate Begay's rights
under the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States
of America. Fourth MIL at 4. Accordingly, the United States requests that the Court make a
pretrial determination that the alleged crimes occurred in Indian Country. See Fourth MIL at 4.

6.      **The Fifth MIL.**

In the Fifth MIL, the United States seeks leave to admit evidence, pursuant to rules 404(b),
413, and 414, of uncharged instances in which Begay allegedly abused Jane Doe 1 and Jane Doe
2. See Fifth MIL at 1. The United States asserts that Jane Doe 1 related to Federal Bureau of
Investigation ("FBI") agents that Begay sexually abused her on five separate instances, with two
of those instances occurring while Begay was a juvenile. See Fifth MIL at 2. The United States

- 11 -

says that it charged the remaining three acts in Counts 1, 2, and 3.  <u>See</u> Fifth MIL at 2.

The United States avers that the acts that Count 1 charges occurred in September, 2004, when Jane Doe was eight years old and when Begay was eighteen years old.  <u>See</u> Fifth MIL at 2-3.  The United States says that the acts that Count 2 charges happened in August, 2006, when Jane Doe 1 was ten years old and Begay was twenty years old.  <u>See</u> Fifth MIL at 3.  The United States avers that the acts that Count 3 occurred around Christmas sometime between 2006 and 2011, when Jane Doe 1 was in high school.  <u>See</u> Fifth MIL at 3.  The United States says Jane Doe 2 told FBI agents that the acts that Count 4 charges occurred around 2009 and 2010, when Jane Doe 2 was seven or eight years old.  <u>See</u> Fifth MIL at 3-4.

Turning to the uncharged acts involving Jane Doe 1, the United States maintains that, when Begay was a juvenile, he attempted to vaginally penetrate Jane Doe 1 at Jane Doe 1's grandmother's house.  <u>See</u> Fifth MIL at 4.  The United States also describes a similar incident, during which Jane Doe 1 was in kindergarten and Begay was a teenager.  <u>See</u> Fifth MIL at 4-5.  The United States also relates sexual misconduct that Begay described to FBI agents.  <u>See</u> Fifth MIL at 5.  The United States says that Begay related three instances in which he attempted to or did penetrate Jane Doe 1 with his penis when she was between four and six years old and Begay was a teenager.  <u>See</u> Fifth MIL at 5.  The United States describes further uncharged acts involving Jane Doe 2.  <u>See</u> Fifth MIL at 5-6.

The United States asserts that rules 413 and 414 apply to these uncharged acts.  <u>See</u> Fifth MIL at 6.  The United States argues first that it may introduce these prior uncharged acts pursuant to rule 414, which provides that, in criminal cases where a defendant is charged with child molestation, courts may admit evidence of other instances in which the defendant molested "'any

other child." Fifth MIL at 6 (quoting Fed. R. Evid. 414). The United States contends that Congress expressly intended that rule 414 supersede rule 404(b) in cases involving sexual assault against children, and that rules 413, 414, and 415 "create a presumption that 'evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects.'" Fifth MIL at 6-7 (quoting 140 Cong. Rec. H8991-92 (1994)(remarks of principal House sponsor, Rep. Molinari), and citing United States v. Benally, 500 F.3d 1085, 1089 (10th Cir. 2007)). The United States avers that, unlike rule 404(b), rule 414 expressly permits evidence of a defendant's prior acts to prove the defendant's propensity to commit the charged acts. See Fifth MIL at 7. The United States further asserts that admitting rule 414 propensity evidence "is the norm" and that "its exclusion is the exception." Fifth MIL at 7. In support of its position, the United States cites rule 414's legislative history, quoting:

> "The practical effect of the new rules is to put evidence of uncharged offenses in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to a special exclusionary rule. The presumption is in favor of admission. The underlying legislative judgment is that the evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects.

> "In line with this judgment, the rules do not impose arbitrary or artificial restrictions on the admissibility of evidence. Evidence of offenses for which the defendant has not previously been prosecuted or convicted will be admissible, as well as evidence of prior convictions. No time limit is imposed on the uncharged offenses . . . as a practical matter, evidence of other sex offenses by the defendant is often probative and properly admitted, notwithstanding substantial lapses of time in relation to the charged offense or offenses."

Fifth MIL at 7 (quoting 140 Cong. Rec. H8992 (1994)(Statements of Rep. Molinari and Sen. Dole)).

The United States contends that three conditions must be met to introduce evidence of a defendant's prior acts of child molestation: (i) the defendant must be accused of sexual assault or child molestation; (ii) the proffered evidence is probative of a defendant's separate instances of sexual assault or child molestation; and (iii) the proffered evidence is relevant. See Fifth MIL at 8 (citing United States v. Benally, 500 F.3d at 1090; United States v. McHorse, 179 F.3d 889, 898 (10th Cir. 1999); United States v. Guardia, 135 F.3d 1326, 1328 (10th Cir. 1998)). The United States avers that the same analysis applies to rule 413. See Fifth MIL at 9 (citing United States v. Batton, 602 F.3d 1191, 1196 (10th Cir. 2010)).

The United States contends that each of Begay's prior, uncharged acts satisfies rules 413 and 414. See Fifth MIL at 9. The United States asserts that Counts 1 and 2 charge Begay with child molestation crimes that rule 414 defines. See Fifth MIL at 9 (citing Fed. R. Evid. 414(d)(1); 18 U.S.C. 2241(a), (c)). The United States further asserts that Begay's alleged prior, uncharged acts are probative of Begay's separate instances of child molestation: the United States asserts that it "cannot think of more probative evidence of defendant's propensity to sexually abuse [Jane Doe 1] as charged than his prior sex abuse of [Jane Doe 1] and her sister, [Jane Doe 2]." Fifth MIL at 9. Last, the United States asserts that these prior acts are relevant. See Fifth MIL at 10. The United States avers that a "'defendant with a propensity to commit acts similar to the charged crime is more likely to have committed the charged crime than another. Evidence of such a propensity is therefore relevant.'" Fifth MIL at 10 (quoting United States v. Guardia, 135 F.3d at 1328). The United States says that it does not know what defense Begay will assert, but the United States contends that it "is conceivable that he may deny the sexual abuse took place." Fifth MIL at 10. The United States argues that Begay's prior acts show that he has a propensity to commit

the acts that Counts 1 and 2 charges, and "he used his position of trust in the family, had access to the sisters, and that he used his larger stature during these assaults and, therefore, it is more likely that he committed the sexual assaults charged in the indictment."  Fifth MIL at 10.

The United States acknowledges that courts must subject rules 413 and rule 414 evidence to rule 403's balancing test.  See Fifth MIL at 11 (citing United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)).  The United States asserts, however, that courts must undertake the rule 403 analysis with rules 413 and 414's policy and intent in mind.  See Fifth MIL at 11 (citing, e.g., United States v. Meacham, 115 F.3d 1488, 1491 (10th Cir. 1997)).  The United States asserts that a preponderance of the evidence shows that Begay's prior acts happened, because Jane Doe 1 and Jane Doe 2 gave statements to FBI agents and were forensically examined, and because Begay's own statements to FBI agents corroborate Jane Doe 1 and Jane Doe 2's accounts.  See Fifth MIL at 12.  The United States acknowledges that the prior acts are prejudicial to Begay, but the United States asserts that all evidence adduced against a defendant at trial is prejudicial to some degree, and the United States asserts that the prior acts are unlikely to cause the jury to "produce a verdict based on emotions wholly apart from the jury's judgment as to the defendant's guilt or innocence." Fifth MIL at 18.  See id. at 12.  The United States further contends that the prior acts are highly probative, because the jury's conclusion in this case will depend largely upon whom the jury finds to be more credible -- Begay or Jane Doe 1 and Jane Doe 2 -- and so Begay's prior acts strengthen Jane Doe 1 and Jane Doe 2's credibility.  See Fifth MIL at 12.

The United States next argues that the prior acts are admissible as rule 404(b) evidence. See Fifth MIL at 13.  The United States argues that evidence of Begay's prior acts "serves to establish motive, intent, plan and absence of mistake or accident with respect to the charged

- 15 -

conduct." Fifth MIL at 14.  The United States contends that the prior acts show Begay's plan to use his physical size to intimidate, and to coerce, Jane Doe 1 and Jane Doe 2.  See Fifth MIL at 14.  The United States also contends that the prior acts show that Begay had access and opportunity to molest Jane Doe 1 and Jane Doe 2.  See Fifth MIL at 15.  Finally, the United States asserts that the prior acts are probative to disprove any potential defense argument alleging mistake.  See Fifth MIL at 15.  The United States further contends that the prior acts are probative as rule 404(b) evidence, because the prior acts happened around the same time as the charged acts, albeit while Begay was a juvenile, and because the prior acts are similar to the acts that the Indictment charges. See Fifth MIL at 15 (citing United States v. Drewry, 365 F.3d 957 (10th Cir. 2004)).  On this point, the United States avers that there is no bright-line rule as to prior acts' temporal proximity to charged acts, but the United States cites cases in which the United States Court of Appeals for the Tenth Circuit has approved of admitting prior acts that occurred as much as thirty years before charged acts, when those acts are sufficiently similar to the charged acts.  See Fifth MIL at 15 (citing United States v. Meacham, 115 F.3d at 1488).  Accordingly, the United States requests that the Court rule in limine that the United States may introduce each of Begay's prior, uncharged acts pursuant to rules 404(b), 414, and 415.  See Fifth MIL at 18.

**7.   The Sixth MIL.**

In the Sixth MIL, the United States seeks to exclude Begay's defense expert, Deborah Davis, Ph.D.  See Sixth MIL at 1.  The United States asserts that Dr. Davis does not satisfy rule 702 and the requirements for expert testimony that the Supreme Court provided in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)("Daubert").  See Sixth MIL at 2.  The United States avers that Begay offers Dr. Davis' testimony "solely to diminish the damage from

- 16 -

Defendant's incriminating statements." Sixth MIL at 2.  The United States asserts that Dr. Davis will testify that Begay's statements resulted from coercion and so are not reliable.  See Sixth MIL at 2.  The United States contends that such testimony is unreliable.  See Sixth MIL at 2.  The United States cites United States v. Benally, in which, the United States asserts, the Honorable William P. Johnson, then-United States District Judge, and now Chief United States District Judge, for the United States District Court for the District of New Mexico, excluded Dr. Davis' testimony as unreliable, a decision that the Tenth Circuit upheld.  See Sixth MIL at 3 (citing United States v. Benally, 541 F.3d at 595).  The United States says that the Honorable Martha Vázquez, United States District Judge for the United States District Court for the District of New Mexico, also excluded Dr. Davis' testimony in a similar case.  See Sixth MIL at 3 (citing United States v. Ohayon, No. 12-cr-0055-MV, 2012 WL 13070065, at *11 (D.N.M. Sept. 19, 2012)(Vazquez, J.)). The United States further notes that the Court excluded similar testimony in this case from Dr. Richard Leo, one of Dr. Davis' colleagues.  See Sixth MIL at 4 (citing United States v. Begay, 310 F. Supp. 3d at 1355).

The United States contends that Begay plans to offer Dr. Davis' testimony on law enforcement interrogation practices generally, without tying Dr. Davis' testimony to the interrogation that happened in this case.  See Sixth MIL at 4.  The United States avers that such generality does not satisfy Daubert's formulation of expert testimony's necessary relevance.  See Sixth MIL at 4 (citing Daubert, 509 U.S. at 591).  The United States contends that an expert witness' proponent must demonstrate that the expert's testimony may properly be applied to the case's disputed facts.  See Sixth MIL at 4 (citing Hoffman v. Ford Motor Co., 493 F. App'x 962, 975-76 (10th Cir. 2012)(unpublished)).  The United States avers that, under this test, courts may

exclude even scientifically valid opinions if those opinions do not assist the trier of fact in resolving disputed issues. See Sixth MIL at 4 (citing Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1234 (10th Cir. 2004)). The United States argues that Dr. Davis' proposed testimony will bolster Begay's assertion that his testimony was coerced and so would encroach on the jury's function in evaluating Begay's credibility. See Sixth MIL at 5. The United States accordingly requests that the Court exclude Dr. Davis' testimony. See Sixth MIL at 5-6.

   **8.     The Sixth MIL Response.**

   Begay responds to the Sixth MIL. See Defendant's Response in Opposition to United States' Motion to Exclude Expert Testimony at Trial, filed March 4, 2020 (Doc. 222)("Sixth MIL Response"). Begay first asserts that his notice complies with rule 16 and rule 702. See Sixth MIL Response at 1-2. Begay contends that his notice demonstrates Dr. Davis' qualifications and notifies the United States of the topics about which Dr. Davis will testify. See Sixth MIL Response at 2. Begay proposes that Dr. Davis testify about:

> 1) Law enforcement interrogation tactics used in attempting to elicit a confession to a crime from a suspect; 2) Psychological effects that such tactics may have on the suspect, and how the specific characteristics of a suspect may affect how susceptible the suspect is to interrogation tactics; 3) False confessions do occur; and 4) Reasons why false confessions may occur.

Sixth MIL Response at 2. Begay next argues that Dr. Davis will demonstrate how Begay's personal traits make him susceptible to falsely confessing, and Begay further argues that Dr. Davis' knowledge in this regard is specialized, technical, and helpful to the jury. See Sixth MIL Response at 1. Begay contends that, in July, 2013, FBI agents interrogated him for several hours outside of his home. See Sixth MIL Response at 3. Begay says that, the next day, he went to the FBI field office to complain that, when FBI agents questioned him the previous day, he had recently awoken

- 18 -

and was "not mentally prepared for the interview." Sixth MIL Response at 3. Begay says that, a few days later, FBI agents again interrogated him at an FBI field office, and Begay asserts that the agents told him that his alleged crimes are not a big deal and that, because they happened so long ago, the agents could work something out with Begay. See Sixth MIL Response at 3.

Begay contends that Dr. Davis has specialized knowledge that will assist the jury. See Sixth MIL Response at 5. Begay says that Dr. Davis has published about twenty-five peer-reviewed articles and has presented at several conferences. See Sixth MIL Response at 5. Begay says that the United States Department of Justice awarded Dr. Davis a grant in 2012 "to perform research on interrogation techniques." Sixth MIL Response at 5. Begay says that he expects Dr. Davis to testify about law enforcement interrogation training and about "how a person's individual mental and personal characteristics can affect their vulnerability to such tactics, including, for example, poor cognition, childhood trauma, physical illness and/or fatigue." Sixth MIL Response at 5. Begay also says that Dr. Davis' testimony will "mirror" that of her colleague, Dr. Leo, who evaluated Begay. Sixth MIL Response at 5. Begay contends that, in the Feb. 23 MOO, the Court held that knowledge of police interrogation tactics is "specialized" within rule 702's meaning, and Begay further argues that the Court held that Dr. Leo's testimony satisfied Daubert and rule 403's relevancy requirement. See Sixth MIL Response at 6 (citing Feb. 23 MOO, 310 F. Supp. 3d at 1349-50). Begay also says that, in United States v. Ganadonegro, 805 F. Supp. 2d 1188 (D.N.M. 2011)(Browning, J.), the Court admitted expert testimony on the voluntariness of a defendant's confession. See Sixth MIL Response at 6 (citing 805 F. Supp. 2d at 1214, 1215). Begay also quotes the Supreme Court's language in Lego v. Twomey, 404 U.S. 477 (1972):

> "If the trial judge determines that the confession was voluntarily made it shall be
> admitted in evidence and the trial judge shall permit the jury to hear relevant

- 19 -

> evidence on the issue of voluntariness and shall instruct the jury to give such weight
> to the confession as the jury feels it deserves under all the circumstances."

Sixth MIL Response at 6 (quoting 404 U.S. at 486 n.14).

Begay contends that the Court has, thus, previously admitted testimony similar to Dr. Davis' proposed testimony. See Sixth MIL Response at 6. Begay acknowledges that Dr. Davis will not opine specifically on the voluntariness of Begay's statements. See Sixth MIL Response at 6-7. Begay asserts, however, that, without Dr. Davis' testimony, the jury "will not be able to effectively evaluate the interrogations that occurred in this case . . . , nor will they be aware that certain characteristics of an individual could, in fact, make him more suggestable to such tactics." Sixth MIL Response at 7. Begay contends that this testimony is "imperative" to his defense. Sixth MIL Response at 7.

Begay next argues that Dr. Davis' testimony regarding false confessions' "existence" and why defendants may confess falsely "has been proven to be helpful to jurors." Sixth MIL Response at 7. Begay distinguishes Judge Johnson's exclusion of Dr. Davis' similar testimony in United States v. Benally by arguing that the research on false confessions has "expanded substantially since 2005." Sixth MIL Response at 7 (citing 541 F.3d at 993). Begay asserts that there is now greater scientific consensus that certain interrogation tactics, such as the promise of leniency, increase the risk of false testimony, and Begay asserts that experts generally agree that adolescents are most likely to confess falsely. See Sixth MIL Response at 7 (citing S.M. Kassin, et al., On the general acceptance of confessions research: Opinions of the scientific community, American Psychologist, 73, 63-80 (2018)). Begay accordingly asserts that "various propositions" that Dr. Davis will offer "have been objectively proven as reliable in the scientific community in the last few years." Sixth MIL Response at 8. Begay argues that, to the extent that Judge Johnson

- 20 -

held in 2005 that Dr. Davis' testimony is unreliable, such a holding is now unsupported by the scientific research in this field." Sixth MIL Response at 8.

Begay avers that many district courts agree that testimony like Dr. Davis' is reliable and helpful to juries. See Sixth MIL Response at 8 (citing Cain v. Burge, No. 11 C 8996, 2013 WL 1966381, at *2 (N.D. Ill. May 10, 2013)(Durkin, J.)("'Although jurors' common sense may suggest to them that someone would never falsely confess to committing a murder, [expert] testimony will educate jurors that false confession sometimes do occur. As a result, the Court believes it will be helpful for the jury to hear expert testimony on this issue." (alteration in Sixth MIL Response)); United States v. Hall, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997)(McDade, J.)). Begay cites United States v. Whittle, CIVIL ACTION NO. 3:13-CV-00170-JHM, 2016 WL 4433685 (W.D. Ky. Aug. 18, 2016)(McKinley, C.J.), as an example in which a court admitted Dr. Davis' testimony to "explain to the jury that some defendants do, in fact, falsely confess to a crime, as well as to describe what psychological traits make it possible to give a false confession." Sixth MIL Response at 8 (citing 2016 WL 4433685, at *2-3). Begay further notes that, in United States v. Whittle, the district judge did not permit Dr. Davis to testify about whether the defendant in fact confessed falsely. See Sixth MIL Response at 9 (citing 2016 WL 4433685, at *2-3). Begay quotes the rationale that the Honorable Joseph H. McKinley, Jr., Chief United States District Judge for the United States District Court for the Western District of Kentucky gave:

> "Drawing this line prevents Dr. Davis from invading the province of the jury, provides relevant and useful information to lay members of the jury, and does not allow Dr. Davis to offer testimony on the credibility of Defendant. It simply gives the jury the tools to make an informed decision about false confessions, which appear to actually occur. The public may not be aware of false confessions as much as those individuals in the criminal justice system, and the expert could provide valuable insight necessary to assure Defendant's Sixth Amendment right to present a complete defense. See generally Crane v. Kentucky, 476 U.S. 683, 684 (1986)

> (ruling that the lower court's exclusion testimony about the physical and psychological environment in which the confession was obtained, in order to prove that the confession was unreliable, deprived the defendant of his Sixth and Fourteenth Amendment [to the Constitution of the United States] right to present a complete defense).   The Court believes, particularly with careful limiting instructions, that a jury could distinguish between information about psychologists' beliefs about false confessions and whether Defendant falsely confessed through their own credibility determinations."

Sixth MIL Response at 9 (quoting 2016 WL 4433685, at *4).

Begay contends that experts like Dr. Davis agree that their role is not to opine whether a defendant in fact confessed falsely, but rather to render juries better able to evaluate defendants' confessions.   See Sixth MIL Response at 9.   Begay argues that such testimony is not unduly prejudicial, because Dr. Davis will merely educate the jury on the existence of the false confession "phenomenon," leaving it to the jury to determine whether this "phenomenon" occurred in this case.  Sixth MIL Response at 9.   Begay instead argues that the "only undue prejudice that would be suffered regarding Dr. Davis's testimony" is the prejudice that Begay will incur if the Court excludes Dr. Davis' testimony.   Sixth MIL Response at 9.

Begay next argues that the United States' cited cases do not amount to a categorical rule that testimony like Dr. Davis' is inadmissible.   See Sixth MIL Response at 10.   Begay instead argues that expert testimony's admissibility lies within district courts' broad discretion and depends on myriad factors unique to each case.   See Sixth MIL Response at 10 (citing Sanford v. Russell, 387 F. Supp. 3d 774 (E.D. Mich. 2019)(Lawson, J.)("'[N]o categorical rule mandating the exclusion of such testimony ever has been laid down, and courts regularly have admitted expert testimony about factors that can precipitate a false confession, where the expert is able sufficiently to relate those factors to the circumstances of the particular interrogation at issue.'")).   Begay further asserts that there is no categorical rule among courts that have allowed testimony like Dr.

Davis' testimony that experts need opine on a defendant's specific mental disorder.  See Sixth MIL Response at 10 (citing United States v. Hall, 93 F.3d 1337 (7th Cir. 1996); United States v. Shay, 57 F.3d 126 (1st. Cir. 1995)).  Begay contends that Dr. Davis' proposed testimony would not invade the jury's province, but rather would educate it "to make supported credibility determinations of [its] own."  Sixth MIL Response at 11.  Begay accordingly requests that the Court hold an evidentiary hearing at which Begay may proffer Dr. Davis for examination.  See Sixth MIL at 11.

   9.   **The Sixth MIL Reply.**

   The United States replies in opposition to Dr. Davis' proposed testimony.  See United States' Reply in Support of its Motion to Exclude Expert Testimony at Trial, filed March 12, 2020 (Doc. 223)("Sixth MIL Reply").  The United States avers that Dr. Davis' proposed testimony that some individuals are susceptible to falsely confessing is unreliable and unhelpful to the jury.  See Sixth MIL Reply at 1.  The United States avers that the Court's conclusion in the Feb. 23 MOO that Dr. Leo is qualified does not automatically render Dr. Davis qualified.  See Sixth MIL Reply at 1.  Instead, the United States contends that "Dr. Davis has limited expertise related exclusively to police interrogation tactics generally, let alone experiences specific to the type of tactics the FBI may employ."  Sixth MIL Reply at 2.  The United States further asserts that the Department of Justice "subawarded" Dr. Davis to study whether interviewers may prime interviewees to predetermine responses.  See Sixth MIL Reply at 2.  The United States says that, in the resulting study, Dr. Davis and her colleagues conducted a survey of 100 Israeli Jewish respondents on topics having nothing to do with law enforcement techniques and, despite this limited sample size and subject matter, Dr. Davis extrapolates from this study to opine generally on law enforcement

interrogation.  <u>See</u> Sixth MIL Reply at 2.  The United States avers that "this research seems to be unrelated, preliminary, and it is unclear how it translates to expertise in law enforcement tactics generally."  Sixth MIL Reply at 3.

The United States seeks to distinguish <u>United States v. Ganadonegro</u> and argues that, in that case, the Court permitted a clinical psychologist to testify about the psychologist's evaluation of the defendant, but the Court did not permit the expert to testify about the defendant's credibility. <u>See</u> Sixth MIL Reply at 3 (citing 805 F. Supp. 2d at 1217).  The United States avers that Dr. Davis, in contrast, is not a clinical psychologist and she has not evaluated Begay.  The United States asserts that this lack of independent evaluation is symptomatic of Dr. Davis' proposed testimony, because she does not propose testimony that relates to this case's facts or notify the United States how her testimony applies to this case.  <u>See</u> Sixth MIL Reply at 3.  The United States quotes the Court's Feb. 23 MOO: "Unlike testimony regarding police interrogation tactics generally, proffered testimony regarding the application of such techniques to this case suggests that the Court consider the error rate, because the error rate 'might prove helpful in determining the reliability of a particular scientific theory or technique.'"  Sixth MIL Reply at 4 (quoting Feb. 23 MOO, 310 F. Supp. at 1351 (quoting <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 141)).

The United States further argues that Dr. Davis' proposed testimony will not assist the jury, because Begay's "conduct is not typical."  Sixth MIL Reply at 5.  The United States says that Begay spoke with FBI agents voluntarily on three separate occasions, including two instances where Begay drove two hours to an FBI field office to "make mitigating statements."  Sixth MIL Reply at 5.  The United States asserts that Begay is "verbose and articulate and he made calculated efforts to seek out multiple opportunities to speak to law enforcement," and so Dr. Davis'

- 24 -

testimony about how unsophisticated defendants are vulnerable to falsely confess is irrelevant to this case's facts. Sixth MIL Reply at 5. The United States "recognizes" Begay's right to mount a defense at trial, but the United States argues that this right does not include an unfettered ability to offer any and all evidence of his choosing. Sixth MIL Reply at 6 (citing <u>United States v. Adams</u>, 271 F.3d 1236, 1243 (10th Cir. 2001)). The United States instead argues that evidentiary prohibitions against expert testimony on a defendant or witness' credibility limit Begay's right to mount his defense. <u>See</u> Sixth MIL at 6 (citing <u>United States v. Hebah</u>, 164 F. App'x 678, 691-92 (10th Cir. 2006)(unpublished)).

The United States next asserts that Dr. Davis' proposed testimony on false confessions' existence does not satisfy <u>Daubert</u> and rule 702. <u>See</u> Sixth MIL Reply at 7-8. The United States characterizes Dr. Davis' testimony as an attempt to "set forth the notion that confessions as a result of police interrogation can be involuntary, in some psychological sense, based on factors specific to a suspect and techniques used by law enforcement, thus implying that defendant's confession is untrue." Sixth MIL Reply at 8. The United States argues, however, that to satisfy <u>Daubert</u>, Dr. Davis must "show that her conclusion is of the type that has been tested, has been subjected to peer review, admits a known potential rate of error and enjoys widespread acceptance within the scientific community." Sixth MIL Reply at 8. The United States avers that Dr. Davis' proposed testimony does not satisfy this test, because the study of false confessions lacks established methodology, is controversial, and "does not enjoy the status of an established and reliable field of expertise." Sixth MIL Reply at 8. The United States quotes a law review article in which, the United States asserts, top researchers in Dr. Davis' field argue that "'it is presently not possible to quantify the number and frequency of false confessions.'" Sixth MIL Reply at 8 (quoting Richard

A. Leo and Richard J. Ofshe, <u>Missing the Forest for the Trees</u>, 74 Denv. U. L. Rev. 1135, 1135 (1997)).  The United States further asserts that <u>United States v. Benally</u>, in which the Tenth Circuit excluded Dr. Davis' testimony, governs here and further undermines the reliability of Dr. Davis' research and opinions.  <u>See</u> Sixth MIL Reply at 9 (citing <u>United States v. Benally</u>, 541 F.3d at 993-93).  The United States thus requests that the Court exclude Dr. Davis' testimony, because cross-examination is a more reliable means of allowing the jury to determine whether Begay's confessions are credible.  <u>See</u> Sixth MIL Reply at 9.

**10.     The Second MIL Response.**

Begay responds to the United States' Second MIL.  <u>See</u> Response to the United States' Sealed Motion *in Limine* to Exclude Evidence of the Victims' Sexual History and Predispositions, filed March 19, 2020 (Doc. 225)("Second MIL Response").  Begay says that he has no plans to introduce evidence of the alleged victims' sexual history.  <u>See</u> Second MIL Response at 1.  Begay further asserts that, should he wish to introduce such evidence, he will "comply with the procedures required by rule 412(c)."  Second MIL Response at 1.

**11.     The Third MIL Response.**

Begay responds to the Third MIL.  <u>See</u> Defendant's Response to the United States' Sealed Motion *in Limine* to Prohibit Discussion of Sentencing or Punishment at Trial, filed March 19, 2020 (Doc. 226)("Third MIL Response").  Begay says that he does not intend to discuss or offer any argument at trial about the punishment he faces if he is convicted.  <u>See</u> Third MIL Response at 1.

**12.     The First MIL Response.**

Begay responds to the First MIL.  <u>See</u> Response To United States' Sealed Notice Of Intent

To Offer Defendant's Recorded Statements In Its Case-In-Chief And Motion *In Limine* To Exclude Defendant's Self-Serving, Inadmissible Hearsay, Irr[e]levant, And Prejudic[i]al Stat[e]ments, filed March 19, 2020 (Doc. 227)("First MIL Response").  Begay concedes that the United States may admit the statements that he made to law enforcement on July 18, 19, and 30, 2014, "without the need for audio recordings."  First MIL Response ¶ 1, at 1.  Begay asserts, however, that the United States "appears" to acknowledge that his statements are admissible if he testifies.  First MIL Response ¶ 2, at 1.  Begay requests that, if he testifies, the Court admit his recorded statements and those statements' transcripts in their entirety.  <u>See</u> First MIL Response ¶¶ 3-4, at 1-2.  Begay concludes by requesting that, if the United States does not agree to admit all of his statements, the United States admit only "testimony obtained by law enforcement."  First MIL Response ¶ 5, at 2.  Begay requests that the Court reserve its ruling on the United States' requests: (i) that the Court exclude allegations of government misconduct; (ii) that the Court exclude information known only to Begay; (iii) that the Court exclude evidence of Begay's health; and (iv) that the Court prohibit Begay from impeaching the United States' witnesses with prior administrative discipline.  <u>See</u> First MIL Response at 1-2.  Begay also stipulates that he will not present to the jury: (i) any of the Court's pretrial rulings; (ii) plea negotiations; (iii) offers to stipulate; and (iv) defense exhibits that have not been disclosed to the United States.  <u>See</u> First MIL Response at 1-2.

13.   <u>**The Fifth MIL Response.**</u>

Begay responds to the Fifth MIL.  <u>See</u> Defendant's Amended Sealed Response to United States'[ ]Sealed Motion *in Limine* to Admit Evidence Pursuant to Fed. R. Evid. 404(b), 413 and 414, filed April 1, 2020 (Doc. 230)("Fifth MIL Response").  Begay first notes that, while the United States details Begay's actions regarding Jane Doe 1 that it would like to admit, Begay

- 27 -

asserts that the United States does not elaborate on his uncharged acts involving Jane Doe 2. <u>See</u> Fifth MIL Response at 2. Begay argues that this lack of notice inhibits his ability to argue about those uncharged acts' admissibility. <u>See</u> Fifth MIL Response at 2. Begay asserts, however, that each of the alleged uncharged acts is unfairly prejudicial, and that their admission will result in delay and wasted time. <u>See</u> Fifth MIL Response at 2.

Begay contends that society places a heavy stigma upon those accused of sex crimes, and so the Court has a special duty to limit evidence of uncharged sex crimes that are likely to cause the jury to act on emotion. <u>See</u> Fifth MIL Response at 3 (citing <u>United States v. Castillo</u>, 140 F.3d 874, 882 (10th Cir. 1998)). Begay avers that the Court must ask of each uncharged act: (i) how likely it is that the act happened; (ii) how probative the act is of a material fact; (iii) how disputed that material fact is; and (iv) whether the United States has less prejudicial evidence available to prove that material fact. <u>See</u> Fifth MIL Response at 3-4. (citing <u>United States v. Enjady</u>, 134 F.3d 1427, 1433 (10th Cir. 1998), <u>opinion clarified</u>, No. 96-2285, 1998 WL 133994 (10th Cir. Mar. 25, 1998)). Begay says that the United States' proffered acts do not satisfy this test. <u>See</u> Fifth MIL Response at 4. Begay first contends that he disputes whether the prior acts happened, and Begay asserts: "The only evidence that Mr. Begay committed an offense of child molestation is the alleged victims' statements. *There is no corroborating evidence* to support the allegations." Fifth MIL Response at 4 (emphasis in original). Begay also asserts that admitting these acts will "very likely" lead to an "improperly based jury verdict." Fifth MIL Response at 4. Begay accordingly requests that the Court deny the Fifth MIL. <u>See</u> Fifth MIL Response at 5.

14.   **The Defense MIL.**

Begay says that the United States recently disclosed "68 phone calls from October 16, 2019-

- 28 -

February 26, 2020" that Begay made from the Santa Fe Adult Correctional Facility.  Defense MIL at 1.

Begay "requests the United States not introduce evidence in its case-in-chief or in the cross-

examination of any defense witnesses."  Defense MIL at 1.  Begay contends that evidence of these

telephone calls is not relevant and that, if relevant, this evidence is unfairly prejudicial.  See Defense

MIL at 1 (citing Fed. R. Evid. 401, 403).  Begay says that he will request a mistrial if this evidence is

admitted at trial.  See Defense MIL at 1.

> ## 15.    The Defense MIL Response.

The United States responds to the Defense MIL.  See United States' Response to

Defendant's Sealed Motion in Limine to Exclude Evidence Regarding Jail Calls, filed April 14,

2020 (Doc. 241)("Defense MIL Response").   The United States asserts that jail calls are not

private.  See Defense MIL Response at 1 (citing United States v. Gangi, 57 F. App'x 809, 814

(10th Cir. 2003)(unpublished)).  The United States further avers that, to the extent to that the calls

feature Begay's statements, the calls are not hearsay and are thus admissible if they are relevant.

See Defense MIL Response at 1 (citing Fed. R. Evid. 801(d)(2)(A)).  The United States avers that

such "admissions" need not be "full confessions" to be admissible.  Defense MIL Response at 2

(citing Wolcher v. United States, 200 F.2d 493, 496 (9th Cir. 1952)).  The United States also

contends that Begay's jail calls are admissible to demonstrate his then-existing state of mind.  See

Defense MIL Response at 2 (citing Fed. R. Evid. 803(3)).  The United States further asserts that

any jail calls that indicate Begay's motive are admissible as probative of his consciousness of guilt.

See Defense MIL Response at 2.  Finally, the United States contends that, should Begay testify,

his jail calls are proper impeachment materials.  See Defense MIL Response at 2 (citing United

States v. Baca, No. CR 16-1613 JB, 2020 WL 1325139, at *38 (D.N.M. March 20,

2020)(Browning, J.)).  The United States requests that the Court deny the Defense MIL.  See

- 29 -

Defense MIL Response at 2.

## LAW REGARDING RELEVANT EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance.  As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible.  See Fed. R. Evid. 402.  The standard for relevance is very liberal.  See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)).  The evidence need have only "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  See United States v. Leonard, 439 F.3d at 651.  "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it need only to have "any tendency" to do so.  United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).  See United States v. Leonard, 439 F.3d at 651.  Although the threshold burden is low, the rules do "not sanction the carte blanche admission of whatever evidence a defendant would like.  The trial judge is the gatekeeper under the Rules of Evidence." United States v. Jordan, 485 F.3d at 1218.

## LAW REGARDING RULE 403

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States

v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.

See <u>United States v. Rodriguez</u>, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See <u>United States v. Caraway</u>, 534 F.3d 1290, 1301 (10th Cir. 2008); <u>United States v. Curtis</u>, 344 F.3d 1057, 1067 (10th Cir. 2003); <u>United States v. Martinez</u>, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  <u>United States v. Caraway</u>, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  <u>Old Chief v. United States</u>, 519 U.S. 172, 180 (1997)(Souter, J.).  "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged."  <u>Old Chief v. United States</u>, 519 U.S. at 180-81.  In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence."  <u>Old Chief v. United States</u>, 519 U.S. at 182.

## <u>LAW REGARDING HEARSAY</u>

"Hearsay testimony is generally inadmissible."  <u>United States v. Christy</u>, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed.

R. Evid. 801(c).  Hearsay bars a party from presenting its own statements, such as "a defendant

. . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without

subjecting himself to cross-examination."  United States v. Cunningham, 194 F.3d 1186, 1199

(11th Cir. 1999)(Carnes, J.).  A statement that is otherwise hearsay, however, may be offered for

a permissible purpose other than to prove the truth of the matter asserted, including impeaching a

witness.  See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)(Hartz, J.)("We have

already explained why the content of the statement, if used substantively, would be inadmissible

hearsay.  If admitted for impeachment purposes, however, it is not hearsay.").  Rule 805 of the

Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as

double hearsay -- may be admissible "if each part of the combined statements conforms with an

exception to the rule." Fed. R. Evid. 805.  See United States v. DeLeon, 287 F. Supp. 3d 1187,

1235-36 (D.N.M. 2018)(Browning, J.).

**LAW REGARDING RULES 413 AND 403 OF THE FEDERAL RULES OF EVIDENCE**

Rule 413 provides that, in cases where a defendant is charged with a sexual assault offense,

"evidence of the defendant's commission of another offense or offenses of sexual assault is

admissible, and may be considered for its bearing on any matter to which it is relevant."  Fed. R.

Evid. 413(a).  See Fed. R. Evid. 414 (permitting the admission of evidence of the defendant's

commission of similar crimes of child molestation when the defendant is charged with child

molestation); Fed. R. Evid. 415 (permitting the admission of evidence of the defendant's

commission of similar acts of sexual assault or child molestation in civil cases concerning sexual

assault or child molestation).  Evidence is admissible under rule 413 when: (i) the defendant is on

trial for a sexual assault offense; (ii) the proffered evidence relates to another sexual assault; and

(iii) the evidence is relevant.  See United States v. Fred, No. CR 05-801 JB, 2006 WL 4079618, at *2 (D.N.M. Dec. 1, 2006)(Browning, J.)(citing Seeley v. Chase, 443 F.3d 1290, 1294 (10th Cir. 2006)).  For rule 413's purposes, an "offense of sexual assault" includes any crime under federal law that involved:

>     (1)     any conduct proscribed by chapter 109A of title 18, United States Code;
>
>     (2)     contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person;
>
>     (3)     contact, without consent, between the genitals or anus of the defendant and any part of another person's body;
>
>     (4)     deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person; or
>
>     (5)     an attempt or conspiracy to engage in conduct described in paragraphs (1)-(4).

Fed. R. Evid. 413(d)(1)-(5).  For evidence admissible under rule 413, the person "need not have been convicted of or charged with a previous assault for it to be admissible. . . ."  United States v. Pascal, 610 F. App'x 791, 793 (10th Cir. 2015).[3]  The similar acts must be established, however,

---

[3]United States v. Pascal is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court concludes that United States v. Pascal, 610 F. App'x 791 (10th Cir. 2015); United States v. Belyea, 159 F. App'x 525 (4th Cir. 2005); United States v. LaFlora, 146 F. App'x 973 (10th Cir. 2005); United States v. Gangi, 57 F.

by "sufficient evidence to support a finding by the jury that the defendant committed the similar act." See United States v. Wilson, No. CR 09-1465 JB, 2010 WL 2954562, at *4 (D.N.M. June 18, 2010)(Browning, J.)(citing United States v. Enjady, 134 F.3d at 1433).  In other words, the district court "must make a preliminary finding that a jury could reasonably find by a preponderance of the evidence that the 'other act' occurred." United States v. Wilson, 2010 WL 2954562, at *4 (citing United States v. Enjady, 134 F.3d at 1433).  This is another way to state the relevance requirement.  See Huddleston v. United States, 485 U.S. 681, 689 (1988).

Evidence is more likely to overcome the threshold question -- relevancy -- when it provides detail and specifics about the similar acts.  See, e.g., United States v. Fred, 2006 WL 4079618, at *1-2 (allowing rule 413 evidence of similar acts documented in an FBI form that provided a detailed account of the alleged similar act).  See also United States v. Wilson, 2010 WL 2954562, at *1-2, *6 (allowing rule 414 evidence of similar acts when the witness described uncharged sexual assaults in detail).  For example, in United States v. Fred, the witness described similar acts of sexual assault including references to time, date, and specific conduct, including where the defendant touched her, and specific circumstances surrounding the sexual assault.  See United States v. Fred, 2006 WL 4079618, at *1-2.  The Court found that the evidence overcame the threshold question of relevancy.  See United States v. Fred, 2006 WL 4079618, at *1, *4-5.

The Tenth Circuit has held that, when evidence falls within rule 413's scope, there is a presumption that the evidence is admissible.  See United States v. Fred, 2006 WL 4079618, at *3 (citing United States v. Enjady, 134 F.3d at 1431).  Rule 413 reflects Congress' belief that it is

---

App'x 809 (10th Cir. 2003), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

"necessary to lower the obstacles to admission of propensity evidence in . . . sexual assault cases [because of] the assistance it provides in assessing credibility." United States v. Enjady, 134 F.3d at 1431.

Despite rule 413's language, and the presumption in favor of admission, the Tenth Circuit has held that, consistent with rule 403, district courts still must weigh the probative value of evidence introduced pursuant to rule 413 against its prejudicial impact. See United States v. Fred, 2006 WL 4079618, at *3 (citing United States v. Guardia, 135 F.3d at 1330)("We hold that a court must perform the same 403 analysis that it does in any other context, but with careful attention to both the significant probative value and the strong prejudicial qualities inherent in all evidence submitted under 413."). In applying rule 403 to the proffered evidence, the Court should consider:

> 1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the probative dangers, a court considers: 1) how likely is it such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct.

Seeley v. Chase, 443 F.3d at 1295 (quoting United States v. Enjady, 134 F.3d at 1433). Finally, while the Tenth Circuit has acknowledged that propensity evidence has "indisputable probative value," its worth in any particular case is based on multiple factors, including "the similarity of the prior acts to the acts charged, the closeness in time of the prior acts to the charged acts, the frequency of the prior acts, the presence or lack of intervening events, and the need for evidence beyond the testimony of the defendant and alleged victim." United States v. Fred, 2006 WL 4079618, at *3 (citing United States v. Guardia, 135 F.3d at 1331).

- 36 -

### RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert</u> . . . , trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert</u>, whether the opinion testimony is the product of a reliable methodology." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224. <u>Daubert</u> "requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224.

1.    **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory committee note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land

- 37 -

values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). See United States v. Edwards, No. CR 16-3068, 2017 WL 4857441, at *13 (D.N.M. 2017)(Browning, J.).

    2.    **The Standard in Daubert.**

    In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18,

- 38 -

2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).   The

Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step

reliability determination, including: (i) whether the method has been tested; (ii) whether the

method has been published and subject to peer review; (iii) the error rate; (iv) the existence of

standards and whether the witness applied them in the present case; and (v) whether the witness'

method is generally accepted as reliable in the relevant medical and scientific community.   See

Daubert, 509 U.S. at 594-95.   The court is also to consider whether the witness' conclusion

represents an "unfounded extrapolation" from the data; whether the witness has adequately

accounted for alternative explanations for the effect at issue; whether the opinion was reached for

the purposes of litigation or as the result of independent studies; or whether it unduly relies on

anecdotal evidence.   Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing Gen.

Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).   The Tenth Circuit stated the applicable standard

in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable."   Bitler v. A.O. Smith Corp., 391 F.3d
> 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . . ).   This obligation
> involves a two-part inquiry.   Id.   "[A] district court must [first] determine if the
> expert's proffered testimony . . . has 'a reliable basis in the knowledge and
> experience of his [or her] discipline.'"   Id.   (quoting Daubert, 509 U.S. at 592 . . .
> ).   In making this determination, the district court must decide "whether the
> reasoning or methodology underlying the testimony is scientifically valid . . . ."   Id.
> (quoting Daubert, 509 U.S. at 592-93 . . . ).   Second, the district court must further
> inquire into whether proposed testimony is sufficiently "relevant to the task at
> hand."   Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted).   "The second inquiry is

related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that

the proposed expert testimony logically advances a material aspect of the case . . . .   The evidence

must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, the Supreme Court expanded the rules under Daubert to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of

- 40 -

establishing that the expert is qualified, that the methodology he or she uses to support his or her

opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to

the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  The Tenth Circuit noted in

Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing
> reliability under Daubert, and because, in light of that discretion, there is not an
> extensive body of appellate case law defining the criteria for assessing scientific
> reliability, we are limited to determining whether the district court's application of
> the Daubert manifests a clear error of judgment or exceeds the bounds of
> permissible choice in the circumstances . . . .   Thus, when coupled with this
> deferential standard of review, Daubert's effort to safeguard the reliability of
> science in the courtroom may produce a counter-intuitive effect: different courts
> relying on the essentially the same science may reach different results.

Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d at 1206.  The United States Court of Appeals

for the Ninth Circuit noted in Claar v. Burlington N. R.R. Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method. Certainly, scientists may form initial tentative hypotheses.
> However, scientists whose conviction about the ultimate conclusion of their
> research is so firm that they are willing to aver under oath that it is correct prior to
> performing the necessary validating tests could properly be viewed by the district
> court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's
> discretion to determine whether expert testimony will be helpful to the trier of fact.
> In making that determination, the court should consider, among other factors, the
> testimony's relevance, the jurors' common knowledge and experience, and whether
> the expert's testimony may usurp the jury's primary role as the evaluator of
> evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir.

2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); <u>In re Breast Implant Litig.</u>, 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. at 146.  <u>See</u> <u>Hollander v.</u> <u>Sandoz Pharm. Corp.</u>, 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); <u>Tyler v. Sterling Drug, Inc.</u>, 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  <u>See</u> <u>Truck Ins. Exch. v. MagneTek, Inc.</u>, 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); <u>Magdaleno v. Burlington N. R.R.</u> <u>Co.</u>, 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").  <u>See</u> <u>United States v. Edwards</u>, 2017 WL 4857441, at *14-15.

### 3.    <u>Necessity of Evaluating an Issue Under</u> Daubert.

The restrictions in <u>Daubert</u> apply to both "novel" expert testimony and "well-established

propositions."  509 U.S. at 593 n.11 ("Although the Frye[4] decision itself focused exclusively on

'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or

exclusively to unconventional evidence.").  "Of course, well-established propositions are less

likely to be challenged than those that are novel, and they are more handily defended."  Daubert,

509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status

of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under

Federal Rule of Evidence 201."  Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need

not take issue under Daubert. . . ."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769,

780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district

court may require further indications of reliability."  Attorney Gen. of Okla. v. Tyson Foods, Inc.,

565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a

relevant consideration in determining whether expert testimony is reliable.  See Attorney Gen. of

Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not

unfamiliar with the PCR methodology,[5] and in fact some courts have indicated their acceptance

of it.").  See United States v. Edwards, 2017 WL 4857441, at *16; United States v. Harry, 20 F.

Supp. 3d 1196, 1226 (D.N.M. 2014)(Browning, J.); United States v. Chapman, 59 F. Supp. 3d

---

[4]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal
Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the
deduction is made must be sufficiently established to have gained general acceptance in the
particular field in which it belongs."  293 F. at 1014.

[5]PCR stands for polymerase chain reaction, which the expert witness used to replicate
bacteria DNA, "a process that would allow her to identify whether such bacteria were present in
various environmental samples."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.

1194, 1212-13 (D.N.M. 2014)(Browning, J.).

## ANALYSIS

The Court first concludes that the alleged acts occurred in Indian Country, because the United States alleges that the actions occurred in Navajo, County of McKinley, State of New Mexico, and thus the Court has subject-matter jurisdiction.  Second, the United States introduce admit evidence of Begay's prior, uncharged sexual assaults of Jane Doe 1 and Jane Doe 2, because the evidence is relevant and not unfairly prejudicial under rule 413.  Third, the Court concludes that Begay may not introduce evidence of nor allude to Jane Doe 1 and Jane Doe 2's sexual history or behavior, because the only relevant reason for admitting such evidence would be to suggest that Jane Doe 1 and Jane Doe 2 consented to Begay's alleged actions, and minors are incapable of consenting to sexual acts.  Fourth, the Court further concludes that Dr. Davis may testify about police interrogation tactics generally, but not about the application of such techniques to this case. Additionally, Dr. Davis may not testify regarding false confessions, because the Tenth Circuit has indicated that such testimony is unreliable, and the Court, conducting an independent Daubert analysis, agrees.  The Court further concludes that the United States generally may admit evidence of Begay's jailhouse calls, unless Begay more clearly identifies which calls he wishes to exclude and their exclusions' bases.  Finally, the Court denies several of the United States' requests in the First MIL, because the United States does not sufficiently explain or justify its requests.

## I.    BEGAY'S ALLEGED ACTS OCCURRED IN INDIAN COUNTRY.

Begay does not contest or otherwise respond to the United States' allegation that the alleged acts occurred in Indian Country.  In the Indian Country Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153, "Congress conferred on the federal courts special

criminal jurisdiction over offenses committed in Indian country."  Cohen's Handbook of Federal

Indian Law § 9.01, at 736-37 (Neil Jessup Newton et al. eds., 2012)("Cohen's Handbook").  For

federal jurisdiction to lie, the crime must occur within "Indian country."  18 U.S.C. §§ 1152 and

1153.  The demonstration of Indian country is "a major jurisdictional predicate for the application

of much of federal Indian law." Cohen's Handbook § 9.02[1][b], at 738.  "'Indian country' is a

term of art," Cohen's Handbook § 9.01, at 737 n.4, and 18 U.S.C. § 1151 provides the term's

present definition:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the
> United States Government, notwithstanding the issuance of any patent, and,
> including rights-of-way running through the reservation, (b) all dependent Indian
> communities within the borders of the United States whether within the original or
> subsequently acquired territory thereof, and whether within or without the limits of
> a state, and (c) all Indian allotments, the Indian titles to which have not been
> extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.  In §§ 1152 or 1153 prosecutions, the court determines jurisdiction by a

preponderance of the evidence.  See United States v. Bustillos, 31 F.3d 931, 933 (10th Cir. 1994).

Under 18 U.S.C. § 1151(a), "Indian country" includes all of the territory within the exterior

boundaries of an Indian reservation.  Regarding the term "Indian reservation," the Tenth Circuit

has explained:

> The term "Indian reservation" has been used in various ways to define Indian
> country. Gradually the term has come to describe federally-protected Indian tribal
> lands meaning those lands which Congress has set apart for tribal and federal
> jurisdiction.  Thus, for purposes of defining Indian country, the term simply refers
> to those lands which Congress intended to reserve for a tribe and over which
> Congress intended primary jurisdiction to rest in the federal and tribal governments.

Indian Country, U.S.A., Inc. v. State of Okla. ex rel. Okla. Tax Comm'n, 829 F.2d 967, 973 (10th

Cir. 1987)(internal quotation marks and citations omitted).  Under § 1151(a), any land contained

within the exterior boundaries of an Indian reservation is "Indian country."  This is so regardless

whether an Indian or non-Indian owns the property on which a crime occurred, so long as that property is within an Indian reservation.   See Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 357 (1952); 18 U.S.C. § 1151(a).

The United States alleges that Begay "sexually abused Jane Doe 1 and Jane Doe 2 while they were living with their parents in a Navajo Nation Housing Authority (NHA) house located in Navajo, New Mexico." Fourth MIL at 2.  That is, the United States alleges that Begay committed each of the crimes charged in Counts 1-4 in a Navajo Housing Authority house, which is located at "WGS84 GPS Geographic Coordinates of N 35º 54.233', W 109º 02.368', Bureau of Indian Affairs Land Management District No. 18, Fort Defiance Agency, McKinley County, State of New Mexico." Fourth MIL at 1.  This house is located within the Navajo Nation Indian Reservation's exterior boundaries.  See 18 U.S.C. § 1851; 84 FR 1200.  Accordingly, the Court has jurisdiction over this case.

## II.   THE UNITED STATES MAY INTRODUCE EVIDENCE OF BEGAY'S PRIOR, UNCHARGED ACTS INVOLVING JANE DOE 1 AND JANE DOE 2.

The Indictment charges sexual abuse of a minor, and there is no dispute that the proffered evidence is of Begay's commission of other child molestation.  Begay's central contention is that the proffered evidence is not relevant, and is unfairly prejudicial under rules 401 and 403.  The Court concludes that the testimony that the United States seeks to elicit is relevant.  Accordingly, the proffered evidence satisfies rules 413 and 414's three-part test.  The Court further concludes that the evidence is admissible under rule 403.  Accordingly, evidence of Begay's prior, uncharged acts is admissible.

**A.    THE PROFFERED EVIDENCE SATISFIES RULE 414'S THREE-PART TEST.**

Begay is charged with violating 18 U.S.C. §§ 2241(a) and (c) and 2244(a).  See Indictment at 1.  Rule 413 defines sexual assault as "any conduct prohibited by 18 U.S.C. chapter 109A." Fed. R. Evid. 413(d)(1).  Rule 414 defines child molestation, in part, to mean a "crime under federal law or under state law . . . involving any conduct prohibited by 18 U.S.C. chapter 110." Fed. R. Evid. 414(d)(1), (d)(2)(B).  Chapter 110 of Title 18 of the United States Code includes aggravated sexual abuse under 18 U.S.C. § 2241(a) and (c).  It is thus undisputed that Begay "is accused of an offense of child molestation."  United States v. McHorse, 179 F.3d at 898. Accordingly, the first prong of the three-prong test is satisfied.

The proffered evidence is of Begay's commission of another child molestation, satisfying the second prong.  See United States v. McHorse, 179 F.3d at 898.  The United States seeks to admit evidence that Begay repeatedly molested and raped Doe 1 over a ten-year period.  See Fifth MIL at 4-6.  The United States also seeks to admit evidence that Begay molested Doe 2 in one instance when Doe 2 was nine years old.  See Fifth MIL at 5-6.  Accordingly, "the proffered evidence is 'evidence of the defendant's commission of another offense or offenses of child molestation.'" United States v. McHorse, 179 F.3d at 898 (quoting Fed. R. Evid. 414).  It is of no consequence, for rules 413 and 414's purposes, that the prior acts were with the same victims.  See United States v. Wilson, 83 Fed. R. Evid. Serv. 49, at *6 (D.N.M. 2010)(Browning, J.)(citing United States v. Tail, 459 F.3d at 858 ("The [prior] conviction was probative because it involved the same victim and an act that occurred close in time and under circumstances similar to the crime charged in this case."); United States v. Castillo, 188 F.3d 519, at *3 ("Evidence that the charged offense was part of a broader pattern of molestation may be important to put the charge in

perspective[, and thus] the uncharged acts were probative of establishing Defendant's specific inclination or disposition to engage in acts of sexual abuse against his daughters.")(internal alterations, quotations, and citations omitted); United States v. Fred, 2006 WL 4079618, at *5-6.

 Begay's primary objection to the proffered evidence is that it is insufficiently corroborated. See Fifth MIL Response at 4. The United States seeks to prove the prior acts' existence in much the same way it seeks to prove the charged acts -- through the victims' testimony and through Begay's statements to law enforcement. See Fifth MIL at 4-6. This proof is sufficient evidence for a jury to reasonably conclude that the alleged other acts occurred. See United States v. Enjady, 134 F.3d at 1433. The Court has previously concluded that the United States could not admit evidence of uncharged molestation where the evidence consisted primarily of anonymous, out-of-court statements and "rumors" corroborating that the prior acts happened. United States v. Edwards, 272 F. Supp. 3d 1270, 1284 (D.N.M. 2017)(Browning). The Court concluded that the proffered evidence did not contain enough specific information to outline a specific act "or to make a meaningful comparison under rule 413." 272 F. Supp. 3d at 1284. The Court noted that the evidence of the other acts did not define the other acts or specify when the acts occurred. See 272 F. Supp. 3d at 1284. The Court further concluded that the evidence was unreliable, because none of the evidence's sources would testify at trial. See 272 F. Supp. 3d at 1285. Here, in contrast, the United States offers Doe 1 and Doe 2's testimony, see Second MIL at 6, increasing the evidence's reliability, see J. Weinstein M. Berger, Weinstein's Federal Evidence § 802.02[1][a], at 802-5 (J. McLaughlin ed., 2d ed. 2017)(noting that the Anglo-American tradition uses three devices to illuminate inaccuracies in testimonial evidence: (i) the oath; (ii) personal presence at trial; and (iii) cross examination). Further, the United States' proffered evidence goes into

extensive detail about each prior act, including, for example, the approximate dates and times when the acts allegedly occurred, the furniture layout in the rooms where the acts allegedly happened, the brand and scent of the lotion that he used to lubricate himself, and statements that Begay made contemporaneous with the acts.  See Fifth MIL at 4-6.  Further, Begay himself corroborated Doe 1 and Doe 2's statements when he spoke with law enforcement on three occasions in 2013.  See Fifth MIL at 6.  Accordingly, there is sufficient evidence to support a finding by the jury that Begay committed the similar act.  Cf. Huddleston v. United States, 485 U.S. at 685 (concluding that "evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act").

Finally, the proffered evidence is relevant.  The evidence that the United States seeks to admit is relevant in that it "indicates that defendant has a propensity to sexually abuse young girls." United States v. McHorse, 179 F.3d at 898.  The evidence is relevant in that it: (i) demonstrates that Begay abused Doe 1 in similar ways on multiple occasions, see, e.g., Fed. R. Evid. 413 advisory committee notes (statement of Rep. Susan Molinari)("In child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant -- a sexual or sadosexual interest in children -- that simply does not exist in ordinary people."); United States v. McHorse, 179 F.3d at 898 ("The Rule 414(a) testimony . . . certainly indicates that Defendant has a propensity to sexually abuse young girls."); (ii) corroborates Doe 1's accusations, see, e.g., Fed. R. Evid. 413 advisory committee notes (statement of Rep. Susan Molinari)("[Child molestation cases] require reliance on child victims whose credibility can readily be attacked in the absence of substantial corroboration.  In such cases, there is a compelling public interest in admitting all significant evidence that will illumine the

- 49 -

credibility of the charge and any denial by the defense."); <u>United States v. Charley</u>, 189 F.3d 1251, 1260 (10th Cir. 1999)(holding that a district court's reliance on the reasoning in rule 413 advisory committee notes was "sufficient to explain the district court's reasoning in admitting the statement"); and (iii) shows that Begay abuses Doe 1 and Doe 2 either late at night or when adults are away to avoid being caught, and that his abuses follow a similar pattern, <u>see</u> <u>United States v. McHorse</u>, 179 F.3d at 898.  Thus, the evidence is relevant, and meets rule 413 and 414's three-part test set forth in <u>United States v. McHorse</u>.

### B.     THE PROFFERED EVIDENCE IS ADMISSIBLE UNDER RULE 403.

The proffered evidence renders it more probable that Begay committed the charged offenses.  If proven, evidence that Begay repeatedly engaged in similar behavior over a span of several years will corroborate Doe 1 and Doe 2's testimony.  The evidence is also probative of Begay's propensity to abuse Doe 1 and Doe 2 repeatedly and in a similar manner.  <u>See</u> Fed. R. Evid. 413.  Other than Doe 1's testimony of these other instances, "there would be no evidence of the systemic nature of the abuse."  <u>United States v. Chaco</u>, No. CR 10-3463 JB, 2011 WL 3503303, at *6 (D.N.M. Aug. 5, 2011)(Browning, J.), <u>aff'd</u>, 520 F. App'x 694 (10th Cir. 2013).

Begay disputes that he sexually abused Doe 1 and Doe 2.  <u>See</u> Fifth MIL Response at 2. Begay also contends that the other acts evidence will serve only to "bolster" the United States case and that the evidence is unfairly prejudicial.  Fifth MIL Response at 4.  That Begay disputes that he sexually abused Doe 1 and Doe 2 does not mean, however, that the Court must or should exclude the evidence under rules 403, 413, and 414.  The United States cannot reasonably avail itself of any less prejudicial evidence regarding the fact that Begay engaged in repeated sexual acts with Doe 1 and Doe 2, and that he had repeated access to the girls while Begay stayed at Doe 1 and Doe

2's grandmother's home.  See United States v. Mann, 193 F.3d at 1175 (affirming the district

court's admission of rule 414 evidence to show that the defendant: "(1) wanted to engage in sexual

acts, including vaginal intercourse, with girls around the ages of the charged offense victims;

(2) regarded his great nieces as suitable objects of his sexual aggression; and (3) lacked effective

inhibitions to control this aggression").  Further, to the extent that the evidence will prejudice

Begay, an appropriate jury instruction,[6] like that used in United States v. McHorse,[7] minimizes the

chances of an improperly based jury verdict.  "Such an instruction will also focus the jury so that

the rule 414 evidence will not distract the jury from the central issues of the trial."  United States

v. Chaco, 2011 WL 3503303, at *7.  Further, to the extent that the rule 414 evidence is prejudicial,

the Court sees only marginal difference in allowing Doe 1 to testify that she was abused eight

times rather than four times.  Finally, that Begay was a juvenile when he committed four of the

five alleged prior acts does not alter the result, provided that the other rule 414 facts are satisfied.

See, e.g., United States v. LeMay, 260 F.3d 1018, 1030 (9th Cir. 2001)(finding no violation of the

---

[6]Begay should prepare and submit a limiting instruction if he would like the Court to give it, although he may not want the Court to highlight this damaging evidence.  That is Begay's choice.

[7]The district court in United States v. McHorse gave this limiting instruction:

> In a criminal case in which the defendant is accused of . . . an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible and may be considered for its bearing on any matter to which it is relevant.  However, evidence of a prior offense on its own is not sufficient to prove the defendant guilty of the crimes charged in the indictment.  Bear in mind as you consider this evidence at all times, the government has the burden of proving that the defendant committed each of the elements of the offense charged in the indictment.  I remind you that the defendant is not on trial for any act, conduct, or offense not charged in the indictment.

United States v. McHorse, 179 F.3d at 903 ("The instruction is proper.").

- 51 -

Due Process Clause of the Fifth Amendment when the United States admitted evidence of molestation that the defendant committed when he was twelve years old)).

The special factors that the Court must weigh in its rule 403 analysis when addressing rule 414 evidence also counsel in favor of allowing Doe 1 to testify about the uncharged conduct. Those factors are: "'1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence.'" United States v. McHorse, 179 F.3d at 898 (quoting United States v. Enjady, 134 F.3d at 1433).  First, the United States likely can prove the uncharged conduct by a preponderance of the evidence, as Doe 1's testimony regarding the charged conduct will corroborate her testimony regarding the uncharged conduct.  As discussed, the uncharged conduct is also relevant and highly probative -- the key disputed issue is whether Begay abused Doe 1 and Doe 2, and evidence that Begay repeatedly abused them in a similar manner on other occasions makes the charged acts more likely to have occurred.  Further, the other available evidence -- Doe 1 and Doe 2's testimony regarding the similar charged acts -- is not any less prejudicial than the proposed other acts evidence.  The Court accordingly concludes that the factors favor allowing Doe 1 and Doe 2's testimony under rule 414.[8]  Finally, Begay cannot complain, as a legal argument, that the United States has some constitutional obligation to charge him with all crimes or acts rather than attempt to use the other

---

[8]The Court also notes that it could be difficult to control Doe 1 and Doe 2's testimony, and reasonably limit it to conduct occurring only during the charged time period.  To require Doe 1 and Doe 2 to talk about four separate instances without any reference to the other five -- which occurred before the charged acts and thus likely shape Doe 1 and Doe 2's experience of the charged acts -- would paint an artificial picture of the facts of this case for the jury, and could make it unnecessarily difficult or impossible for Doe 1 and Doe 2 to testify.

- 52 -

instances as evidence under the Federal Rule of Evidence; otherwise, there would be no application for rules 404(b) and 414.

The United States also seeks to admit the uncharged acts under rule 404(b).  See Fifth MIL at 1.  The uncharged acts are admissible under rule 404(b).  This point may be more academic than practical -- as discussed, the United States may admit the prior acts as rule 414 evidence, which, in contrast to rule 404(b), allows the United States to use the prior acts to demonstrate a propensity to commit the charged crime.  See United States v. Romine, 377 F. Supp. 2d at 1132.  The Court concludes that the prior acts evidence is admissible under rule 404(b) to show Begay's pattern of behavior.  See Fed. R. Evid. 412, 1994 Amendment advisory committee notes ("In a prosecution for child sexual abuse, for example, evidence of uncharged sexual activity between the accused and the alleged victim offered by the prosecution may be admissible pursuant to Rule 404(b) to show a pattern of behavior.").  Rule 404(b) is a rule of inclusion rather than a rule of exclusion. See United States v. Romine, 377 F. Supp. 2d 1129, 1131-32 (D.N.M. 2005)(Browning, J.)(citing Huddleston v. United States, 485 U.S. at 688).  Rule 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Fed. R. Evid. 404.  The Tenth Circuit has also "consistently held that evidence of 'modus operandi' or a common plan or scheme may be properly submitted under 404(b)."  United States v. LaFlora, 146 F. App'x 973, 975 (10th Cir. 2005)(unpublished).  See United States v. Isabella, 918 F.3d 816, 840 (10th Cir. 2019).  Thus, the rule generally provides for the admission of all evidence of other acts relevant to an issue in the trial, unless the evidence is introduced to prove criminal propensity

or is unfairly prejudicial.  See United States v. Romine, 377 F. Supp. 2d at 1132 (citing United States v. Segien, 114 F.3d 1014, 1022 (10th Cir. 1997), overruled on other grounds by Jones v. United States, 526 U.S. 227, 227 (1999)).  Additionally, the rule 404(b) evidence must be extrinsic to the charged crime.  "'An uncharged act [is not] extrinsic if it was part of the scheme for which a defendant is being prosecuted, or if it was 'inextricably intertwined' with the charged crime such that witness' testimony 'would have been confusing and incomplete without mention of the prior act.'"  United States v. DeLuna, 10 F.3d 1529, 1532 (10th Cir. 1993) (quoting United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989)).

The United States asserts that the prior acts evidence is "so related to the charged conduct that it serves to establish, motive, intent, plan and absence of mistake or accident with respect to the charged conduct."  Fifth MIL at 14.  Begay counters that the prior acts evidence's unfair prejudice substantially outweighs its probativeness, and that the prior acts will confuse the jury and waste time.  See Fifth MIL Response at 2.  Begay does not object to the prior acts evidence as extrinsic.  See Fifth MIL Response at 2.  The Court agrees that the prior acts evidence is not extrinsic -- although the prior acts are very similar to the charged acts, several years separate the prior acts, which happened when Begay was a juvenile, and the charged acts, which happened when Begay was an adult.  See Fifth MIL at 2-6.  Rule 404(b) and rule 413 both share a preliminary threshold.  See United States v. Enjady, 134 F.3d at 1433.  Under both rules, there must be "sufficient evidence to support a finding by the jury that the defendant committed the similar act."  Huddleston v. United States, 485 U.S. at 685.  The Court employs similar reasoning for this rule 404(b) issue as it applied earlier in the opinion to the rule 413 issue.  There is sufficient evidence

for the jury to conclude that Begay committed the similar acts.  Doe 1 and Doe 2 describe the prior

acts with exacting specificity.  See Fifth MIL at 4-6.

In Huddleston v. United States, the Supreme Court set out four procedural safeguards that

apply to rule 404(b) evidence:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be
> relevant; (3) the trial court must make a Rule 403 determination of whether the
> probative value of the similar acts is substantially outweighed by its potential for
> unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon
> request, instruct the jury that the evidence of similar acts is to be considered only
> for the proper purpose for which it was admitted.

United States v. Jefferson, 925 F.2d 1242, 1258 (10th Cir.), cert. denied, 502 U.S. 884 (1991)

(citing Huddleston v. United States, 485 U.S. at 691-92).  The United States offers the evidence

for a proper purpose.  Begay's anticipated defense is that he did not commit the charged acts.  The

prior acts evidence shows that Begay may have had a pattern of preying on his young relatives,

and that both the prior acts and the uncharged acts happened while Begay and Doe 1 and Doe 2

were staying at Doe 1 and Doe 2's grandmother's house shows Begay's opportunity to commit the

charged acts.  The prior acts evidence is also relevant.  As discussed regarding rule 414, the prior

acts evidence shows that Begay used similar tactics each time he abused Doe 1 and Doe 2.  He

either caught them while they were alone and sleeping or used his larger size to intimidate and

silence Doe 1 and Doe 2.  Evidence that Begay engaged in similar conduct for several years before

committing the charged acts makes it more likely that he committed the charged acts.

The prior acts' prejudice does not outweigh their probativeness.  "Evidence is unfairly

prejudicial if it makes a conviction more likely because it provokes an emotional response in the

jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart

from its judgment as to his guilt or innocence of the crime charged."  United States v. Henthorn,

- 55 -

864 F.3d 1241, 1256 (10th Cir. 2017).  Further, rule 403 directs evidence's exclusion not merely

when the evidence's prejudice is greater than its probative value, but rather "the danger of that

prejudice must substantially outweigh the evidence's probative value."  United States v. Cerno,

529 F.3d 926, 935 (10th Cir. 2008).  The Court must also "give the evidence its maximum

reasonable probative force and its minimum reasonable prejudicial value."  United States v. Cerno,

529 F.3d at 935.  Here, the prior acts evidence is admissible, because its probative value is

substantial.  It tends to rebut one of the only defenses available to Begay -- that he did not commit

the charged acts.  Finally, the Court will issue a limiting instruction should Begay request it.[9]  As

a practical matter, however, the Court notes the difficulties of admitting the prior acts evidence

pursuant to rule 414, which permits the United States to make a propensity argument, and

admitting the evidence pursuant to rule 404(b), which permits Begay a limiting instruction that the

acts are not probative of his propensity to abuse.

III.     **BEGAY MAY NOT COMMENT ON DOE 1 AND DOE 2'S SEXUAL HISTORY OR PREDISPOSITIONS, BUT HE MAY CROSS-EXAMINE DOE 1 AND DOE 2 ON THE ALLEGED PRIOR ACTS.**

         In the Second MIL, the United States requests that the Court prohibit Begay from "seeking

---

[9]Such a limiting instruction might be:

        You have heard evidence of other acts engaged in by the [Mr. Begay].  You may consider that evidence only as it bears on [Mr. Begay's opportunity to abuse Jane Doe 1 and Jane Doe 2] and for no other purpose.  Of course, the fact that the [Mr. Begay] may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case.

Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, **CRIMINAL PATTERN JURY INSTRUCTIONS (CRIMINAL)** 1.30, at 46 (**2011 Edition** Updated February 2018)(SIMILAR ACTS).f

to elicit, from any witness, evidence offered to prove Jane Doe 1 or Jane Doe 2 allegedly engaged in other sexual behavior, including sexual stereotyping, any post-offense sexual conduct, or any other evidence designed to show Jane Doe 1 or Jane Doe 2's alleged sexual disposition." Second MIL at 1. Begay says that he has no plans to introduce evidence of the alleged victims' sexual history. See Second MIL Response at 1. Begay further asserts that, should he wish to introduce such evidence, he will "comply with the procedures required by rule 412(c)." Second MIL Response at 1. The Court concludes that there is no permissible reason for Begay to admit evidence of Doe 1 and Doe 2's sexual predisposition. See Fed. R. Evid. 412(a)(2) and (b)(1)(B). Rule 412(b)(1)(B) is an exception to Rule 412(a), but a limited one; rule 412(a)(2) excludes evidence of a victim's sexual behavior and sexual disposition, while rule 412(b)(1)(B) allows only evidence of the victim's sexual behavior "with respect to" the victim's consent to the alleged act. Fed. R. Evid 412(b)(1)(B). See Fed. R. Evid. 412, advisory committee note to the 1994 amendment ("Evidence relating to the victim's alleged sexual predisposition is not admissible pursuant to this exception.").

Further, Begay may not admit evidence of Doe 1 and Doe 2's "other sexual behavior," because such evidence is not relevant to a material fact. Fed. R. Evid. 412(a)(1). See Fed. R. Evid. 401. To the extent that Begay denies that any sexual activity took place, evidence of Doe 1 and Doe 2's prior sexual behavior with regard to Begay is of limited relevancy, because it does not go to a consequential fact. See Sera v. State, 341 Ark. 415, 17 S.W.3d 61, 78 (2000)(holding that the defendant's earlier sexual encounters with the victim were not relevant, because the defendant denied that the sexual acts with which he was charged took place); State v. Jackson, 216 Wis. 2d 646, 575 N.W.2d 475, 481 (1998). Second, Rule 412 also permits evidence of the victim's "other"

sexual behavior when the prosecutor offers the evidence.   Fed. R. Evid. 412(b)(1)(B).

Accordingly, the rule permits the United States to admit the rules 413 and 414 evidence discussed

supra.  Similarly, rule 412(a) restricts evidence of a victim's "other sexual behavior," i.e., not the

behavior that an indictment charges, so Begay may admit evidence of the charged conduct.  Fed.

R. Evid. 412(a)(1).  Most importantly, however, because the United States alleges that the charged

acts occurred when Doe 1 and Doe 2 were children -- three of the alleged acts happened when Doe

1 and Doe 2 were under the age of twelve, and the last happened when Doe 1 was a teenager under

the age of eighteen.  See Indictment ¶¶ 1-4, at 1-2.  Because each alleged act happened when Doe

1 and Doe 2 were too young to consent, evidence of their "other sexual behavior," Fed. R. Evid.

412(a)(1), "with respect to Begay" is irrelevant, Fed. R. Evid. 412(b)(1)(B).  See United States v.

Torres, 937 F.2d 1469, 1473 (9th Cir. 1991)(holding that the rule 412(b)(1)(B) exception does not

apply where the victim is too young to consent).  Begay may, however, cross-examine Doe 1 and

Doe 2 regarding both the charged acts and the rule 414 uncharged acts.  See U.S. Const. amend.

VI; United States v. McHorse, 179 F.3d at 900 ("[T]he demands of the Confrontation Clause are

satisfied where a defendant has the opportunity to reveal weaknesses in the witness' testimony").

## IV.   DR. DAVIS MAY TESTIFY AT TRIAL REGARDING POLICE INTERROGATION TECHNIQUES GENERALLY, BUT NOT ABOUT THE APPLICATION OF SUCH TECHNIQUES TO THIS CASE, ABOUT FALSE CONFESSIONS, OR ABOUT WHY PEOPLE MAY FALSELY CONFESS.

The United States asks that the Court exclude Dr. Davis from testifying.  See Sixth MIL

at 1.  The United States contends that Dr. Davis' proposed testimony is unreliable and so does not

satisfy Daubert.  Sixth MIL at 1.  The United States notes that Dr. Davis has not examined Begay,

and so her general testimony regarding false confessions has little bearing on whether Begay

falsely confessed.  See Sixth MIL at 4.  The United States further asserts that Dr. Davis' proposed

testimony will intrude on the jury's province to determine Begay's credibility. See Sixth MIL at 1. Accordingly, the United States objects not to Dr. Davis' qualifications, but rather to her field of study's scientific validity and, to the extent that this field has scientific validity, its relevance to this case. See Sixth MIL at 1.

> Begay says that Dr. Davis will testify as to
>
> 1) Law enforcement interrogation tactics used in attempting to elicit a confession to a crime from a suspect; 2) Psychological effects that such tactics may have on the suspect, and how the specific characteristics of a suspect may affect how susceptible the suspect is to interrogation tactics; 3) False confessions do occur; and 4) Reasons why false confessions may occur.

Fifth MIL Response at 2.

Rule 702 first requires the trial court to "determine whether the expert is proposing to testify to . . . scientific, technical, or other specialized knowledge." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). "Fed. R. Evid. 702 . . . instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence. Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991). In the Feb. 23 MOO, the Court concluded that police interrogation tactics are specialized knowledge, because a juror would not be able to understand fully the evidence against Begay, specifically the FBI interviews, without knowledge of such tactics. See 310 F. Supp. 3d at 1349-50. The Court maintains that conclusion here, and, because the United States does not contest Dr. Davis' expertise in police interrogation tactics, see Sixth MIL at 3-7, the Court concludes that Dr. Davis is competent to testify about police interrogation tactics.

The Court must next assess whether the second, third, and fourth categories of Dr. Davis'

proposed testimony -- "2) Psychological effects that such tactics may have on the suspect, and how the specific characteristics of a suspect may affect how susceptible the suspect is to interrogation tactics; 3) False confessions do occur; and 4) Reasons why false confessions may occur," Sixth MIL Response at 2 --  meet the <u>Daubert</u> reliability standards.  <u>See</u> <u>Daubert</u>, 509 U.S. at 594-95; <u>Witherspoon v. Navajo Ref. Co., LP</u>, 2005 WL 5988649, at *2.  Although the Court noted that the Tenth Circuit has held that false-confession theory may not satisfy <u>Daubert</u>, <u>see</u> Feb. 23 MOO, 310 F. Supp. 3d at 1350-55, the Court now conducts an independent <u>Daubert</u> analysis and concludes for itself that false-confession theory does not satisfy <u>Daubert</u>.  The Court then concludes that, even if false-confession theory satisfies <u>Daubert</u>, the Tenth Circuit caselaw strongly counsels the exclusion of false-confession expert testimony.

A. **FALSE-CONFESSION THEORY DOES NOT SATISFY <u>DAUBERT</u>, BECAUSE THERE IS NO SCIENTIFICALLY RELIABLE MEANS OF DETERMINING WHETHER A GIVEN CONFESSION IS FALSE, AND THE STUDY'S ERROR-RATE IS TOO HIGH.[10]**

---

[10]In the Feb. 23 MOO, the Court noted that, were it writing on a blank slate, it would allow false-confession expert testimony, because "[i]t seems useful to let an expert tell the jury that there are false confessions," 310 F. Supp. 3d at 1354 n.19, but the Court nonetheless excluded false-confession expert testimony, primarily because Tenth Circuit caselaw precludes its admissibility, <u>see</u> 310 F. Supp. 3d at 1355-57.  In this Memorandum Opinion and Order, the Court conducts an independent <u>Daubert</u> analysis and concludes that false-confession expert testimony does not satisfy <u>Daubert</u>'s reliability standards.  The Court still contends that jurors are smart, will ignore expert testimony with which they disagree, and will make an independent assessment of a confession's veracity.  <u>See</u> Feb. 23 MOO, 310 F. Supp. 3d at 1352 ("'Jurors are pretty smart, and the Court's experience is that they routinely ignore experts. . . .'" (quoting <u>United States v. Ganadonegro</u>, 805 F. Supp. 2d at 1212)).  If defendants want to use experts to convince juries that they falsely confessed, the Court would be inclined to let them do so, and the Court believes that juries are capable of judging the experts' authority for themselves.  The Supreme Court and the Tenth Circuit have instructed, however, that district courts must screen expert testimony for scientific reliability.  <u>See</u> <u>Daubert</u>, 509 U.S. at 594-95.  The Court has now conducted such a screening and concludes that false-confession expert testimony is not sufficiently reliable to satisfy the Supreme Court and Tenth Circuit caselaw.

The Supreme Court has articulated a non-exclusive list of factors that weigh into a district court's reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  See Daubert, 509 U.S. at 594-95.  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

### 1. The law regarding false confession determines false-confession expert testimony's relevance and shapes the Court's Daubert analysis.

Before discussing false confession science's reliability the Court discusses its relevance, because Tenth Circuit caselaw limits the purposes for which defendants may use false-confession experts.  See United States v. Benally, 541 F.3d at 996.  Expert testimony must also "assist the trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d at 1337. "Whether the expert testimony will assist the trier of fact goes primarily to relevance."  United States v. Markum, 4 F.3d 891, 896 (10th Cir. 1993).  The Court posits that defendants typically seek to use false-confession expert testimony as a backstop to call into question constitutionally obtained confessions, or to suggest that a confession's admissibility does not guarantee its reliability.  False-confession expert testimony's utility depends on the presumption that constitutional interrogation techniques may nonetheless yield unreliable confessions.  Before the

advent of DNA[11] testing, most practitioners, observers, and laypeople believed that a defendant's confession was the strongest possible evidence of guilt.  See, e.g., Marvin Zalman, An Integrated Justice Model of Wrongful Convictions, 74 Alb. L. Rev. 1465, 1479-80 (2010-11)("In 1990, very few Americans thought of wrongful convictions as a problem.  Most would have said that criminal justice was deficient in not catching, convicting, imprisoning, and executing enough criminals.").  The law has long recognized, however, that interrogation tactics may overcome a person's free will, and thus confessions that such tactics yield are unreliable and therefore inadmissible.  See, e.g., The King v. Warickshall, (1783) 168 Eng. Rep. 234, 234-236 (K.B.).  Current law around confessions' admissibility is based on the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America: if a confession is produced via tactics consistent with due process, then the confession is presumptively reliable and admissible.  See Miranda v. Arizona, 384 U.S. 436 (1966).  The Supreme Court has thus equated a confession's reliability with the constitutionality of the interrogation that yields the confession.  See, e.g., Brown v. Mississippi, 297 U.S. 278, 286 (1936)(holding that a confession obtained via violence is presumptively unreliable and therefore inadmissible).  If unconstitutional interrogation tactics

---

[11]"DNA" is the initialism for deoxyribonucleic acid, "the hereditary material in humans and almost all other organisms.  Nearly every cell in a person's body has the same DNA."  Nat'l Institute for Heath, Genetics Home Reference, "What is DNA?", https://ghr.nlm.nih.gov/primer/basics/dna (last accessed May 2, 2020).  DNA testing allows for forensic comparison between evidence and potential suspects that can, in some instances, objectively verify whether a suspect perpetrated a crime or was present at a crime scene.  See Dep't of Justice, "Advancing Justice Through DNA Evidence: Using DNA Evidence to Solve Crimes," https://www.justice.gov/archives/ag/advancing-justice-through-dna-technology-using-dna-solve-crimes (last accessed May 2, 2020).  False confession theorists point to DNA evidence as a means to verify objectively whether certain confessions are falsely made.  See, e.g., Steven A. Drizin & Richard A. Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C.L. Rev. 891 (2004).

yield the confession, the confession is inadmissible.  See, e.g., Edwards v. Arizona, 451 U.S. 477, 481-82 (1981).  False-confession expert testimony's relevance thus depends on the proposition that constitutional interrogation tactics may nonetheless yield unreliable -- i.e., untrue -- confessions, because, were the interrogation unconstitutional, it would generally be inadmissible. Further, a confession's legal admissibility depends not on the defendant's mental and developmental qualities, but rather on whether law enforcement complied with the Constitution in securing the confession.  In Colorado v. Connelly, 479 U.S. 157 (1986), the Supreme Court held that a confession's admissibility depends on police conduct, notwithstanding expert testimony that the defendant suffered from chronic schizophrenia and was in a psychotic state when he confessed. See 479 U.S. at 169-71.  The Supreme Court has thus directed that courts analyze separately the concepts of voluntariness and reliability.   See Crane v. Kentucky, 476 U.S. 683, 687 (1986)("[E]vidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories").  Accordingly, courts determine a confession's voluntariness as a matter of law, while a confession's reliability -- i.e., trustworthiness -- is left for the jury to decide.  See Cranie v. Kentucky, 476 U.S. at 688 (noting that a confession's "probative weight" is "a matter that is exclusively for the jury to assess").  Expert testimony may thus be probative of a confession's voluntariness -- in which case it is proper at a suppression hearing to assist with a legal conclusion, see, e.g., Crane v. Kentucky, 476 U.S. at 687 -- or of a confession's reliability -- in which case it is proper, if at all, before the jury.

Courts are divided, however, on the admissibility of expert testimony regarding confessions' reliability, and how parties may use false-confession expertise affects its relevance. Some courts limit such testimony to the defendant's mental condition.  See, e.g., United States v.

- 63 -

<u>Shay</u>, 57 F.3d 126, 131 (1st Cir. 1995)(allowing an expert to testify as to the defendant's character for truthfulness); <u>United States v. Raposo</u>, No. 98 CR. 185 (DAB), 1998 WL 879723, at *6 (S.D.N.Y. Dec. 16, 1998)(Batts, J.)(allowing expert testimony as to "both the falsity and the voluntariness of Defendant's statement").   Other courts limit testimony to false confessions' general existence.   <u>See</u>, <u>e.g.</u>, <u>United States v. Belyea</u>, 159 F. App'x 525, 530 (4th Cir. 2005)(unpublished)(permitting testimony regarding false confessions' existence and the interrogation techniques that may induce them); <u>United States v. Hall</u>, 93 F.3d 1337, 1344-45 (7th Cir. 1996)(permitting Dr. Ofshe, Dr. Davis' colleague, to testify about false confessions and their prevalence).   Some courts limit testimony to the general elements of a false confession that might be present in the defendant's confession but bar testimony about the confession's veracity.   <u>See</u>, <u>e.g.</u>, <u>State v. Buechler</u>, 572 N.W.2d 65, 73 (Neb. 1998)(allowing expert testimony that does not opine as to the defendant's truthfulness but rather explains the typical circumstances that produce false confessions).   Finally, the growing trend is to exclude such testimony altogether.   <u>See</u>, <u>e.g.</u>, <u>United States v. Adams</u>, 271 F.3d at 1246 (a Tenth Circuit panel holding that expert testimony about confessions' credibility should be excluded, because it is prejudicial and intrudes on the jury's province).

The Tenth Circuit has disapproved of false-confession expert testimony, and this limitation affects the relevancy of Dr. Davis' potential testimony.   In <u>United States v. Benally</u>, two girls indicated that the defendant had sexually abused them.   <u>See</u> 541 F.3d at 992.   Following these allegations, FBI officers interviewed the defendant.   <u>See</u> 541 F.3d at 992.   The defendant "initially denied touching either girl inappropriately, but confessed to the allegations later in the interview. At the conclusion of the meeting, he provided the agents with a written confession."   541 F.3d

- 64 -

at 992.  Before trial, the defendant notified the United States that he planned to call "Dr. Deborah

Davis, a professor of psychology at the University of Nevada at Reno, as an expert witness on false

confessions."  541 F.3d at 993.  The defendant "offered Dr. Davis's testimony on two subjects: (1)

whether false confessions occur; and (2) why people confess falsely.  Dr. Davis had never

examined [the defendant], and would not offer an opinion as to whether he confessed falsely."  541

F.3d at 993.    At a  Daubert  hearing, Judge Johnson ruled that Dr. Davis' testimony was

inadmissible, because "it did not meet the standards for relevant or reliability required by Daubert."

541 F.3d at 993.  The Tenth Circuit, in an opinion that the Honorable Mary Briscoe, United States

Circuit Judge for the United States Court of Appeals for the Tenth Circuit, wrote and that the

Honorable Carlos Lucero and the Honorable Timothy Tymkovich, United States Circuit Judges,

joined, concluded that Judge Johnson did not abuse his discretion by excluding Dr. Davis'

testimony.  See 541 F.3d at 994.  The Tenth Circuit identified "three concerns associated with this

type of testimony."  541 F.3d at 994-95.

> First, expert testimony which does nothing but vouch for the credibility of another
> witness encroaches upon the jury's vital and exclusive function to make credibility
> determinations, and therefore does not assist the trier of fact as required by Rule
> 702.  Also, a proposed expert's opinion that a witness is lying or telling the truth
> might be inadmissible pursuant to Rule 702 because the opinion exceeds the scope
> of the expert's specialized knowledge and therefore merely informs the jury that it
> should reach a particular outcome.  Yet another rationale for exclusion is that the
> testimony of impressively qualified experts on the credibility of other witnesses is
> prejudicial, unduly influences the jury, and should be excluded under Rule 403.

United States v. Benally, 541 F.3d at 995 (citing United States v. Adams, 271 F.3d 1236, 1245

(10th Cir. 2001)).  The defendant protested that "Dr. Davis did not intend to provide an opinion as

to whether the defendant before the court falsely confessed."  United States v. Benally, 541 F.3d

at 995.  The Tenth Circuit, stated, however:

> While Mr. Benally emphasizes that Dr. Davis would not have opined as to whether she believed Mr. Benally confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the defendant's testimony that his confession was a lie.   Testimony concerning credibility "is often excluded because it usurps a critical function of the jury and because it is not helpful to the jury, which is capable of making its own determination regarding credibility."   United States v. Call, 129 F.3d 1402, 1406 (10th Cir. 1997).

United States v. Benally, 541 F.3d at 995.   The Tenth Circuit thus affirmed the district court's decision to exclude Dr. Davis' false confession testimony.   See United States v. Benally, 541 F.3d at 996.

### 2.   False-Confession theory is not sufficiently scientific and has an unacceptably high error-rate, and false-confession expert testimony encroaches on the jury's province.

Daubert requires that expert testimony be "scientific . . . knowledge:" objectively verifiable facts that result from reliable methods and procedures.   Daubert, 509 U.S. at 589-90.   Daubert and rule 702 thus focus on reliability; each of the Daubert factors is intended to gatekeep and ensure that expert testimony aids courts and juries with ascertaining objectively verifiable, empirical facts. See Daubert, 509 U.S. at 594-95.   To be admissible, therefore, expert testimony on false confessions' prevalence -- the primary focus of Dr. Davis' proposed testimony -- depends on the extent to which false confessions' prevalence is objectively verifiable.   The United States' chief concern is that testimony like Dr. Davis' is based on anecdotal evidence.   See Sixth MIL at 2-4. The United States posits that Dr. Davis will extrapolate from anecdotes of false confessions to speculate on false confessions' general prevalence -- an unreliable method to attain scientific knowledge.   See Sixth MIL at 5.   Accordingly, the extent to which Dr. Davis' proposed testimony on the prevalence of false confessions and their causes depends on the extent to which: (i) a given confession's truth is objectively verifiable; (ii) a reliable statistical method can approximate false

- 66 -

confessions' true prevalence, e.g., the likelihood that a given confession is false; and (iii) some objectively verifiable or statistically significant causal relationship exists between police interrogation tactics and false confessions, e.g., under what circumstances are confessions more likely to be false than true.

Scholarship on false confessions generally identifies three categories of false confessions. See Richard A. Leo & Richard J. Ofshe, The Decision to Confess Falsely: Rational Choice and Irrational Action, 74 Denv. U. L. Rev. 979, 997 (1997)("Leo & Ofshe"). First, "stress-compliant" false confessions result from interrogation's "inherent stressors," such as being placed in an unfamiliar, accusatory situations in which the defendant loses control and undergoes emotional distress. Leo & Ofshe, 74 Denv. U. L. Rev. at 997. In such a situation, confessing falsely becomes a short-term strategy to avoid the stress of an interrogation. See Leo & Ofshe, 74 Denv. U. L. Rev. at 997. Second, "coercive compliant" false confessions result from law enforcement's more overt coercion, using threats, promises of leniency, and psychological manipulation. See Leo & Ofshe, 74 Denv. U. L. Rev. at 998. Third, "coerced-persuaded" false confessions result when the tactics that produce coercive compliant false confessions cause the defendant to actually believe that he or she committed the crime. Leo & Ofshe, 74 Denv. U. L. Rev. at 999. According to Dr. Leo and Dr. Ofshe, persuaded false confessions may also be non-coerced, when otherwise normal interrogation tactics convince a psychologically malleable defendant that he or she committed the crime despite having no actual memory of having committed the crime. See Leo & Ofshe, 74 Denv. U. L. Rev. at 999. Dr. Leo and Dr. Ofshe assert that persuaded false confessions are exceedingly rare. See Leo & Ofshe, 74 Denv. U. L. Rev. at 999. Persuaded false confessions result from an interrogator making the defendant doubt their memory and knowledge, then

explaining that doubt by suggesting that the defendant suppressed the memory, and then feeds the defendant facts that fabricate a false memory of having committed the crime.  See Leo & Ofshe, 74 Denv. U. L. Rev. at 990-91.  In this way, false confession theorists recommend comparing the defendant's post-confession narrative to the case's known facts to determine whether the confession is in fact false.  See Leo & Ofshe, 74 Denv. U. L. Rev. at 991-93.  False confession theorists assert that this method is a means to verify a given confession's veracity: a post-confession narrative that differs greatly from the case's facts is evidence of innocence, while a post-confession narrative that fits the facts is more inconsistent with innocence.  See Leo & Ofshe, 74 Denv. U. L. Rev. at 993.  Notably, this approach presumes that the interrogator has not supplied the defendant with the case's facts and further presumes that only a guilty person is aware of a case's particular facts.

False-confession theory -- which posits that there is an understood mechanism by which false confessions are produced and that demonstrates false confessions' prevalence -- does not generally satisfy Daubert.  First, scientific testimony must meet some minimum threshold of reliability.  See Daubert, 509 U.S. at 589.  Crucially, there does not appear to be a reliable estimate of how many confessions are false, regardless of the interrogation tactic employed.  See Lawrence S. Wrightsman & Saul M. Kassin, Confessions in the Courtroom at 75 (1993)(noting that it is impossible to identify the true rate of false confessions).

> At best, the existing research has shown: 1) that certain interrogation techniques are more likely than other techniques to result in false confessions; and 2) that certain types of people-such as juveniles and the mentally impaired-appear somewhat more likely than the average suspect to give a false confession.  The research has not demonstrated, however, how often the techniques in question result in false confessions, nor what number of suspects in these more vulnerable groups give false confessions . . . . [The research] does not demonstrate that persons in these groups give false confessions at a substantial rate.

- 68 -

Laurie Magid, Deceptive Police Interrogation Practices: How Far is Too Far, 99 Mich. L. Rev. 1168, 1192 (2001).

In addition to not knowing false confessions' prevalence, false-confession theory cannot reliably determine whether a given confession is false. To the contrary, false confession theorists acknowledge that their methods do not allow them to make such conclusions. See Richard A. Leo, Police Interrogation and American Justice at 5 (2008)("In the vast majority of alleged false confession cases, it is therefore impossible to completely remove any possible doubts about the confessor's innocence."). For example, in United States v. Hall, 93 F.3d 1337 (7th Cir. 1996), the United States Court of Appeals for the Seventh Circuit reversed a district court's exclusion of false-confession expert testimony in conjunction with expert psychiatric testimony that, together, "would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." 93 F.3d at 1345. On remand, the district court reconsidered the United States' motion to exclude the false confession testimony and allowed Dr. Ofshe to testify to determine whether false-confession expert testimony satisfies Daubert. See United States v. Hall, 974 F. Supp. 1198, 1203-04 (C.D. Ill. 1997)(McDade, J.). Dr. Ofshe discussed the field of false confession studies and opined that some interrogation techniques may be more likely to produce false confessions than other techniques, but refused to apply his methodology to that case or, for that matter, to any particular case. United States v. Hall, 974 F. Supp. at 1205 ("Dr. Ofshe discussed his reluctance to state an ultimate opinion in the courtroom as to whether a false confession has actually occurred in any particular case."). That false confession theorists are unable to apply their methods to a given case counsels against concluding that false confession methodology satisfies Daubert. An untested

hypothesis does not provide a scientific basis to support an expert opinion.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  Further, as false-confession theorists are unable to apply their methodology to a particular case to determine whether a confession is false, their hypotheses as to which interrogation tactics and defendant characteristics are conducive to false confessions are not falsifiable.  "Although the empirical data can identify factors that are conducive to eliciting false confessions, they cannot tell us how often standard interrogation methods produce false confessions. . . .  Thus, estimates as to the number or percentage of cases . . . seem likely to be based on little more than speculation."  Welsh S. White, False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions, 32 Harv. C.R.-C.L. L. Rev. 105, 111-12 (1997).

A further limitation is that false-confession theory does not appear to be based on significant empirical data.  See Daubert, 509 U.S. at 593-94 (providing that empirical data and tests must support an expert's conclusions).  False-confession theory instead appears to be based primarily on anecdotal evidence, small-sample-size studies, or extrapolations from inapposite situations.  For example, in 1998, Dr. Leo and Dr. Ofshe selected and studied sixty confessions, which they acknowledge is not a "statistically adequate sample."[12]  Richard A. Leo & Richard J.

--------

[12]One commentator calculated that there were roughly twenty-three million confessions in the United States between 1987 and 1997, the approximate date range from which Dr. Leo and Dr. Ofshe drew their sample.  See Paul G. Cassell, Balanced Approaches to the False Confession Problem: A Brief Comment on Ofshe, Leo, and Alschuler, 74 Denv. U. L. Rev. 1123, 1127 (1997).

- 70 -

Ofshe, The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation, 88 J. Crim. L. & Criminology 429, 435-36 (1998)("Consequences of False Confessions").  Further, of these sixty confessions, only twenty-nine were part of cases that went to trial and produced convictions based, at least in part, on the confessions.  See Consequences of False Confessions, 88 J. Crim. L. & Criminology at 477.  Dr. Leo and Dr. Ofshe largely relied on contemporaneous news stories and other secondary sources, see Consequences of False Confessions, 88 J. Crim. L. & Criminology at 435 n.15, which are hardly scientific sources from which to gauge a confession's veracity, see Paul G. Cassell, The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confessions, 22 Harv. J. L. & Pub. Pol'y, 523, 587 (1999)("The Guilty and the Innocent")(noting that Dr. Leo and Dr. Ofhse's "analysis only rarely cites -- much less discusses -- primary court records, even where judicial opinions are readily available in published reporters.").  Accordingly, a leading study in the field of false confession relies on a handpicked, statistically insignificant same size, and the researchers drew their conclusions from unreliable sources.

Other studies are not analogous to the kinds of interrogations to which false-confession experts testify.  In one study, researchers convinced college students that they were participating in a typewriting study, and told the participants that the computer would crash if the participants pressed the "ALT" button on the keyboard.  Saul M. Kassin & Katherine L. Keichel, The Social Psychology of False Confessions: Compliance, Internalization, and Confabulation, 7 Psychol. Sci. 125, 126 (1996)("Kassin & Keichel").  In fact, the computers were programmed to crash independent of the ALT button.  See Kassin & Keichel, 7 Psychol. Sci. at 126.  Of the participants whose computers crashed, seventy percent signed statements that they had pressed the ALT button,

- 71 -

with nearly ten percent providing details that corroborated their "confession."  Kassin & Keichel, 7 Psychol. Sci. at 126.  Dr. Kassin and Dr. Keicher concluded that these results support the "provocative notion that the presentation of false incriminating evidence -- an interrogation ploy that is common among the police and sanctioned by many courts -- can induce people to internalize blame for outcomes they did not produce."  Kassin & Keichel, 7 Psychol. Sci. at 127.  The authors concede, however, that the study's participants are likely not representative of typical interrogatees and that the study's scenarios are not comparable to real-life, high stakes criminal interrogations.  See Kassin & Keichel, 7 Psychol. Sci. at 127.  Dr. Leo writes that "experimental studies specifically demonstrating the distortion and creation of false memories in the laboratory are not directly relevant to and thus misconceive the psychology of persuaded false confessions."  Richard A. Leo, Police Interrogation and American Justice at 224.  See James R. Agar, II, "The Admissibility of False Confession Expert Testimony," Army Law., Aug. 1999, at 28-29 (1999)("The emotional and psychological damage inflicted on test subjects to falsely confess to a murder or rape they did not commit exceeds the tolerance of most people. . . .  Therefore, adopting Kassin's experiment to more closely approximate the conditions faced by the typical criminal suspect may not be possible.").  Such studies thus may not be helpful to identify the extent to which criminal suspects falsely confess.

To the extent that false confession theory is based on empirical data from real-life interrogation, false-confession theorists acknowledge that such data is exceedingly difficult to acquire.  See, e.g., Leo, Police Interrogation and American Justice at 4-5 (noting that law enforcement frequently denies researchers access to case files, and there is no official governmental body that tracks false confessions' frequency).  The absence of solid empirical data

thus further counsels against admitting false-confession expert testimony, demonstrates how false-confession experts are largely unable to offer predictive, falsifiable theories.  See Richard A. Leo, Police Interrogation and American Justice at 5 ("In the vast majority of alleged false confession cases, it is therefore impossible to completely remove any possible doubts about the confessor's innocence.").  "Without any long-term empirical data, we cannot determine any patterns; and without a pattern we are left only with a phenomenon that happens to occur about once every million confessions."  David A. Perez, The (In)Admissibility of False Confession Expert Testimony, 26 Touro L. Rev. 23, 51 (2010).  As there is little reliable data to estimate false confessions' frequency, false-confession theory therefore has minimal scientific ability to determine the interrogation tactics that are conducive to false confessions.  Accordingly, the Court is not convinced that false-confession theory can reliably determine whether a given confession is false, reducing expert testimony's utility in this area.

The empirical data limitations similarly produce a high error-rate.  See Daubert, 509 U.S. at 593-94 (instructing district courts to consider, among other facts, a scientific field's rate of error).  In Dr. Leo and Dr. Ofshe's 1998 study of sixty confessions, the authors asserted that thirty-four of the confessions were "proven" false, eighteen were "highly probable false confessions," and eight were "probabl[y] false."  Consequences of False Confessions, 88 J. Crim. L. & Criminology at 436-38.  As discussed earlier, however, only twenty-nine of the confessions involved defendants who were convicted at trial, and, of those twenty-nine confessions, nine were demonstrably false.  See Consequences of False Confessions, 88 J. Crim. L. & Criminology at 478.  One scholar, analyzing Dr. Leo and Dr. Osfhe's study, noted that the parties to those nine convictions acknowledged that the convictions needed to be overturned, thus revealing the

confessions' falsity without false-confession theory.  See Paul G. Cassell, The Guilty and the "Innocent", 22 Harv. J. L. & Pub. Pol'y, at 587.  Professor Cassell also concluded that, of the remaining twenty confessions that resulted in convictions -- which Dr. Leo and Dr. Ofshe concluded were false -- nine were in fact true, meaning that the confessors were in fact guilty.  The Guilty and the "Innocent", 22 Harv. J. L. & Pub. Pol'y, at 587.  The false-confession theorists thus may have reached incorrect conclusions in forty-five percent of their assertions.  See The Guilty and the "Innocent", 22 Harv. J. L. & Pub. Pol'y, at 587-88 ("Even giving Leo and Ofshe the generous benefit of the doubt that they were entirely right on the remaining eleven cases, their success rate in identifying false confessions in the disputed cases can be no better than eleven of twenty (fifty-five percent), barely better than one would expect from flipping a coin to decide a controverted issue.").  Accordingly, even limited expert testimony about false confessions' prevalence and contributing factors -- that does not opine as to the veracity of particular defendant's confession -- may not satisfy Daubert, because insubstantial empirical data supports false-confession theory and false-confession theory is prone to an unacceptably high rate of error.

False-confession theory's methodological problems also increase the manner in which false-confession expert testimony invades the jury' province, because false-confession theorists may opine, even indirectly, about something on which they have little more authority than the jury.  It is the jury's exclusive role to determine a witness's credibility and assign weight to a defendant's confession.  See Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, **CRIMINAL PATTERN JURY INSTRUCTIONS (CRIMINAL)** 1.08, at 13 (**2011 Edition** Updated February 2018)(CREDIBILITY OF WITNESSES)("Tenth Circuit Pattern Jury Instructions")("You are the sole judges of the credibility or "believability" of

- 74 -

each witness and the weight to be given to the witness's testimony."); Tenth Circuit Pattern Jury

Instructions 1.25 (VOLUNTARINESS OF STATEMENT BY DEFENDANT)("You should give

any such [confession] the weight you think it deserves, after considering all the circumstances

under which the statement was made).

> All hierarchies of rank, learning, and technical prowess give way in the face
> of this asserted power of common jurors to spot a lie: In most jurisdictions today,
> no trial judge may advise the jury that a witness has lied.  No psychiatric expert
> may comment on a witness's credibility.  Rarely may a polygraph technician lecture
> to jurors about a witness's pulse and pressure, tension or temperature.  The job of
> lie detecting belongs to the jurors alone. Nor may we later, once the jurors have
> done their job of sifting truth from falsehood, review how they did it.

George Fisher, The Jury's Rise as Lie Detector, 107 Yale L.J. 575, 577-78 (1997).  While experts

in interrogation techniques may assist juries in understanding how police interrogate suspects, see

Summary of Potential Testimony at 6-17, filed March 4, 2020 (Doc. 222-1)(summarizing various

interrogation techniques)(citing Feb. 23 MOO, 310 F. Supp. 3d at 1349-50 (concluding that

knowledge about police interrogation techniques is specialized and may be helpful to the jury)),

false-confession experts often rely on facts that juries are independently capable of assessing:

> Did the suspect confess to details only the real perpetrator would know?  Did the
> cops "feed" the information to the suspect?  Is there some innocent explanation for
> the incriminating statement from the suspect?  These are not subjects generally
> beyond the ken of the average jury and indeed, as Leo and Ofshe recognize, there
> are many cases in which jurors have acquitted possible false confessors

The Guilty and the "Innocent", 22 Harv. J. L. & Pub. Pol'y, at 599 (citing Consequences of False

Confessions, 88 J. Crim. L. & Criminology at 476-77).

Similarly, Dr. Davis' proposed testimony regarding false confession's prevalence and

causes may not "assist the trier of fact to understand or determine a fact in issue."  United States

v. Muldrow, 19 F.3d at 1337.  "Whether the expert testimony will assist the trier of fact goes

primarily to relevance." <u>United States v. Markum</u>, 4 F.3d 891, 896 (10th Cir. 1993). "Under the relevance prong of the <u>Daubert</u> analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . . The evidence must have a valid scientific connection to the disputed facts in the case." <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 884 n.2 (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 43 F.3d at 1315 (on remand from the Supreme Court); <u>Daubert</u>, 509 U.S. at 591). An expert's testimony may not assist the jury if an untrained layperson is qualified to determine the material fact without specialized knowledge. <u>See</u> <u>United States v. Adams</u>, 271 F.3d at 1245 ("First, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702."). The Court suspects that most jurors are aware that false confessions occur and understand that this occurrence is rare. <u>See</u> Richard A. Leo, "The Problem of False Confession in America" at 31, Champion, Dec. 31, 2007 (concluding that almost seventy percent of jurors believe that false confessions exist but that they occur rarely). Indeed, the primary rationale that false-confession experts advance for their testimony's admissibility is that jurors typically disbelieve that anyone would ever confess to a crime they did not commit. <u>See</u>, <u>e.g.</u>, Fifth MIL Response at 6. That nearly seventy percent of jurors understand that false confessions exist and that they occur rarely -- likely an empirically correct belief, <u>see</u> <u>The Guilty and the "Innocent"</u>, 22 Harv. J. L. & Pub. Pol'y, at 530 (calculating an "error rate," defined as the total number of wrongful convictions attributable to false confessions, as less than one percent of all convictions) -- undercuts this rationale. An expert that confirms what the jury already knows thus may not "assist the trier of fact." <u>Daubert</u>, 509 U.S. at 592. Further, as discussed, to the extent that knowledge of the causes

of false confessions is specialized and beyond a layperson's ken, that knowledge has not demonstrated a sufficient indicia of reliability.  Finally, the Tenth Circuit's Pattern Jury Instructions already direct the jury's attention to evidence that false-confession experts are likely to discuss, but without an expert's potentially excessive influence.  The Tenth Circuit's Pattern Jury Instructions provide that jurors should always "consider[] with caution and weigh[] with care" defendants' out-of-court confessions to assess the confessions' reliability and credibility.  Tenth Circuit Pattern Jury Instructions 1.25 (VOLUNTARINESS OF STATEMENT BY DEFENDANT).  The instructions further direct the jury to "consider the age, gender, training, education, occupation, and physical condition of the defendant, and any evidence concerning his treatment while under interrogation if the statement was made in response to questioning by government officials, and all other circumstances surrounding the making of the statement."  Tenth Circuit Pattern Jury Instructions 1.25 (VOLUNTARINESS OF STATEMENT BY DEFENDANT).

Other Courts of Appeals have admitted false-confession expert testimony, taking a less restrictive view than the Tenth Circuit did in United States v. Adams and United States v. Benally.  See United States v. Hall, 93 F.3d 1337; United States v. Shay, 57 F.3d 126 (1st Cir. 1995).  In those cases, however, the proffered expert addressed a defendant's specific mental illness.  See United States v. Hall, 93 F.3d at 1341.  In United States v. Shay, the United States Court of Appeals for the First Circuit permitted a psychiatrist to testify about the defendant's mental illness, but prohibited testimony whether the defendant's confession was false, noting that such an opinion "exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion."  57 F.3d at 131.  The First Circuit thus limited the

- 77 -

testimony to the witness's expertise -- the psychiatric diagnosis, because the jury could not independently diagnose the defendant and understand that diagnosis' implications without the expert's testimony.  See United States v. Shay, 57 F.3d at 133-34.  Accordingly, even courts that allow expert testimony regarding susceptibility to falsely confess limit such testimony to the defendant's unique traits.  These courts recognize that, while the jury is capable is gauging a confession's credibility, the jury is not competent to diagnose a defendant's mental illness.  See United States v. Shay, 57 F.3d at 133 (concluding that the jury is competent to "assess the reliability" of the defendant's statements without an expert's opinion); United States v. Hall, 974 F. Supp. at 1204-5 (prohibiting a false-confession expert from discussing discrepancies in the case's evidence and the defendant's post-admission narrative, because the expert was not qualified to discuss the defendant's credibility and such testimony would usurp the jury's role).

Some commentators assert that the "strongest case for admissibility of expert confession testimony would appear to be the psychiatrist or psychologist who treated the confessor before he was interrogated."  Steven B. Duke, Does Miranda Protect the Innocent or the Guilty?, 10 Chap. L. Rev. 551, 573 (2007).  General Testimony about false confessions is not synonymous, however, with psychiatric testimony about a defendant's particular mental illness.  The former typically does not involve diagnosing the defendant or applying false-confession theory to the defendant.  See United States v. Benally, 541 F.3d at 996 ("Mr. Benally's confession differs from the confessions in *Hall* and *Shay* because he does not identify a medical condition that contributed to his decision to confess."); Sixth MIL Response at 2 (proposing that Dr. Davis testify to false-confessions' prevalence and causes while not diagnosing Begay with any particular trait that may be conducive to falsely confessing).  Cases allowing false-confession testimony are thus more likely to involve

- 78 -

psychiatric expertise that is applied to the defendant and so are not applicable to false-confession expert testimony's admissibility.  See United States v. Benally, 541 F.3d at 996.  Accordingly, the Court concludes that expert testimony on false confessions' prevalence and causes does not generally satisfy rule 702, is often not relevant, and may be unfairly prejudicial.

### B.   TENTH CIRCUIT CASELAW PRECLUDES FALSE-CONFESSION EXPERT TESTIMONY.

Were the Court to conclude that false-confession expert testimony satisfies rules 403 and 702, Tenth Circuit caselaw nonetheless generally precludes its use, primarily because such testimony is unfairly prejudicial.  The Tenth Circuit has noted that the "Supreme Court has held that Rule 702 imposes a special obligation upon a trial judge to ensure that all expert testimony, even non-scientific and experience-based expert testimony, is both relevant and reliable." United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)(citations omitted).  As discussed above, the Tenth Circuit has identified "three concerns associated with" false-confession expert testimony.  541 F.3d at 994-95.

> "First, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702.  Also, a proposed expert's opinion that a witness is lying or telling the truth might be inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular outcome.  Yet another rationale for exclusion is that the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial, unduly influences the jury, and should be excluded under Rule 403."

United States v. Benally, 541 F.3d at 995 (quoting United States v. Adams, 271 F.3d at 1245). The Tenth Circuit also rejected the argument that Begay now makes -- that Dr. Davis will not offer an opinion as to the veracity of Begay's confessions:

> While Mr. Benally emphasizes that Dr. Davis would not have opined as to whether

> she believed Mr. Benally confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the defendant's testimony that his confession was a lie.   Testimony concerning credibility "is often excluded because it usurps a critical function of the jury and because it is not helpful to the jury, which is capable of making its own determination regarding credibility." *United States v. Call*, 129 F.3d 1402, 1406 (10th Cir. 1997).

United States v. Benally, 541 F.3d at 995.   The Tenth Circuit thus affirmed the district court's

decision to exclude Dr. Davis' false confession testimony.   See United States v. Benally, 541 F.3d

at 996.

The Court has previously followed <u>United States v. Benally</u>, and <u>United States v. Adams</u>,[13]

and excluded expert testimony regarding false confessions, both generally and as it went to the

particular defendant's credibility, because the "'evidence lack[s] relevance and would not assist

the trier of fact as required by Rule 702.'"   <u>United States v. Ganadonegro</u>, 805 F. Supp. 2d at 1213,

1218 (quoting <u>United States v. Adams</u>, 271 F.3d at 1246).

Here, Begay proposes that Dr. Davis testify about

> 1) Law enforcement interrogation tactics used in attempting to elicit a confession to a crime from a suspect; 2) Psychological effects that such tactics may have on the suspect, and how the specific characteristics of a suspect may affect how susceptible the suspect is to interrogation tactics; 3) False confessions do occur; and 4) Reasons why false confessions may occur.

Sixth MIL Response at 2.   These latter two categories are very similar to the categories which the

Tenth Circuit affirmed the district court's exclusion of in <u>United States v. Benally</u>, where the

---

[13]In <u>United States v. Adams</u>, the Tenth Circuit "affirmed a district court's exclusion of a psychologist's expert testimony regarding the credibility of incriminating statements made by a defendant to police officers."   <u>United States v. Benally</u>, 541 F.3d at 994 (citing <u>United States v. Adams</u>, 271 F.3d at 1244).   <u>United States v. Adams</u> was the first case in which the Tenth Circuit compiled the "three concerns associated with this type of testimony."   <u>United States v. Benally</u>, 541 F.3d at 994-95.

defendant "offered Dr. Davis's testimony on two subjects: (1) whether false confessions occur; and (2) why people confess falsely."  United States v. Benally, 541 F.3d at 993.  The Tenth Circuit's holding in United States v. Benally was based in part not on false-confession theory's reliability, but rather its relevance and prejudicial effect.  See 541 F.3d at 995.  The Tenth Circuit disapproved of admitting false-confession theory in the abstract, because Dr. Davis had not personally examined the defendant and did not propose applying her expertise to the case.  See United States v. Benally, 541 F.3d at 995.  The Tenth Circuit thus tightly constrained the potential uses for false-confession expert testimony:  it indicated that false-confession theory is unreliable, but also held that, independent of that reliability, abstract false-confession expert testimony is irrelevant, while applied false-confession expert testimony is unfairly prejudicial.  See United States v. Benally, 541 U.S. at 993-95.  Accordingly, independent of the Court's assessment of false-confession theory's reliability and helpfulness, Tenth Circuit caselaw precludes Dr. Davis' proposed testimony on the latter two subjects -- false confessions' prevalence and causes.[14]  Dr.

_____

[14]The Court could distinguish the Tenth Circuit's decisions in United States v. Benally and United States v. Adams, because the Tenth Circuit affirmed the district courts' exclusions of false confessions expert testimony, but did not say that the admission of such expert testimony would be an abuse of discretion.  See United States v. Benally, 541 F.3d at 994 ("The district court did not abuse its discretion by excluding Dr. Davis's testimony."); United States v. Adams, 271 F.3d at 1246 ("The judge was well within his discretion in determining that the evidence lacked relevance and would not 'assist the trier of fact as required by Rule 702.'").  The Tenth Circuit might affirm, under an abuse-of-discretion standard, the admission of a false confessions expert, but that argument would probably distinguish United States v. Adams and United States v. Benally without identifying a real difference.  The Tenth Circuit -- at least five of its judges -- has indicated that it does not like false-confessions expert testimony.  Additionally, while the Tenth Circuit may have painted false-confession theory with too broad a brush, the Court has also identified shortcomings in false-confession studies.  Further, the Court must, and will, follow Tenth Circuit authority which holds that it is not only appropriate to exclude false confessions experts, but also strongly suggests that district courts should not permit such experts to testify.

The Court acknowledges Begay's argument, however, that false-confession studies have progressed in their rigor and reliability over the last decade.  See Sixth MIL Response at 8 ("To

Davis may thus testify at trial regarding police interrogation techniques generally, but not about false confessions or about why people may falsely confess.

**V.     THE UNITED STATES MAY ADMIT EVIDENCE OF BEGAY'S JAIL CALLS UNLESS BEGAY IDENTIFIES EXCLUDABLE CALLS WITH SPECIFICITY AND IDENTIFIES WHY THEY ARE INADMISSIBLE.**

In the Defense MIL, Begay says that the United States disclosed evidence of sixty-eight phone calls that Begay made from the Santa Fe County Adult Detention Center between October, 2019, and February, 2020. See Defense MIL at 1. Begay does not discuss these calls' content, but nonetheless asserts that they are unfairly prejudicial and not relevant. See Defense MIL at 1. Begay says that, "[i]f such evidence is introduced intentionally or inadvertently, Mr. Begay will request this Court grant a mistrial." Defense MIL at 1.

The United States responds that jailhouse calls "are not private," and asserts that Begay's statements are not hearsay and, if relevant, are admissible. Defense MIL Response at 1 (citing United States v. Gangi, 57 F. App'x 809, 814 (10th Cir. 2003); Fed. R. Evid. 801(d)(2)(A)). The United States also asserts that, if Begay testifies at trial, his jailhouse calls may be relevant impeachment materials. See Defense MIL Response at 2.

---

the extent that the district court in Benally indicated that Dr. Davis's testimony in 2005 was unreliable, such a holding is now unsupported by the scientific research in this field."). The Court has given its view based on its survey of the literature, but, should Begay wish, the Court will hold a hearing at which Begay and Dr. Davis can assuage the Court's concerns, and demonstrate that false-confession theory has evolved and achieved a sufficient measure of reliability. The Court's analysis above should guide Begay as he considers the purposes and topics of Dr. Davis' testimony, and the Court's doubts that he must overcome. The Court further notes, however, that the Tenth Circuit's concerns about unfair prejudice and intruding into the jury's province will remain regardless of the science's merits.

Begay does not assert the grounds on which the Court should exclude evidence of his jailhouse calls. <u>See</u> Defense MIL at 1-2.  Instead, Begay asserts only that this evidence is unfairly prejudicial and minimally probative. <u>See</u> Defense MIL at 1.  A motion in limine asks the Court "'to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" <u>Palmieri v. Defaria</u>, 88 F.3d 136, 141 (2nd Cir. 1996)(quoting <u>Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.</u>, 652 F. Supp. 1400, 1401 (D. Md. 1987)(Smalkin, J.)).  The Court cannot, however, balance the calls' probative value against their prejudicial effect without knowing more about the calls and the reasons for which the United States plans to introduce the calls:

> As a procedural matter, the movant should identify the particular evidence at issue and articulate with specificity the arguments supporting the position that the particular evidence is inadmissible on any relevant ground.  A court is well within its discretion to deny a motion in limine that fails to identify the evidence with particularity or to present arguments with specificity.

<u>United States v. Cline</u>, 188 F. Supp. 2d 1287, 1292 (D. Kan. 2002)(Crow, J.), <u>aff'd</u>, 349 F.3d 1276 (10th Cir. 2003)(citing <u>National Union v. L.E. Myers Co. Group</u>, 937 F. Supp. 276, 287 (S.D.N.Y.1996)(Kram, J.)).  Accordingly, a motion "'seeking to prohibit generic, unspecified prejudicial testimony [is] not useful.'" <u>United States v. Enns</u>, No. 15-10045-JTM, 2015 WL 8770006, at *1 (D. Kan. Dec. 14, 2015)(Marten, J.)(quoting <u>Hemetek v. United States</u>, No. 3:08-CR-00198, 2012 WL 3870620, at *9 (S.D. W. Va. April 25, 2012)(Eifert, M.J.)).

The Court denies the Defense MIL without prejudice, because Begay does not identify the evidence that he wishes to exclude with specificity or justify his request.  The Court notes that Begay does not assert an objection under the Fourth Amendment to the Constitution, and nor could he, because "'no prisoner should reasonably expect privacy in his outbound telephone calls.

Although prisoners do not forfeit all their privacy rights at the jailhouse steps, they do have those rights severely curtailed.'" United States v. Gangi, 57 F. App'x at 816 (quoting United States v. Van Poyck, 77 F.3d 285, 291 (9th Cir. 1996)). Additionally, Begay's own statements are not hearsay and may be used against him if they are relevant. See Fed. R. Evid. 801(d)(2)(A). "The United States Court of Appeals for the Tenth Circuit has stated that proponents of such evidence 'need only show by a preponderance of the evidence that the opposing party had made the statement.'" United States v. Shirley, No. CR 15-1285 JB, 2016 WL 9021832, at *7 (D.N.M. Dec. 21, 2016)(Browning, J.)(quoting United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)). See United States v. Williams, 760 F. App'x 959, 963 (11th Cir. 2019)(unpublished)(holding statements that a defendant made in recorded jailhouse telephone call were admissible as admissions of a party-opponent). Should Begay have specific objections, such as that a particular statement involves double hearsay, see Fed. R. Evid. 805, or pertains to the attorney-client privilege, see Fed. R. Evid. 402, or even a rule 403 objection, the Court will entertain such an objection, provided that Begay states with specificity the grounds for excluding that particular statement. See United States v. Cline, 188 F. Supp. 2d at 1292 ("[T]he movant should identify the particular evidence at issue and articulate with specificity the arguments supporting the position that the particular evidence is inadmissible on any relevant ground."). As Begay has not identified any specific statements that the Court should exclude or why the Court should exclude his statements wholesale, the Court will deny the Defense MIL.

## VI.    THE COURT WILL HOLD A LAFLER-FRYE HEARING.

The United States requests that the Court hold a hearing to ensure that Begay's counsel has communicated the United States' plea offers to Begay. See Lafler-Frye Motion at 1. The United

States contends that such a hearing is necessary, "[s]o that a clear record will exist in the event Defendant is convicted at trial and subsequently brings a claim under 28 U.S.C. § 2255 alleging that his attorney failed to effectively convey the United States' plea offer to him." Lafler-Frye Motion at 1. The United States "presumes that defendant opposes this motion." Lafler-Frye Motion at 2. Begay does not respond to the United States' request.[15]

In Lafler v. Cooper, the Supreme Court held that "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." 566 U.S. at 168. In Missouri v. Frye, the Supreme Court held that, "[w]hen defense counsel allowed [a plea] offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires." 566 U.S. at 145. In that case, the defendant's counsel did not communicate a plea offer before the offer had expired, and the defendant later brought a claim for ineffective assistance of counsel, arguing that he would have accepted the plea offer had he known about it. See Missouri v. Frye, 566 U.S. at 138-39. In Lafler v. Cooper, the defendant's counsel told him about a plea offer, but the defendant rejected the offer on his counsel's advice. See 566 U.S. at 160. The defendant was convicted and received

---

[15]In several of the United States' motions, the United States "presumes that" Begay opposes the motion, indicating that the United States did not confer with Begay. See First MIL at 4; Second MIL at 7; Lafler-Frye Motion at 1. The local rules provide that movants "must determine whether a motion is opposed," and that movants "must recite in the motion whether concurrence was refused or explain why concurrence could not be obtained." D.N.M.LR-CR 47.1. The United States' practice with these motions -- to not seek Begay's consent, but rather to presume his opposition -- thus violate the local rules. The local rules further provide that a "motion that fails to recite the concurrence of each party may be summarily denied." D.N.M.LR-CR 47.2. The Court reminds the United States of its duty to comply with the local rules. See Benavidez v. Sandia Nat'l Labs., 319 F.R.D. 696, 724 (D.N.M. 2017)(Browning, J.)(noting that the Federal Rules of Civil Procedure and the local rules require parties' good faith efforts to confer with each other, and that courts may summarily dismiss motions that do not comply with this requirement).

a more severe sentence than he would have received had he accepted the plea offer, and the defendant brought a post-conviction ineffective-assistance claim. See 566 U.S. at 160. The Supreme Court concluded that the defendant stated a valid ineffective-assistance claim, "where ineffective assistance results in a rejection of a plea offer and the defendant is convicted at the ensuing trial." 566 U.S. at 163.

Here, the United States requests a pretrial motion for a hearing to inquire whether Begay's counsel informed him of the United States' plea offer. See Lafler-Frye Motion at 1. As discussed, Lafler v. Cooper and Missouri v. Frye involved post-conviction ineffective-assistance claims, whereas here the United States seeks to hold a pretrial hearing, "[s]o that a clear record will exist in the event Defendant is convicted at trial and subsequently brings a claim under 28 U.S.C. § 2255 alleging that his attorney failed to effectively convey the United States' plea offer to him." Lafler-Frye Motion at 1. In Missouri v. Frye, the Supreme Court noted that "[t]he prosecution and the trial courts may adopt some measures to help ensure against late, frivolous, or fabricated claims after a later, less advantageous plea offer has been accepted or after a trial leading to conviction with resulting harsh consequences." 566 U.S. at 146.

The Court notes, however, that the Court's authority regarding plea negotiations is constrained. Rule 11(c)(1) of the Federal Rules of Criminal Procedure prohibits courts from participating in plea negotiations. See Fed. R. Crim. P. 11(c)(1) ("An attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement. The court must not participate in these discussions."). The Tenth Circuit has concluded, however, that "[n]ot all judicial comments relating to plea agreements violate the rule." United States v. Cano-Varela, 497 F.3d 1122, 1132 (10th Cir. 2007). "This rule is in place because such discussion 'inevitably carries

with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty.'" United States v. Paul, 634 F.3d 668, 671 (2d Cir. 2011)(quoting United States v. Bruce, 976 F.2d 552, 556 (9th Cir. 1992)). Further, the attorney-client privilege protects "'confidential communications by a client to an attorney made in order to obtain legal assistance' from the attorney in his capacity as a legal advisor." In re Grand Jury Proceedings, 616 F.3d 1172, 1182 (10th Cir. 2010)(quoting In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, 697 F.2d 277, 278 (10th Cir. 1983)). Other courts have concluded, however, that the attorney-client privilege does not prohibit pretrial hearings to determine whether defense counsel has communicated a plea offer to the defendant. See United States v. Morgan, 294 F. Supp. 3d 1218, 1224 (D.N.M. 2018)(Johnson, C.J.); United States v. Mayer, No. 19-CR-0096 (WMW/HB), 2020 WL 1444964, at *4 (D. Minn. March 25, 2020)(Wright, J.). Further, not all communications between an attorney and his or her client are privileged, and "[w]here questions only request information regarding communications where the attorney was acting as a 'conduit' for non-confidential information, the client may not invoke the attorney-client privilege." In re Grand Jury Proceedings, 616 F.3d at 1182-83  (quoting United States v. Defazio, 899 F.2d 626, 635 (7th Cir. 1990)). The attorney-client privilege thus prohibits courts from inquiring into attorney-client communication's substance, but does not prevent simple yes-or-no inquiry into communications that do not involve legal advice. See United States v. Defazio, 899 F.2d at 635. Accordingly, a simple colloquy inquiring whether Begay's counsel acted as a conduit for the United States' plea offer would not elicit privileged information. Similarly, the Fifth Amendment provides that "[n]o person . . . shall be compelled in a criminal case to be a witness against himself." U.S. Const. amend. V. To qualify for the Fifth Amendment privilege, however, the "communication must be

testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Ct., 542 U.S. 177, 189 (2004).   Nonetheless, a simple colloquy asking Begay whether his counsel communicated the United States' plea offer to Begay is unlikely to elicit an incriminating statement.

There does not appear to be any guidance from the Tenth Circuit on district courts' authority to order a pretrial hearing to determine whether a defense attorney has communicated a plea offer to the defendant, and district courts considering the matter have disagreed.   See, e.g., United States v. Morgan, 294 F. Supp. 3d at 1226-27 (granting the United States' motion for such a hearing over the defendant's objection); United States v. Pirk, 236 F. Supp. 3d 796, 799-801 (W.D.N.Y. 2017)(Wolford, J.)(same); United States v. Broombaugh, No. 14-40005-10, 2014 WL 3107963, at *3-4 (D. Kan. July 8, 2014)(Crabtree, J.)(denying the United States motion for such a hearing), amended in part by sub nom. United States v. Reulet, No. 14-40005, 2016 WL 126355, at *11 (D. Kan. Jan. 11, 2016)(granting the United States motion).   The Court notes that Begay does not object or otherwise respond to the United States' request.   Additionally, the Court is obligate to ensure that Begay receives effective assistance of counsel.   See Garcia v. Teitler, 443 F.3d 202, 209 (2d Cir. 2006)("[A] district court must . . . protect a defendant's Sixth Amendment right to effective assistance of counsel"); United States v. Gonzalez-Lopez, 399 F.3d 924, 928-29 (8th Cir. 2005)(balancing a defendant's right to choose his counsel against the court's need to administer justice).

The Court concludes that it may hold a hearing to ascertain whether Begay's counsel communicated the United States' plea offer.   The Court will not inquire as to the substance of those communications, but rather to determine the simple factual question whether Begay's counsel communicated the United States' plea offer.   See United States v. Slane, No. 11-81, 2015

WL 728481, at *20 n. 14 (W.D. Pa. Feb. 19, 2015)(Fischer, J.)("[T]he Court is careful to elicit only factual information from the parties and the defendant rather than soliciting any advice provided by defense counsel to the defendant and protected by the attorney-client privilege."). The Court will also conduct this hearing in open court, in the United States' presence. See, e.g., United States v. Draper, 882 F.3d 210, 217-18 (5th Cir. 2018)(noting that all parties were present). Such a procedure enables the parties to establish with certainty that all parties share the same understanding of the plea agreement, and enables the United States to remedy any miscommunication or issue under Lafler v. Cooper or Missouri v. Frye. See Lafler v. Cooper, 566 U.S. at 171-72 (noting that it is "difficult to restore the defendant and the prosecution to the precise positions they occupied prior to the rejection of the plea offer"). The Court will further decline to hold an ex parte hearing to inquire into Begay's rationale for rejecting the United States' plea offer:

> Nor, contrary to the government's suggestion, does *Frye* require a district court to satisfy itself of the intelligence of a defendant's decision to exercise his right to trial instead of accepting a plea offer. *Frye* and its companion case, *Lafler v. Cooper*, concern the duty of *defense counsel* to advise their clients regarding formal plea offers; they do not obligate or permit judges to give advice to defendants on whether to accept such agreements. . . . [T]he district court, as described above, fulfilled its role under *Frye* by memorializing the offer on the record at the government's request . . . . Nothing more was required or justified by *Frye*.

United States v. Braxton, 784 F.3d 240, 247 (4th Cir. 2015). Similarly, the Court will note the offer's terms in the record to better inform any post-conviction collateral attack about which the United States is concerned, but the Court may seal the record should the parties identify "'some significant interest that outweighs the presumption' in favor of open access to judicial records." United States v. Pickard, 733 F.3d 1297, 1300 (10th Cir. 2013)(quoting Colony Ins. Co. v. Burke, 698 F.3d 1222, 1241 (10th Cir. 2012)). See United States v. Morgan, 294 F. Supp. 3d at 1226

- 89 -

(choosing to hold the hearing in open court, but inviting the parties to justify a sealed exhibit containing the plea offer should they desire).  Accordingly, the Court will hold a hearing to identify the terms of the United States' plea offer and to confirm that Begay's counsel communicated the offer to Begay.  See United States v. Pirk, 236 F. Supp. 3d at 801 ("Faced with these competing principles and obligations, the Court elected to engage in part in the colloquy requested by the Government -- namely to memorialize the terms of any plea offer on the record to ensure that the defendant was aware of the offer and understood its terms.").

## VII.   AT THIS TIME, THE COURT WILL NOT PROHIBIT BEGAY FROM ALLEGING GOVERNMENT MISCONDUCT.

The United States asks that the Court preclude Begay from "introducing any evidence, making any statement, or asking any questions regarding allegations of government misconduct or constitutional violations."  First MIL at 1.  The United States does not elaborate what Begay might allege, but rather asserts that any such allegations' prejudicial effect will substantially outweigh their probative value.  See First MIL at 1.  The United States further asserts that such allegations "would run the risk of creating mini-trials about issues which are questions of law that the jury should and will be wholly unaware of, absent Defendant raising them."  First MIL at 1. Begay requests that the Court reserve ruling on the United States' request.  See First MIL Response at 1.

As discussed supra in Part V, "the movant should identify the particular evidence at issue and articulate with specificity the arguments supporting the position that the particular evidence is inadmissible on any relevant ground."  United States v. Cline, 188 F. Supp. 2d at 1292.  "A court is well within its discretion to deny a motion in limine that fails to identify the evidence with particularity or to present arguments with specificity."  United States v. Cline, 188 F. Supp. 2d at

1292.  The Court declines to issue a categorical prohibition against any allegations of government misconduct.  The parties have not informed the Court what allegations may come up at trial.  Should Begay wish to present such evidence, he should bring it to the Court's attention before introducing it at trial in front of the jury.

**VIII.  THE COURT DENIES UNITED STATES' REQUEST TO EXCLUDE INFORMATION THAT ONLY BEGAY KNOW, BECAUSE THE UNITED STATES DOES NOT SUFFICIENTLY EXPLAIN ITS REQUEST.**

The United States requests that the Court prohibit Begay from "introducing any evidence, making any statement, or asking any questions regarding any information or facts which could only otherwise come to the jury's attention through the sworn testimony of Defendant, unless Defendant's counsel informs the Court that Defendant will, in fact, testify." First MIL at 2-3.  The United States does not cite any authority for this request.  See First MIL at 2-3.  Begay asks that the Court reserve its ruling on this request.  See First MIL Response at 1.  The Court will deny the United States' request, as have two other district judges in the District of New Mexico faced with identical requests from the United States Attorney's Office.  See United States v. Johnson, No. CR 18-2665 JAP, 2020 WL 406370, at *4 (D.N.M. Jan. 24, 2020)(Parker, J.); United States v. Coriz, No. CR 17-1105 JCH, 2019 WL 2076791, at *2 (D.N.M. May 10, 2019)(Herrera, J.).  The Court can address the United States' concerns at trial unless the United States can identify more specifically the evidence that it wishes to exclude and the reasons for its exclusion.  The Court suspects that the United States seeks to prevent Begay from eliciting his own exculpatory statements from the United States' witnesses, but the Court cannot conclude with certainty from the First MIL that this is the United States' objective.  A party-opponent's statements are not hearsay.  See Fed. R. Evid. 801(d)(2)(A).  Accordingly, Begay is unable to elicit his own

- 91 -

exculpatory statements from law enforcement.  See, e.g., United States v. Gossett, 877 F.2d 901, 906 (11th Cir. 1989)("The testimony was not admissible under Rule 801(d)(2) because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants.").

IX.    **THE COURT DENIES THE UNITED STATES' REQUEST TO PROHIBIT BEGAY FROM IMPEACHING THE UNITED STATES' WITNESSES WITH EVIDENCE OF PRIOR ADMINISTRATIVE DISCIPLINE, BECAUSE THE UNITED STATES DOES NOT IDENTIFY THE EVIDENCE IT WISHES TO EXCLUDE.**

The United States asks that the Court prohibit Begay from "engaging in any attempt to impeach any witness with prior administrative disciplinary findings unless and until the Court has an opportunity to review such evidence to determine its admissibility."  First MIL at 3 (citing Fed. R. Evid. 608(b)).  The United States asks that Begay approach the bench "before delving into such evidence, thereby allowing the Court to make the appropriate determination on admissibility."  First MIL at 3.  Begay asks that the Court reserve its ruling on this request.  See First MIL Response at 1.  As with the United States' request regarding government misconduct, rules 401, 403, and 608 and the rules governing hearsay will determine an evidentiary category's admissibility.  The Court will deny the United States' request, as have two other district judges in the District of New Mexico faced with identical requests from the United States Attorney's Office.  See United States v. Johnson, 2020 WL 406370, at *4; United States v. Coriz, WL 2076791, at *2.  The Court can address the United States' concerns at trial unless the United States can identify more specifically the evidence that it wishes to exclude and the reasons for its exclusion.  Nonetheless, the Court provides background information on rule 608 that may inform Begay's use of administrative discipline to impeach the United States' witnesses, and the United States' rule 608 objections in

the future.

"Rule 608 of the Federal Rules of Evidence provides certain mechanisms for attacking witnesses' character for truthfulness or untruthfulness." Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 5476882, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.).  See United States v. Huerta-Rodriguez, No. CR 09-3206 JB, 2010 WL 3834061, at *7 (D.N.M. Aug. 12, 2010)(Browning, J.)(same).  In the criminal context, the Tenth Circuit has stated that "'defense counsel should ordinarily be given wide latitude when cross examining a witness about credibility or bias.'"  United States v. Rosario Fuentez, 231 F.3d 700, 704 (10th Cir. 2000)(alteration omitted)(quoting United States v. DeSoto, 950 F.2d 626, 629 (10th Cir. 1991)).  Nevertheless, "[o]ne key aspect of this rule is that its application is explicitly within the discretion of the district court."  Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1114 (10th Cir. 2001).  See United States v. Rosario Fuentez, 231 F.3d at 704 (10th Cir. 2000)("The trial court . . . retains discretion to reasonably limit cross-examination.")(internal quotations omitted)(quoting United States v. DeSoto, 950 F.3d at 629).

Rule 608(a) states:

A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character.  But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a).  The truthfulness or untruthfulness of a witness may be attacked by opinion or reputation evidence without ever proffering evidence of a good character for truthfulness.  See United States v. Holt, 486 F.3d 997, 1002 (7th Cir. 2007)(noting that, while it is within the trial court's discretion to prohibit cross-examination of a police officer as to whether he had been

suspended to call into question his credibility, the plaintiff "could have used Rule 608(a) and called

a member of the department to testify directly about his opinions or reputation of [the credibility

of the officer]").   To establish a proper foundation for the opinion or reputation testimony, a

witness must show: "such acquaintance with the person under attack, the community in which he

has lived and the circles in which he has moved, as to speak with authority of the terms in which

generally he is regarded."   United States v. Ruiz-Castro, 92 F.3d 1519, 1529 (10th Cir. 1996),

overruled on other grounds by United States v. Flowers, 464 F.3d 1127 (10th Cir. 2006)(quoting

United States v. Bedonie, 913 F.2d 782, 802 (10th Cir. 1990)).

Rule 608 was amended in 2003 "to clarify that the absolute prohibition on extrinsic

evidence applies only when the sole reason for proffering that evidence is to attack or support the

witness' character for truthfulness," and not "to bar extrinsic evidence for bias, competency and

contradiction impeachment." Fed. R. Evid. 608 advisory committee note to 2003 amendment. The

rule precluding the

> admission of extrinsic evidence of specific instances of conduct of the witness when
> offered for the purpose of attacking credibility . . . does not apply, however, when
> extrinsic evidence is used to show that a statement made by a defendant on direct
> examination is false, even if the statement is about a collateral issue.

United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)(citing 27 Charles A. Wright &

Victor J. Gold, Fed. Practice and Procedure: Evidence § 5096, at 546-47 (1990)).  This doctrine,

"known as 'specific contradiction,'" allows such impeachment "even if the evidence elicited . . .

ordinarily might be collateral or otherwise inadmissible."   United States v. Crockett, 435 F.3d

at 1313.  See United States v. Cerno, 529 F.3d 926, 944 (10th Cir. 2008)("If there is evidence that

specifically contradicts a witness's testimony, impeachment evidence is admissible to demonstrate

that the witness lacks credibility and has a propensity for lying.").

- 94 -

It is generally true that "a party may inquire into specific instances of conduct by extrinsic evidence only on cross-examination of a witness in challenging the truthfulness of his testimony." See Bennett v. Longacre, 774 F.2d 1024, 1027 (10th Cir. 1985). Where a party has already attacked a witness' credibility by cross-examination on specific instances of conduct and the witness made a false statement on the stand, however, the party may provide extrinsic evidence to impeach that witness on re-direct or during a later direct examination. See United States v. Embry, 452 F. App'x 826, 835 (10th Cir. 2011)(unpublished)(noting that "Rule 608(b)(1) . . . allows impeachment testimony . . . on direct or redirect examination . . . where a party already has attacked the credibility of a witness by referring to specific instances of conduct"). When a witness makes a false statement while providing testimony, the opposing party is allowed to prove that lie by presenting rebuttal witnesses. See United States v. Crockett, 435 F.3d at 1313 ("[W]hen a defendant makes a false statement during direct testimony, the prosecution is allowed to prove, either through cross-examination or by rebuttal witnesses, that the defendant lied as to that fact.").

It is "permissible impeachment to expose a witness's bias." United States v. Baldridge, 559 F.3d 1126, 1135 (10th Cir. 2009)(citing United States v. Abel, 469 U.S. 45, 51 (1984)). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. at 52. Thus, because bias is never collateral, "it is permissible to [prove bias] by extrinsic evidence." Montoya v. City of Albuquerque, No. CIV 03-0261 JB/RHS, 2004 WL 3426435, at *4 (D.N.M. May 18, 2004)(Browning, J.). The Tenth Circuit describes bias, based on its definition at common law, as "the relationship between a witness and a party which might cause the witness to slant his testimony for or against the party."

- 95 -

United States v. Baldridge, 559 F.3d at 1135 (citing United States v. Abel, 469 U.S. at 52).

Accordingly, categorical exclusion of all prior administrative discipline is unlikely.  Should any

such impeachment evidence arise, the United States will have to address each instance's

admissibility as impeachment evidence.

**X.    THE COURT DENIES THE UNITED STATES' REQUEST THAT THE COURT PROHIBIT BEGAY FROM DISCUSSING HIS HEALTH, BECAUSE THE UNITED STATES DOES NOT SPECIFY ANY HEALTH ISSUES OR THE GROUNDS FOR THEIR EXCLUSION.**

The United States asks that the Court prohibit Begay from "introducing any evidence,

making any statement, or asking any questions regarding Defendant's mental or physical health,

including, without limitation, past or current diseases, traumas, illnesses, attacks, and medical or

psychological conditions."  First MIL at 3.  The United States does not identify any specific issues

that it expects Begay to discuss at trial and does not offer any rationale for its request beyond citing

rules 401, 402, and 403.  See First MIL at 3.  Begay asks that the Court reserve its ruling on this

request.  See First MIL Response at 1.  The Court will deny the United States request for a

categorical exclusion, because the United States does not identify any specific issues.  The

Honorable Judith Herrera, United States District Judge for the United States District Court for the

District of New Mexico, reached the same conclusion when faced with an identical request from

the United States Attorney's Office.  See United States v. Coriz, 2019 WL 2076791, at *2.  The

Court can address the United States' concerns at before trial if the United States can tell the Court

what the issue is, and identify more specifically the evidence that it wishes to exclude and the

reasons for its exclusion.  The Court notes, however, that  evidence of Begay's health may be

unfairly prejudicial if it would likely provoke an emotional response from the jury or would

otherwise tend to adversely affect the jury's attitude toward Begay.  See United States v.

- 96 -

Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999).

      **IT IS ORDERED** that: (i) United States' First Motion *in Limine*, filed January 11, 2019

(Doc. 172), is granted in part and denied in part; (ii) United States' Motion for a *Lafler-Frye*

Hearing, filed January 11, 2019 (Doc. 173), is granted; (iii) the United States' Sealed Motion *in*

*Limine* to Exclude Evidence of the Victims' Sexual Behavior and Predispositions, filed January

11, 2019 (Doc. 174), is granted; (iv) the United States' Motion *in Limine* to Prohibit Discussion of

Sentencing or Punishment at Trial, filed August 26, 2019 (Doc. 189), is granted; (v) the United

States' Motion *in Limine* for Pre-trial Determination of Indian Country Status, filed August 26,

2019 (Doc. 190), is granted; (vi) the United States' Sealed Motion to Admit Evidence Pursuant to

Rules 413, 414, and 404(b), filed August 26, 2019 (Doc. 192), is granted; (vii) United States'

Motion to Exclude Expert Testimony at Trial, filed February 14, 2020 (Doc. 218), is granted in

part and denied in part; and (viii) Defendant's Sealed Motion *in Limine* to Exclude Evidence

Regarding Jail Calls, filed March 31, 2020 (Doc. 229), is denied.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Novaline D. Wilson
Kyle T. Nayback
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Alexandra W. Jones
Jones Law Firm, LLC
Albuquerque, New Mexico

 --and--

Samuel L. Winder
Romero & Winder, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendant*